IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| BOA VIDA HEALTHCARE, LLC, et al., | )<br>)<br>) |
| Plaintiffs, | )  CIVIL ACTION NO.:<br>) |
| v. | )  7:19-cv-00840-GMB<br>) |
| PICKENS COUNTY HEALTH CARE AUTHORITY, | )  OPPOSED<br>)<br>) |
| Defendant. | ) |

**DEFENDANT'S MOTION TO EXCLUDE
DR. ROBERT MCLEOD AS AN EXPERT WITNESS**

Defendant Pickens County Health Care Authority d/b/a Pickens County Medical Center ("the Hospital" or "PCMC"), pursuant to Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, hereby move to exclude Plaintiffs' proffered expert, Dr. Robert McLeod, as an expert witness.

McLeod's opinions are speculative and rely on unreasonable and unsupported projections provided to him by the Plaintiffs which McLeod did not independently analyze or verify; his opinions ignore the true facts in favor of fiction; and his report contains numerous errors and inconsistencies, all of which render McLeod's opinions unreliable and unhelpful to the trier of fact. In further support of this motion, Defendant shows as follows.

**Introduction**

Plaintiffs have designated Robert McLeod, Ph.D.[1] to testify as an expert witness with respect to economic damages claimed by the Plaintiffs in this case. All expert testimony, including the non-scientific economic type of testimony proffered by Plaintiffs, must meet the requirements of Fed. R. Evid. 702 and *Daubert* and its progeny. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (holding that the objective is to ensure the reliability and relevancy of expert testimony and that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.")

The party offering the expert testimony carries the burden of demonstrating by a preponderance of the evidence that the expert is qualified and that his testimony is reliable and helpful to the trier of fact. *See, e.g., Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

Pursuant to Rule 702, qualified experts may testify if, among other things, "the testimony is based on sufficient facts or data"; "the testimony is the product of reliable principles and methods; and" "the expert has reliably applied the principles and methods to the facts of the case." *Hughes*, 766 F.3d

---

[1] McLeod is a professor at the University of Alabama and the co-founder of a company where he is the head of litigation support services. He has testified in approximately 200 depositions and 40-50 trials. (McLeod Dep. at 12:6-16).

at 1328 (quoting Fed. R. Evid. 702(b-d)). Under these standards, and those developed following *Daubert*, District Courts "act as gatekeepers, excluding evidence unless it is reliable and relevant." *Hughes*, 766 F.3d at 1328.

The gatekeeping function requires an "exacting inquiry." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Opinions are excluded where they lack reliable analysis. *See, e.g., Hughes*, 766 F.3d at 1328; *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *7 (N.D. Ala. Nov. 16, 2016) (excluding two economic experts). Courts routinely strike expert testimony that is speculative and conjectural. *See, e.g., General Electric v. Joiner*, 522 U.S. 136, 140 (1997) (upholding district court decision to exclude expert testimony on the ground that it "did not rise above 'subjective belief or unsupported speculation'").

### McLeod's Opinions

McLeod was hired by Plaintiffs to provide opinions regarding damages claimed by Plaintiffs relating to Defendant's termination of the Management Agreement and two ancillary agreements. McLeod prepared a report[2] which estimates that Plaintiffs' past damages through February 2020 total $1,347,433 ($151,310 in unreimbursed expenses, $362,500 in fees under the Management Agreement and $833,623 in fees under the Billing and Services Agreement

---

[2] The Deposition of Robert McLeod ("McLeod Dep."), and pertinent exhibits thereto, is attached as Exhibit I. A copy of McLeod's Expert Report ("Report") is attached as Exhibit 1 to the deposition.

("BSA")). McLeod also projected future lost profits through December 2038, at a present value of $25,618,532 (including $2,314.654 in fees under the Management Agreement, $9,467,986 in fees under the BSA, and $12,488,459 for an incentive bonus under the Management Agreement).

### I.   McLeod's Opinions are Not Based on Reliable Principles and Methodology.

First, McLeod's report falsely attributes financial projections for the years 2019 and 2020 to the Strategic, Financial, and Operational Assessment performed by Stroudwater Associates ("Stroudwater Report") dated January 23, 2019. (Report at 4-5, n. 6, 7.). Stroudwater Associates is a healthcare advisory firm that performed an assessment of the Hospital and made recommendations for operational improvements, but did not make any financial projections associated therewith.[3] (See McLeod Dep. Exhibit 3).

McLeod stated in his Report that he computed estimated Net Patient Revenue for 2019 and 2020 "as per the proforma statements" found in the Stroudwater Report, even though the Stroudwater Report does not include proforma statements. (Report at ¶14, n. 6). McLeod also stated that Table 1 is from the Stroudwater Report. (Report at p. 5, n.7). But, the Stroudwater Report

---

[3] By way of example, the Stroudwater Report recommended that the Hospital partner with existing medical staff to identify medical and surgical specialty-care needs and service development opportunities, to explore the establishment of a pain management clinic, and to determine the feasibility of upgrading its MRI and CT machines, among other things. (See McLeod Dep. Exhibit 3).

4

only included actual financial information for 2015 through 2018 and did not contain projections for 2019 and 2020.  (See McLeod Dep. Exhibit 3, p. 8).

McLeod admitted in his deposition that the projections for 2019 and 2020 were actually provided to him by Plaintiff Boa Vida and did not come from Stroudwater as his Report stated.  (McLeod Dep. at 22:19-23; 23:1-10). Plaintiff provided the projections in a spreadsheet titled "Pickens County Medical Center Financial Trending Report 2015 through 2024." (McLeod Dep. at 2:3-5 and Exh. 4).  However, McLeod does not know who at Boa Vida prepared these projections.  (McLeod Dep. at 26:22-23; 27:1-7).  McLeod also does not know how Boa Vida came up with its projections, stating "I have not looked at any supporting documentation. Just from conversations with them, that was their expectation."  (McLeod Dep. at 67:5-10).

Plaintiffs' projections include an 8% increase in gross patient revenue every year beginning in 2019 through 2024, and a positive operating margin starting in 2019. (See McLeod Dep. Exhibit 4).  Notwithstanding the lack of supporting documentation from the Plaintiffs for these revenue projections, McLeod did not perform any independent verification of the Plaintiffs' projections or any analysis of his own to determine whether the projections are reasonable. (See McLeod Dep. at 29:10-14; 30-31, 37-38, 57, 64-66).  Rather, McLeod relied "upon my conversations with the representatives of Boa Vida." (Id. at 38:1-4).  When asked if he had any objective data to support the

reasonableness of the projections, McLeod stated: "I've seen no documentation on that particular issue. I was relying upon representations of Boa Vida reps." (Id. at 57:4-9). He also testified that "Going forward, the revenue side, I did not independently verify that." (Id. at 64:5-6).[4] When asked how he substantiated the revenue increases projected by Boa Vida, he stated "once again, I'm relying upon management's expectations for those particular numbers." (McLeod Dep at 65:21-23; 66:2-4).

For the years 2025 through 2039, McLeod built upon Plaintiffs' unsubstantiated projections through 2024 and applied a continued revenue growth rate of 2.96% per year based on the average annual increase in medical care expenditures he obtained from the U.S. Department of Labor, Bureau of Labor Statistics. (McLeod Dep. at 31-32). In other words, McLeod utilized statistics for increases in medical care costs as a proxy for revenues that the Hospital could expect to receive. (Id. at 66:15-19). These statistics are for costs of medical care generally and are not specific to rural hospitals like PCMC. (Id. at 79:14-18). McLeod provided no substantiation for how increases in nationwide costs of medical care translate to increases in revenue for a rural hospital in Alabama. He could not name a single rural hospital in Alabama that enjoys a 2.96% annual increase in revenue. (Id. at 37:6-10).

---

[4] McLeod stated that he reviewed the recommendations in the Stroudwater Report, but he admits that Stroudwater did not make any financial projections associated with those recommendations. (McLeod Dep. at 30:6-10; 65:10-13).

McLeod has never performed an economic analysis on a rural hospital. (McLeod Dep. at 20:20-23). In forming his opinions in this case, McLeod did not consider PCMC's historical revenues, which McLeod testified "had been fairly static over the last four years." (McLeod Dep. 29:10-16). As shown in the Stroudwater Report, PCMC functioned at a negative operating margin for each year from 2015-2018. (McLeod Dep. Exhibit 3, p. 8).

McLeod testified that in providing an estimation of lost profits or earnings, he would normally look at comparable businesses. (McLeod Dep. at 111:18-21). However, in this case, McLeod did not look at or compare revenues or financial information from other rural hospitals. (Id. at 18: 3-16; 69:17-21). In fact, he did not even try to obtain historical revenues from any comparable rural hospital. (Id. at 70:3-6). McLeod has not looked at the average percentage revenue increase from year to year for any rural hospital in Alabama to confirm if Plaintiffs' projections are reasonable. (Id. at 70:7-10).

McLeod also did not consider market trends or industry trends, even though he admitted that he would normally do so. (McLeod Dep. at 111:22-23; 112:1-5). He did not consider the fact that 170 rural hospitals in the United States have closed since 2005, or that 85 to 90% of rural hospitals in Alabama have a negative operating margin. (McLeod Dep. at 89-90). McLeod testified that for a business valuation he would typically talk to the current owner or

7

operator of the business; however, he did not speak with anyone affiliated with the Hospital in forming his opinions in this case. (Id. at 19:19-22; 112:6-18).

In forming his opinions, McLeod did not utilize any accepted method of proving lost profits in this Circuit and, therefore, his opinions fail to satisfy the requirements of Rule 702.

> "There are two generally recognized methods of proving lost profits: (1) the before and after theory; and (2) the yardstick test. The before and after theory compares the plaintiff's profit record prior to the violation with that subsequent to it. The before and after theory is not easily adaptable to a plaintiff who is driven out of business before he is able to compile an earnings record sufficient to allow estimation of lost profits. Therefore, the yardstick test is sometimes employed. It consists of a study of the profits of business operations that are closely comparable to the plaintiff's. Although allowances can be made for differences between the firms, the business used as a standard must be as nearly identical to the plaintiff's as possible."

*Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974). *See also G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1538–39 (11th Cir. 1985) (discussing the two recognized methods of proving lost profits). McLeod did not attempt to conduct any comparison of revenues, nor did he attempt to analyze the profits of other rural hospitals in Alabama as a comparitor.

Instead, McLeod relied upon the unsubstantiated and self-serving opinions of the Plaintiff as to projected future revenues. "Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not." *Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985). Moreover, it has been recognized that internal projections of a plaintiff "represent

hopes rather than the results of scientific analysis." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005).

This Court has acknowledged that an expert witness cannot blindly rely upon opinions of the party hiring him, rather the expert must perform his own analysis. In *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1240 (N.D. Ala. 2000), aff'd, 284 F.3d 1237 (11th Cir. 2002), this Court struck an expert witness who failed to conduct his own independent analysis and instead relied upon opinions expressed by plaintiffs' counsel, stating "[a]s an expert, Gunther should have confirmed those representations through his own analyses."

Likewise, numerous other federal courts have held that where an expert fails to conduct any independent research to substantiate information provided to him in forming his opinions, that expert's report and testimony should be excluded. *See Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000) (excluding expert who relied on the plaintiffs' compilations of data, without seeking to verify the information provided to him, "which gives rise to a 'common-sense skepticism' regarding the expert's evaluation").[5]

---

[5] *See also Contract Packaging, Inc. v. Cent. Garden & Pet Co.*, 2011 WL 13162306, at *6 (N.D. Ga. Mar. 31, 2011) (excluding expert's report and testimony where he relied upon revenue projections he did not create and did not independently verify or analyze); *Victory Records, Inc. v. Virgin Records Am., Inc.*, 2011 WL 382743, *2-3 (N.D. Ill. Feb. 3, 2011) (excluding expert and holding that "an assumption based on the internal projections of the expert's sponsor lacks the reliability demanded by Rule 702"); *ZF Meritor LLC v. Eaton Corp.*, 646 F.Supp.2d 663, 667 (D.Del.2009) (excluding testimony of expert who "did not apply his own assumptions, based upon his expertise, to any financial data in order to project" the party's future performance, but who instead relied on the party's own internal financial projections); *First Premium Servs., Inc. v. Best W. Int'l, Inc.*, 2004 WL 7203535, at

With respect to past damages claimed through February 2020, McLeod again accepted Plaintiffs' representations about what is due to be paid and what expenses should be reimbursed, without any independent evaluation. McLeod has no personal knowledge regarding whether the Hospital received the services and supplies for which Plaintiffs seek to be reimbursed, and he sought no verification thereof. (McLeod Dep. at 71:21-23; 72:1).

All of McLeod's opinions should be excluded because they are not based on any reliable methodology and rely solely on projections or representations of Plaintiffs without any independent analysis or substantiation thereof.

## II. McLeod's Opinions Are Not Based on Sufficient Facts or Data and Ignore Economic Reality.

McLeod's opinions also fail to satisfy Rule 702's requirement that testimony is based on sufficient facts or data. In projecting future revenues, McLeod ignores the true facts about the Hospital's financials, which is something an expert cannot do. *See Eleven Line, Inc. v. N. Texas State Soccer*

---

\*3 (S.D. Fla. Jan. 8, 2004) (holding that expert who merely accepted projections as true based on the opinions of others without any independent examination rested on unreliable methods); *JRL Enters., Inc. v. Procorp Assocs., Inc.*, 2003 WL 21284020, at \*7-8 (E.D. La. June 3, 2003) (finding expert opinion unreliable when expert performed "no independent analysis of the numbers given him" by the plaintiff); *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, at \*7-8 (E.D. Pa. Apr. 15, 1998) (finding insufficient factual basis for expert's opinion when expert knew little about the industry, did not perform any market surveys or studies, did not conduct or review any research on like businesses, and did not attempt to verify information provided to him by the plaintiff); *Otis v. Doctor's Associates, Inc.*, 1998 WL 673595 (N.D.Ill. 1998) (excluding expert opinion on claim for lost profits where expert did not perform any independent analysis of the reliability or accuracy of the projections he relied upon).

*Ass'n, Inc.*, 213 F.3d 198, 209 (5th Cir. 2000) ("Damage assumptions that find no support in the actual facts of the case cannot support a verdict.").

The District Court as gatekeeper has "an important role designed to extract evidence tainted by farce or fiction. Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (affirming exclusion of expert testimony).

A comparison of the Hospital's actual financial performance in 2019 and 2020 with McLeod's projections for those years illustrates how unreliable McLeod's opinions are. The Hospital's fiscal year for 2019 ended on September 30, 2019, approximately six months after it terminated the agreements with Plaintiffs. McLeod projected $13,426,000 in net patient revenue for FYE 2019. (Report at 5). However, the actual net patient revenue for FYE 2019 was only $8,670,000. (See Exhibit B to the Declaration of Shawn McDaniel, attached hereto as Exhibit II). Thus, McLeod's projections overstate the actual revenue in 2019 by $4,756,000 – or by about 35%. McLeod could not explain how Boa Vida would have increased the revenue of the Hospital by $5 million in the last six months of FY2019 if it had continued to manage the Hospital. (McLeod Dep. at 41-43). McLeod could not testify as to the projected impact or dollar amount of increased revenue for any program that Boa Vida might have implemented during that time period. (Id).

Similarly, as of March 2020, the Hospital's year-to-date patient revenues for FY2020 were down $4 million from the prior year. (See Exhibit C to McDaniel Decl.). McLeod wrongly projected an 8% increase in revenues for 2020 on top of the 8% increase he had erroneously projected for 2019.

McLeod's opinions also fail to take into account that the Hospital closed on March 6, 2020, thus ignoring the reality that future patient revenues will be $0. McLeod disregards the actual financial situation and, instead, relies upon a fictitious set of facts, which constitutes impermissible speculation.

Lost profits must be established with "reasonable certainty." *See NTA Graphics S., Inc. v. Axiom Impressions, LLC*, 413 F. Supp. 3d 1164, 1176 (N.D. Ala. 2019). "[T]o the extent lost profits are speculative, conjectural, or remote, they are disallowed." *Id.* at 1176. It is nearly impossible to forecast lost profits for a period of 20 years with any reasonable certainty. *See, e.g., Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 597 (W.D. Va. 2000) ("[Plaintiff's] future lost profits would be ascertainable only by speculation; the amount of such damages, over a twenty-year period, is unprovable. No reasonable jury could award [Plaintiff] future lost profits for such an arbitrarily long damages period.").

McLeod's opinions are not based on true facts or data, but instead rely upon fiction, making his opinions speculative and unreliable. Therefore, Plaintiffs cannot satisfy the requirements of Rule 702 or *Daubert*.

### III. Errors in McLeod's Report Render His Opinions Unreliable and Unhelpful.

McLeod also makes significant errors that render his testimony unreliable and unhelpful. *See Raskin v. The Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997) (expert testimony that contains "elementary" error is not helpful). Indeed, "expert testimony should be excluded if it contains internal inconsistencies." *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1293 (M.D. Ala. 2001).

McLeod's report contains several errors and inconsistencies that he cannot explain. McLeod could not defend why he projected sales tax revenue for 2021 at $900,000 less than 2020. (McLeod Dep. at 45-46). He tried to brush it off by stating that this particular line item did not go into his calculation of damages, "so, it doesn't matter really what it is." (Id. at 45:20-23). However, when pressed about whether that number would factor into the operating margin, he agreed that it would and decided it was "a computational error." (Id. at 46:1-5).

Similarly, when asked why he projected a variation in Medicaid DSH (Disproportionate Share Hospital) payments from $590,000 in 2020, to $148,000 in 2021, back to $590,000 in 2022, McLeod simply chalked it up to "the same computational error that was in the sales tax revenue." (McLeod Dep. at 46:6-14). McLeod admittedly does not know how Medicaid DSH

13

payments are determined or whether they are subject to change. (Id. at 46:18-23; 47:1). McLeod testified that these "incorrect figures" for sales tax and Medicaid DSH payments also infected his projections regarding net operating margin. (Id. at 57:14-23; 58:1-8).

When asked why he projected supply expenses to decrease each year, while the number of patients was projected to increase, McLeod's response was that "these operating expenses had nothing to do with my computations. So, I didn't spend a lot of time looking at these." (McLeod Dep. at 48:11-20). McLeod stated that the important calculations are those "which would depend on the computation of something called EBITDA, which is a measure that determines whether or not there's going to be an incentive bonus." (Id. at 49:7-13). Then, McLeod admitted that the expenses actually are important because they are factored into calculating EBITDA. (Id. at 49:13-17).

The Management Agreement provides for an incentive bonus of 10% of Net Revenue if the Hospital has a positive EBITDA in any given quarter.[6] McLeod opined that EBITDA would be positive beginning in fiscal year 2022, and that Plaintiffs are entitled to an incentive bonus estimated at $48,345,876, reduced to a present value of $12,488.459. (Report at ¶22). However, McLeod admitted in his deposition that <u>his EBITDA calculations are wrong</u>, stating:

---

[6] To achieve the incentive bonus, the agreement also requires that accounts payable more than 120 days old not be greater than fifty percent of the total accounts payable. (Doc. 2-1 at ¶7.3). However, McLeod did not even consider this provision when opining that Plaintiffs would be entitled to the incentive bonus starting in 2022. (McLeod Dep. at 81-82, 84).

14

"the EBITDA calculation is not correct is the simplest way to put it." (See McLeod Dep. at 84-85, 89:6-7). These EBITDA calculations performed by McLeod, which he utilized to project a multi-million dollar incentive bonus for the Plaintiffs over a period of 20 years, are by his own admission "<u>not correct</u>". Such projections are admittedly not reliable.

McLeod also used an incorrect starting date for calculating fees due under the Management Agreement (at a rate of $25,000 per month). McLeod's calculations run from December 17, 2018, through the end of February 2020, and he opines that Boa Vida is entitled to collect $362,500 for that time period. (See Report at ¶13). However, all parties have agreed that the effective starting date for the Management Agreement is February 1, 2019, not December 17, 2018, rendering McLeod's opinion erroneously high.

## Conclusion

McLeod's opinions are speculative, without sufficient factual basis, methodologically flawed, and internally inconsistent. For these reasons, Plaintiffs cannot demonstrate that McLeod's opinions are relevant and reliable as is required for admission of expert testimony pursuant to Rule 702 and *Daubert*. Accordingly, McLeod's report and his testimony should be excluded.

Respectfully submitted,

s/ *James F. Henry*
James F. Henry (ASB-2274-H67J)

s/ *Diane B. Maughan*
Diane B. Maughan (ASB-4912-U53D)

Attorneys for Pickens County Health Care Authority d/b/a Pickens County Medical Center

OF COUNSEL:
CABANISS, JOHNSTON, GARDNER,
  DUMAS & O'NEAL LLP
2001 Park Place North, Suite 700
Birmingham, Alabama  35203
Telephone: (205) 716-5200
Facsimile: (205) 716-5389
jfh@cabaniss.com
dbm@cabaniss.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered users of the system who have appeared in this case, including:

Wilson F. Green
FLEENOR & GREEN, LLP
1657 McFarland Blvd. N. Ste. G2A
Tuscaloosa, AL 35406

This 28th day of August, 2020.

s/ *Diane B. Maughan*
OF COUNSEL

16