FILED

2020 Aug-28  PM 01:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# DEFENDANT'S EXHIBIT I

## Deposition of Robert McLeod, Ph.D.



Deposition of:

**Robert W. McLeod , PhD**

*July 27, 2020*

In the Matter of:

**Boa Vida Healthcare, LLC Vs. Pickens County Health Care Authority**

Veritext Legal Solutions
877.373.3660 | calendar-al@veritext.com | 800.808.4958

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

CASE NUMBER: 7:19-CV-00840-GMB

BOA VIDA HEALTHCARE, LLC, an Indiana limited liability company, and BOA VIDA HOSPITAL OF ABERDEEN, MS, LLC, d/b/a MONROE REGIONAL HOSPITAL,

Plaintiff,

vs.

PICKENS COUNTY HEALTH CARE AUTHORITY, an Alabama non-profit corporation,

Defendant.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the virtual deposition of ROBERT W. MCLEOD, PhD, may be taken before Michelle L. Parvin, Commissioner, at 2316 University Boulevard,

Suite 201, Tuscaloosa, Alabama, 35401, on the 27th day of July, 2020.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of the deposition by the Commissioner is waived.

INDEX

EXAMINATION BY: PAGE NUMBER:

Ms. Maughan 8

DEFENDANT'S EXHIBITS:

Exhibit 1 9
Expert Report of Robert McLeod, PH.D.

Exhibit 2 13
Deposition and Trial Testimony of Robert W. McLeod

Exhibit 3 23
Stroudwater report

Exhibit 4 26
Pickens County Medical Center Financial Trending Report 2015-2024

Exhibit 5 59
Email

Exhibit 6 98
Complaint

Exhibit 7 98
Complaint

Exhibit 8 100

Management Agreement

Exhibit 9 101
Billing and Services Agreement

Exhibit 10 101
Services Agreement

Exhibit 11 102
Letter dated March 22, 2019

Exhibit 12 103
Pickens County Health Care Authority Financial Statements and Supplementary Information September 30, 2017, and 2016

Exhibit 13 104
Boa Vida Healthcare and Monroe Regional Hospital Loss from Pickens Engagement 2/4/19-3/22/19

Exhibit 14 105
American Express bill

Exhibit 15 107
Pickens County Medical Center 2/25-3/22/19 Total Daily AR Cash Receipts

Exhibit 16 107
Invoice

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

CASE NUMBER: 7:19-CV-00840-GMB

BOA VIDA HEALTHCARE, LLC, an Indiana limited liability company, and BOA VIDA HOSPITAL OF ABERDEEN, MS, LLC, d/b/a MONROE REGIONAL HOSPITAL,

Plaintiffs,

vs.

PICKENS COUNTY HEALTH CARE AUTHORITY, an Alabama non-profit corporation,

Defendant.

BEFORE:

Michelle L. Parvin, Certified Court Reporter

APPEARANCES:

FLEENOR & GREEN, LLP, by Mr. Wilson F. Green, 1657 McFarland Boulevard

Page 6

North, Suite G2A, Tuscaloosa, Alabama, 35406, appearing on behalf of the Plaintiffs.

CABANISS JOHNSTON GARDNER DUMAS & O'NEAL, LLP, by Ms. Diane Maughan, 2001 Park Place North, Suite 700, Birmingham, Alabama, 35203, appearing on behalf of the Defendant.

Page 7

I, Michelle L. Parvin, a Court Reporter of Birmingham, Alabama, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure of the United States District Court, and the foregoing stipulation of counsel, there came before me at 2316 University Boulevard, Suite 201, Tuscaloosa, Alabama, 35401, beginning at 10:07 a.m., ROBERT W. MCLEOD, PhD, witness in the above cause, for oral examination, whereupon the following proceedings were had:

ROBERT W. MCLEOD, PhD, being first duly sworn, was examined and testified as follows:

THE COURT REPORTER: Okay. Usual stipulations?

MS. MAUGHAN: That's fine.

MR. GREEN: That's fine.

Page 8

EXAMINATION BY MS. MAUGHAN:

Q. Dr. McLeod, I'm Diane Maughan. I'm an attorney representing Pickens County Health Care Authority in this matter that was filed by Boa Vida Healthcare, LLC, and Boa Vida Hospital of Aberdeen, Mississippi, LLC. How are you today?

A. Just fine. Thank you.

Q. Good. I understand that you have been retained by the plaintiff to provide expert testimony in this matter; is that true?

A. That's correct.

Q. I'm going to attempt to pull up your expert report here. We are kind of newbies on Exhibit Share and Zoom. Can you see that?

A. Yes, I can.

(Whereupon, a discussion was held off the record.)

Page 9

(Whereupon, Defendant's Exhibit 1 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN)Okay. So, I am showing you what's been marked as Exhibit Number 1. Is this the report that you prepared in this matter?

A. Yes, it appears to be. Now, I can also pull it up on my end so I've got the exhibit file, so I've got it on my computer as well.

Q. Okay.

(Whereupon, a discussion was held off the record.)

Q. (BY MS. MAUGHAN) Okay. Dr. McLeod, your expert report has a CV attached to it as Appendix A; is that correct?

A. That's correct.

Q. Is this CV current and up to date?

A. To the best of my recollection, it is, yes.
Q. Okay. I'm not going to go through and ask you about your entire background since we have it in the report here.
Can you tell me what Financial Economic Consulting Group, Inc., is?
A. Well, it's a consulting firm that I cofounded about maybe thirty-five years ago. We do a number of different things within the firm. The firm is a registered investment advisory firm. We do private wealth management and financial planning for our clients. We also do business valuations. And the fourth area is litigation support.
Q. Okay. And your report states that you are the head of FECG's litigation support services; is that accurate?
A. That's correct.
Q. What percentage of your working time is spent on litigation?
A. At FECG, probably half my time.

Q. Okay. And are you also still teaching at the University of Alabama?
A. Yes, I'm still a full-time professor.
Q. Okay. What percentage of your income is from litigation?
A. That's hard to say because we don't really break it down. But I would say that from FECG, my total income from all sources is about a third of my income, total income.
Q. Okay. And if you spent fifty percent of your time at FECG on litigation, roughly half of that one-third would be litigation income?
A. Well, we just have total income. Just -- we have a modest salary, and then, we distribute profits at the end of the year that come from all sources.
Q. How many depositions have you given?
A. How many?
Q. Yes.

A. I'm sorry. Okay.
Q. How many depositions?
A. Okay. We're talking over each other. So, if you don't mind repeating it one more time for clarity.
Q. Sure. How many depositions have you given?
A. Oh, a couple hundred probably.

(Whereupon, a brief recess was taken.)

Q. (BY MS. MAUGHAN) How many times have you testified at trial?
A. Probably about forty times. Forty to fifty.
Q. Okay. I'm going to go back and try to pull up the list of your testimony and introduce it.

(Whereupon, a discussion was held off the record.)

(Whereupon, Defendant's Exhibit 2 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) So, I'm marking as Exhibit 2 the deposition and trial testimony of Robert W. McLeod 2016 to date. Can you see that?
A. Yes, I can.
Q. Okay. Is this an up-to-date list of all cases in which you've provided testimony since 2016?
A. That's correct.
Q. What percentage of your testimony would you say is given on behalf of plaintiffs?
A. If it's a personal injury case, probably about ninety-five percent. If it's other types of case -- it's case situations, then, it varies. But probably sixty/forty on the plaintiff on the other types of cases.
Q. Okay. Have you ever had your testimony excluded by a court?

Page 14

A. I had part of my testimony excluded in one case. The judge didn't want either of the experts to opine on causality. And so, there was a restriction on the causality side. But no other case that has been upheld in terms of restricting my testimony.
Q. Do you remember the name of the case where the testimony on causality was excluded?
A. It was about fifteen years ago, and I really don't recall. But I do recall the circumstances.
Q. Okay. Do you remember what court that was in?
A. I'm not sure whether it was federal or state, but it was -- it was an Alabama case, I do recall that.
Q. Do you remember the name of the party which you were testifying on behalf of?
A. No.
Q. Do you have any prior relationship with Wilson Green?

Page 15

A. I have worked on cases with him one or two times, and he was a former tenant in an office building that I'm a co-owner.
Q. Okay. What kind of cases have you worked on before with Wilson Green?
A. It seems to me the cases were more of an advisory type situation. I never -- I don't think I ever gave a deposition or testimony, but they were business-related cases.
Q. Did you provide any sort of business valuation in those matters?
A. Not that I recall.
Q. Do you have any prior relationship with anyone associated with Boa Vida Healthcare or Monroe Regional Hospital?
A. No.
Q. When were you first contacted about this case?
A. Probably late last year or early this year. Late 2019 or early 2020.
Q. Okay. I assume you were contacted by Wilson Green?

Page 16

A. That's correct.
Q. And what were you asked to do?
A. Well, after we got a -- what I normally do first of all is do a conflict check to determine if there's any issue that would prevent me from assisting in the case. And then, after that, we discussed the issue that there's an allegation of a termination -- unlawful wrongful termination of a contract and to be able to try to estimate what the impact would be on the plaintiffs in terms of lost revenues or profits associated with the termination of the contract.
Q. What all have you done to prepare to give opinions in this case?
A. I've reviewed some of the financial documents on the Pickens County Medical Center, the Stroudmeyer -- I think it's the right name of it. One second. I always mispronounce it. Stroudwater, I should say, not Stroudmeyer, report. I've looked at documents provided by Boa Vida,

Page 17

records on expenses provided by Boa Vida, information from the U.S. Department of Labor, Bureau of Labor Statistics on the growth in Medicare costs over the last ten years. I've looked at returns on various healthcare enterprises that were similar to Boa Vida. And let's see. That's pretty much what I recall right now. There may have been some other documents I reviewed.
Q. What do you mean by returns on similar healthcare enterprises similar to Boa Vida?
A. Well, since we're looking at the computation of damages that would go into the future, you have to reduce those damages to a present value number. So, you have to have a discount rate. So, my proxy for that discount rate was to look at comparable companies in terms of what kind of returns they were generating and use that as my discount rate. So, it's for present value calculations.
Q. And what kind of companies did

Page 18

you look at for that?
A. They're in my report. Let's see. Universal Health Services. It will be found in Exhibit 1 on Page 6. The footnote on Page 6 is the citation.
Q. So, the footnote references the average return on equity of Universal Health Services and Community Health Systems?
A. That's correct.
Q. So, are those two different entities?
A. Yes, they are.
Q. Okay. Did you look at any financials or other information for other rural hospitals?
A. No, did not.
Q. Have you spoken with anyone about matters at issue in this case?
A. I spoke to Dr. Singh. I've had a conversation with one or two of the Boa Vida executives, either the CFO or another administrator. I think the -- those contacts are of those that are included in the email

Page 19

stream that was provided to you.
Q. How many times did you talk to Dr. Singh or other Boa Vida representatives?
A. Probably three times.
Q. And what kind of information did they tell you during these discussions?
A. In one conversation, there was a spreadsheet that had been produced by Boa Vida that had some projections going from 2019 through 2024. So, we talked about the assumptions that went into the creation of that spreadsheet. Also had conversations concerning the amount of expenses that were incurred either by the Monroe facility or by Boa Vida itself and asked for documentation to support those numbers, which they sent to me. I think those were the major topics of conversation.
Q. Did you talk with anyone from Pickens County Medical Center in preparing your opinions in this case?
A. No.
Q. What do you know about Pickens

Page 20

County Medical Center?
A. It's a small rural hospital.
Q. Do you know how many beds it has?
A. I remember reviewing that in the Stroudwater report. I don't recall offhand.
Q. Do you know what the average daily census at the hospital has been over the last several years?
A. It has not been very good, I know that. It's been fairly low.
Q. And are you aware of the financial condition of the hospital over the past several years?
A. It's not in good financial shape at all.
Q. Are you aware that the Pickens County Medical Center closed in March of this year?
A. Yes.
Q. Have you performed any kind of economic analysis on any rural hospitals?
A. Not what I would define as a rural hospital.

Page 21

Q. Okay. Have you performed an economic analysis on any hospital?
A. Yes, I've done some work on Riverview Medical Center in Gadsden.
Q. What did you do related to the Riverview Medical Center in Gadsden?
A. Basically was involved in a case where there was litigation involving some doctors who had equity interest in the hospital that were suing the hospital management company for what they alleged to be poor management or improper management of the hospital resulting in a loss of value to them.
Q. And did you provide testimony in that case?
A. I think I provided two depositions in that case.
Q. What was the substance of your opinions in that -- in that case?
A. That the value of the doctors' interest in the hospital had been negatively impacted by the lack of action of the

Page 22

hospital management group in trying to keep the hospital competitive in the local market.

Q. Did you perform any sort of projections of revenue for the hospital in that case?

A. Yes, there were projections in that case.

Q. Do you remember what court that case was pending in?

A. I don't recall whether it's federal or state court, but, you know, the -- it was in Alabama and on behalf of the physicians that had an interest in the medical center in Gadsden.

Q. About how long ago was that?

A. I'm going to say probably -- it should be on my list of deposition testimony. It's been within the last four or five years.

Q. Okay. I want to ask you about some specific parts of your report, which is Exhibit 1. Table 1, which is on Page 5 of the report, there's a footnote on the heading of Table 1 that says, Table 1 is from the

Page 23

strategic financial and operational assessment by Stroudwater January 23rd, 2019. Is that the Stroudwater report that you referenced a minute ago?

A. That's correct, with a little qualification. The -- for fiscal years 2015 through '18, that's from the Stroudwater report. And then, the 2019 and '20 was actually from the spreadsheet provided by Boa Vida. So, I guess, technically, that table is based on the Stroudwater report and information from Boa Vida.

Q. Okay. That's what I was going to ask you, was where are the 2019 and 2020 projections in the Stroudwater report, but you're saying those years are not actually in the Stroudwater report, those came from Boa Vida?

A. That's correct.

Q. Okay.

(Whereupon, Defendant's Exhibit 3 was marked for identification and

Page 24

copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) Okay. I'm marking as Exhibit 3 the version of the Stroudwater report that Mr. Green produced that he said he provided to you. Does this look like the report that you reviewed?

A. Let's see. Actually, what I have looks like it was a Power Point presentation.

Q. Okay.

A. And other than that, it looks to be the same. In fact, this may be the same document there.

Q. Okay. Well, for example, the chart we were just talking on is Table 1. On Page 8 of the Stroudwater report, we have fiscal year '15 through '18, which appears to be the same as the numbers that are contained in Table 1 of your report; do you agree?

A. Yes. It should be the same.

Q. Did the version that you reviewed, did it have the draft watermark stamped on the top right corner?

Page 25

A. Not on the cover page, but it does have draft on the subsequent pages.

Q. Okay. Have you spoken with anyone from Stroudwater about this report?

A. No.

Q. Do you know whether the final version of the report is any different than this draft?

A. No, I don't.

Q. Would that be important for you to know in giving your opinions?

A. Well, not necessarily because this is looking at the -- at least for this particular financial summary is based upon what's happened in the past. That shouldn't change. That should be the same numbers.

Q. Is there anything in the Stroudwater report that you relied on other than this financial summary on Page 8?

A. Well, I read the entire report. And just looking at, yeah, the recommendations that were being made in order to help the hospital become viable along with

Page 26

the demographic data that were provided to get a feel for the market area that was served by the hospital, the demographics in terms of particularly the age groups that were served, the types of different services the hospital provided and to whom those services were provided to get just an overall feel from the operations of the hospital at that point in time.

Q. And you feel comfortable using a draft version as opposed to a final version for that?

MR. GREEN: Object to form.

A. Well, in terms of the purpose for which I was using it, yes.

Q. (BY MS. MAUGHAN) Okay.

(Whereupon, Defendant's Exhibit 4 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) I'm going to show you what I've marked as Exhibit 4, which

Page 27

says at the top Pickens County Medical Center Financial Trending Report 2015 through 2024. Are these the financial projections that you obtained from Boa Vida?

A. Yes, that's correct.

Q. Do you know who prepared these?

A. Not the specific person, no.

Q. Did you do any sort of independent analysis to substantiate these numbers?

A. I did check the numbers for accuracy in terms of the assumptions that went into the spreadsheet, and I did actually find, you know, an error or two in there that I corrected in my calculations.

Q. So, you corrected a mathematical error?

A. Yes, in my Table -- let's see. Yeah, in my Table 2. Corrections from this particular Exhibit 4 were incorporated into my Table 2.

Q. What assumptions were made with respect to these financial projections?

Page 28

A. Well, there were assumptions made in terms of the rate of growth in gross patient revenue. In fact, all the assumptions that go into this are found at the bottom of the exhibit. So, you've got -- you can see they were anticipating an increase in the gross patient revenue of eight percent, increasing it one half of one percent increment thereafter through 2024. But as I mentioned, they -- it was an error in the computation of the 2000 -- I didn't mention the year, but 2024, they had an error in the computation, which overstated the revenue. And I reduced it down to what it should be for that particular year. So, I did go through and look at the assumptions and the application of those assumptions to the spreadsheet and that there was an error that needed to be corrected.

Q. Whose assumptions are these?

A. Those are Boa Vida's assumptions. But I went back and looked at, for example, contractual allowances, bad debts, salaries,

Page 29

benefits, et cetera. I went back and back tested that from 2000 and, let's see, 15 through '18 to see if they were consistent with what the hospital had experienced in the past, and they were. So, why they were not my assumptions, they were basically verifiable by going back and looking at the relationships over the previous four years for which you had actual data.

Q. What did you do to back test the increase in revenue?

A. That was something that I couldn't access because the hospital had not had much of an increase. In fact, the gross revenues had been fairly static over the last four years. But the purpose of hiring a manager from the outside was to get the highest and best use out of the facility, which would include some changes in operations. But they're also outlined in the Stroudwater report about things that needed to be done to put the hospital on good financial footing.

So, based upon my review of that report and my conversations with Dr. Singh and others within Boa Vida, I felt these were reasonable expectations for the next few years in terms of growth.

Q. Is there anything in the Stroudwater report that make projections of increased revenue by eight percent and end year?

A. No, ma'am.

Q. Is that a projection from Dr. Singh at Boa Vida?

A. He or his financial people there, yes.

Q. And have you done anything to independently determine whether that is a reasonable increase in revenue for this hospital?

A. Nothing independent of my conversations with the plaintiffs and the review of the Stroudwater report in terms of things that could and should have been done from the hospital in order to increase the

revenue stream. It seemed reasonable to me if they implemented those changes that this would be a reasonable number.

Q. So, basically, you're relying on what Dr. Singh and others at Boa Vida are telling you could be done in the future?

A. Only as -- well, in a limited sense, only as it pertains to projections through 2024. Anything after 2024 is based upon my own expectations for growth and revenues, for example.

Q. Okay. And what are your projections for growth and revenue after 2024 based on?

A. Well, I dropped the growth rate down to two point nine six percent, which is the average long-term growth and medical care expenditures from the U.S. Department of Labor, Bureau of Labor Statistics, which is slightly above the long-term inflation rate. So, it's a very conservative projection going from 2024 on. And that's based upon the assumption that the major changes would be

implemented in the next few years so there would be no room for higher growth. After 2024, there would probably be more the norm of growth due to this increase in medical care cost.

Q. I'm not sure I followed you there. What did you obtain from the U.S. Department of Labor?

A. Well, there are various costs indices that are provided. The one that I used is the -- there's a medical care index that shows you the annual increase in cost for medical care. And for projections past 2024, I went back and looked at the last ten years and computed the average annual increase in the cost of medical care, which was two point nine six percent. And that's what I used for projections after 2024.

Q. How does the average annual increase in cost translate to an increase in revenue?

A. Well, they're tied together. The costs are based upon the revenue stream

that's charged on average by hospitals and other medical care providers. So, in other words, it gives you an average annual increase in what those costs are. And most hospitals, at least the hospitals I'm familiar with, you know, will pass along cost increases where they're able to do so.

Q. Are you familiar with how that works at a rural hospital?

A. I can't say definitely I can, but the ability to pass along costs would depend on the mix of payers that you have and the relationships you have with the insurance companies as well as Medicare or Medicaid. But, you know, whatever experience it would have would be, in my opinion, similar to what you would see on average with Medicare, Medicaid, private pay, individual pay in terms of what those cost increases are. So, I'm dealing with cost increases as a measure of what type of increase in revenue stream you'd expect.

Q. Do you have what the payer mix

Page 34

was at Pickens County Medical Center?
A. Based upon the Stroudwater report, it appeared to be, best of my recollection, that they had a fairly high percentage of Medicare and Medicaid.
Q. Wouldn't an increase in revenue require an increase in patients as well?
A. Well, in the early years, the forecast -- I'm going back to the forecast provided by the Boa Vida people -- they are looking at an increase in utilization as being the driving factor for that increase in revenue stream. From the end of that forecast period of 2024 forward, I'm not forecasting any increase in utilization. I'm just looking at increase in cost that would be passed along to the consumer in the form of additional -- patient in the form of additional revenues.
Q. In looking at the financial performance of Pickens County Medical Center in prior years, did they equal this cost increase that you found at the U.S.

Page 35

Department of Labor?
A. I cannot tell from the financial information that I have because what I have is just basically aggregate data, which is based upon total patient revenue, which is driven by the census that it has. And I can't answer that question.
Q. Well, can you -- I mean, based on the numbers that you have seen, would a decrease in net operating margin or a greater loss every year, would that correlate with seeing an increase of two point seven five percent in revenues?
A. I don't know where you're getting two point seven five percent, so I can't answer that question.
Q. Okay. I thought that's what you told me you got from the U.S. Department of Labor.
A. No, it's two point nine six percent.
Q. I'm sorry. Two point nine six percent.

Page 36

Has Pickens County Medical Center seen an increase in revenue of two point nine six percent each year?
A. No.
Q. So, isn't it speculative to say that it would see that kind of increase going forward over the next twenty years every year?
MR. GREEN: Object to the form.
A. I don't agree with that being speculative because it's based upon, you know, average trends. And what you're looking at in 2014 through 2018 was really a period of time -- well, actually, 2015 through 2018, you know, there was a transition period. I think DCH Regional Medical Center was running the hospital until 2014. And then, they, I guess, terminated that agreement and went out on their own. Obviously, didn't do a very good job based upon review of the financials of running the hospital themselves. And so, that's one reason why you'd want to bring in somebody

Page 37

that had some expertise to run the hospital.
So, if it wasn't managed effectively and efficiently for that period of time, it's not surprising at all that the financials look as bad as they do.
Q. (BY MS. MAUGHAN) Do you have any rural hospitals in Alabama that have an annual increase in revenue of two point nine percent each year?
A. No, I do not.
Q. What factual substantiation do you have to indicate that Boa Vida would have been able to achieve the increases in revenue?
A. Well, since you're looking in the future, there's no factual information. What you're looking at is what the expectations are based upon a reasonable set of assumptions as to what could be done in the but-for world.
Q. And what are your reasonable set of assumptions that you're relying on for this increase in revenue?

Page 38

A. Well, if you're looking at the period of time from 2019 to 2024, our reliance is upon my conversations with the representatives of Boa Vida.
Q. With respect to the projections for 2019 -- and this is in your Table 1 -- and also in the projections that were provided to you by Boa Vida, there's a projection of net patient revenue for fiscal year 2019 of thirteen million, four hundred and twenty-six thousand dollars; is that correct?
A. That's what the exhibit shows, yes.
Q. Okay. And that was a projection that you've included in your report, correct?
A. That's true.
Q. Are you aware that the actual net patient revenue for fiscal year 2019 was about thirty-five percent less than that?
A. No, I'm not, but I'm not surprised.
Q. In fact, the actual net patient

Page 39

revenue for 2019 was only about eight million, six hundred seventy thousand dollars. Just about five million less than the thirteen million four twenty-six that's projected in your report. But that doesn't surprise you?
A. Well, the fact that it -- they fired Boa Vida and somebody was running the hospital. And, you know, to find that big of a decline between 2018, 2019 reflects, you know, the issues that Boa Vida was trying to address in terms of increasing the census, increasing utilization that obviously was not implemented.
Q. And what assessment basis do you have to believe that if Boa Vida would have stayed on as the management company that they would have increased the revenue by five million dollars in 2019?
A. Well, one of the problems that the hospital had is the fact that it was -- you know, didn't have the capitalization, didn't have the money to implement some of

Page 40

these program changes. And from my review of money that was put into the hospital by Boa Vida or entities controlled by them, that was to really help the hospital grow. And when they were terminated, those funds ceased.
Q. What funds did Boa Vida or an affiliate put into the hospital?
A. Well, in my report, I've got hundreds of thousands of dollars of -- that were expenses that were incurred by Boa Vida or its entities that went to support the operations of the hospital that the hospital itself would have had to pay for without having these affiliations with the Boa Vida enterprises. So, if that source of capital were terminated, you know, the hospital would be back in a situation of not having adequate sources of funds to implement really any of the recommendations that the Stroudwater report pointed out that would be useful and necessary in order to keep the hospital as a viable entity.
Q. Do you have any personal

Page 41

knowledge about the expenses that Boa Vida claims it incurred?
A. I reviewed the expense documentation. And, you know, as far as me independently verifying that each one of those is something that is a -- you know, I've not verified independently that the expenditure is something that was necessary or reasonable, you know, looking at it from that standpoint.
Q. But you're talking about expenses that were paid by Boa Vida on the front end that would have ultimately been paid by the hospital. Did Boa Vida actually infuse any capital into the hospital?
A. Well, by providing materials and services for which they were not compensated is the equivalent of providing capital.
Q. Okay. How does that translate into an increase in revenue of five million dollars over what was actually brought in in 2019?
A. Well, it's -- you know, the fact

Page 42

that they were looking at, you know, various types of operations that would increase revenue such as -- you know, one of the things a lot of hospitals have gone to would be swing beds, for example, where they can bring in patients who stay there for rehabilitation, Medicare-related expenses, psych units, more penetration in that particular market. So, there are things that could have been implemented that would generate additional revenues that would have benefited the hospital.

Q. And do you know how long it would have taken to implement any of these different psych units or other things that Boa Vida had proposed to put in the hospital?

A. Well, some of these were already in place. It's a matter of generating more revenues off those, you know, going out and marketing it and making sure it's something that's available to and known by potential users of these particular services.

Q. Well, the geri psych ward of the

Page 43

hospital was not already in place, was it?

A. I don't recall for sure on that.

Q. You really don't have any way to know whether any of the programs that Boa Vida proposed to implement would have resulted in increased revenue, do you?

MR. GREEN: Object to form.

A. In terms of knowing what's -- the exact impact and the exact dollar amount, no.

Q. (BY MS. MAUGHAN) On Table 1 of your report for fiscal year 2019 and 2020, you have under nonoperating income for each year, fifty thousand dollars. Can you tell me what that is?

A. I don't recall having a conversation about that particular line item. And it doesn't go in any of my computations.

Q. Well, you carry that over in Table 2 for every year thereafter, but you don't know what that is?

A. Once again, I just carried it over, but it doesn't go into any of my computations of damages. So, I didn't

Page 44

investigate what it was.

Q. With respect to your Table 2, can you tell me why there's such a wide variance on the sales tax revenue? For example, 2020, you project one million, two hundred and six thousand, whereas, 2021, you only project three hundred and two thousand. And then, 2022 is back up to one million, two hundred six thousand.

A. The -- that particular year is based upon a four-year moving average. So, we're just trying to smooth it out in terms of what that revenue stream would be. So, I'll go back and take the previous four years and take an average of that, and then, the next year, it's an average of the previous four years. So, it's called a smoothing technique to try to account for variations from year to year in that particular number.

Q. Do you know what the average yearly sales tax revenue is?

A. Well, you can go back to Table 1, it'll show you for the four years of which we

Page 45

have actual data. And you can see from Table 1, a million three would be the high in 2015 and a million one hundred and eighty-three thousand would be the low in 2016. So, it goes up and down. So, that's the reason I used an averaging or smoothing technique for forecasting purposes.

Q. How does entering a number of three hundred two thousand in 2021 create an average?

A. Once again, it's based on a moving average. In fact --

Q. I mean -- and the numbers don't vary by more than about a hundred thousand dollars per year. So, why the huge drop of almost nine hundred thousand dollars in 2021?

A. 2021. See if you can scroll up on yours. I can't -- for some reason, mine's not letting me see a larger one. Okay. I don't know why that changes, but, once again, that particular line item is not something that goes into my calculation of damages. So, it doesn't matter really what it is.

Page 46

Q. That number doesn't ultimately factor into the no operating margin?

A. It should. Let's see. The more I look at that, that looks like what might be a computational error on that three twenty.

Q. Okay. What about the numbers that are included for the Medicaid DSH payments on your Table 2; why is there such a drop in 2021 in the amount of Medicaid DSH payments of five ninety to one forty-eight and then back up to five ninety?

A. That looks to be the same computational error that was in the sales tax revenue. It looks like for both of those, there was a -- because going back and looking at previous years, those numbers should be higher than that for those periods.

Q. Do you know how Medicaid DSH payments are determined?

A. No, I do not.

Q. Do you know whether they're subject to being changed or eliminated at any time by the government?

Page 47

A. I don't know.

Q. Let me ask you about the line in your Table 2 regarding supplies and other. It seems like you show a decrease in the cost of supplies each year going forward. How do you substantiate that supply costs are going to go down every year for the next twenty years?

A. Well, in terms of the -- just looking -- once again, I'm using a moving average. And I believe, from my recollection, the costs were -- cost savings were implemented prior to 2019 that resulted in reduction in cost. It seems to be around three and a half percent reduction in cost if I'm not mistaken. So, there had been cost reductions. So, what I did was just continue that and then use that moving average approach that would result in these changes.

Q. Well, if you look at the costs from 2017 to 2018, there was actually an increase in supplies and other of four hundred thousand dollars; do you see that on

Page 48

Table 1?

A. I'll have to go back to Table 1 but -- yeah, I can see where it was higher in 2016 and went down and went back up, and then, the expectation was for it to go down in 2019 and '20.

Q. Well, why would you have that expectation?

A. Better management. Better cost controls.

Q. Wouldn't an increase number of patients necessarily mean an increase in the amount of supplies to take care of those patients?

A. It depends on whether or not you were using those supplies effectively before, if there's not a lot of waste involved. And, once again, these operating expenses had nothing to do with my computations. So, I didn't spend a lot of time looking at these.

Q. I see. So, it doesn't matter whether these numbers are correct?

A. Well, in terms of operating

Page 49

expenses, because it does not go to the method of computing damages. The method of computing damages does not look at the operating expenses category. So, I did not spend a lot of time on those particular items.

Those that are important for my calculations would be the revenue cycle fee and management fee and also interest and depreciation, which would depend on the computation of something called EBITDA, which is a measure that determines whether or not there's going to be an incentive bonus. So, it does come into play there.

Q. So, expenses don't go into calculation of EBITDA?

A. They do.

Q. They do?

A. They do, yes.

Q. So, then, those numbers would be important to have accurate, wouldn't they?

A. If they are outside of the realm of possibility, then, certainly, you consider

them. But based upon what I've looked at, if they're intended to be the opportunity to experience cost benefits based upon synergies associated with the affiliation with Boa Vida hospitals, which could result in reduction in cost over time.

Q. And you're just basing that on Boa Vida telling you they were going to reduce expenses?

A. That the expectation was there would be synergies associated with the affiliation of the hospitals, which synergies normally result in benefits. The benefits in this case would be reduced expenses.

Q. Okay. But you don't believe that an increased number of patients would result in an increase of cost necessary to take care of those patients?

A. Well, you would hope that the increase in revenue associated with those increased patients, if it did increase cost, but also would result in an increase in EBITDA. So, it would have a positive impact

on EBITDA as well.

Q. Right. Well, you've already projected an increase in revenue but also a decrease in cost, which seems disconnected from increasing patient care.

MR. GREEN: Object to form.

A. Well, if they are -- once again, I assume that after 2024 that there really is no increase in terms of trying to impute or input into my calculations increase in patient utilization. It's just looking at increase in costs going forward in terms of that is a proxy for the increase in revenue side.

So, you could -- if you were to increase the census, the average daily census, then, I would certainly agree that assuming that the supplies are managed effectively and efficiently, you've got an increase in the average daily census, then, that would result in some increase in cost after the implementation of cost savings had been put into place.

Q. (BY MS. MAUGHAN) Where does the increase in revenue come from if it's not from an increased patient census?

A. In earlier years, it is, up through 2024. After 2024, basically, I'm holding everything hostage in a cost increase based upon the average annual increase in the cost of medical care.

Q. Are you -- did you take into account the fact that the reimbursement to rural hospitals has been declining despite the fact that the cost in medical care actually is increasing?

MR. GREEN: Object to form.

A. There have been some changes, yes.

Q. (BY MS. MAUGHAN) So, you took that into account?

A. Well, in terms of the forecast, you know, that's part and parcel of what those increase in cost show that takes into consideration all these factors.

Q. Does the increase in cost that

you obtained from the U.S. Bureau of Labor, does that in any way address the amount of reimbursement that the hospital is receiving?

A. Ultimately, it does, yes.

Q. In what way?

A. In the sense that the -- whoever is doing the reimbursement has to take into consideration the cost of providing the services in determining what that reimbursement rate is going to be.

THE WITNESS: I've lost your volume, Diane. I still can't hear you.

MS. MAUGHAN: Can you hear me now?

THE WITNESS: I can hear you now. That's good.

MS. MAUGHAN: Okay. I don't know what happened there.

Michelle, can you read back the last question and answer, please?

(Whereupon, the desired portion of the testimony was read back by

Page 54

the court reporter.)

Q. (BY MR. MAUGHAN) So, are you telling me that you think that Medicare and Medicaid increased their reimbursement by two point nine percent each year?
A. No, I'm not saying that at all. I'm saying it's taken it into consideration in determining what that reimbursement rate would be.
Q. Well, if the reimbursement rate does not keep up with the increased amount of costs, then, that's going to result in less revenue to the hospital, right?
MR. GREEN: Object to form.
A. Depending upon the patient mix again.
Q. (BY MS. MAUGHAN) So, that could be the case?
A. It could be the case, yes.
Q. And why didn't you use the Department of Labor cost increase percentage number of two point nine percent to increase

Page 55

the expenses to the hospital such as supplies and other?
A. The -- if we were in a static world, then, that would be possibly something you could use.
Q. Explain what you mean by that.
A. Well, in terms of if -- you know, no growth due to increase in average daily census, for example, then, the question would be which of those supplies and other would be tied, you know, to these cost increases. You'd have to use probably a different index because the medical care index would include things that would not be specifically in supplies and others. But there might be an index that you could use for that.
Q. Well, I mean, your total operating expenses year to year don't increase by two point nine percent, do they?
A. I'd have to calculate that, but they are increasing every year.
Q. Not nearly as quickly as the increase in revenue you projected.

Page 56

A. Well, let's see. Well, let's just take the first two years. Actually, the first year of operating expenses are going up three point eight five percent.
Q. How about after that?
A. The next year, they're going up five -- a little over five percent.
Q. Which year are you talking about right now?
A. I'm talking about 2021, 2022.
Q. Okay. And what's the percent increase from 2024 to 2025?
A. Okay.
Q. It's only three hundred thousand dollars.
A. 2024 to 2025. About one point five eight percent that year.
Q. Let's go back for a minute to Exhibit 4, which were the financial projections from Boa Vida. In the assumptions box, Number 1, the assumption is an eight percent increase in gross patient revenue Year 1, additional point five percent

Page 57

increase per annum after due to higher census, detox program, surgical cases, outpatient, and RHC clinic volume increases. Do you have any objective data to indicate that these percent increases are reasonable to assume?
A. I've seen no documentation on that particular issue. I was relying upon representations of Boa Vida reps.
Q. And you haven't looked at how these types of programs have fared at other rural hospitals in Alabama or elsewhere?
A. No.
Q. Going back to your Table 2 in your report, why do you have such a variance in the net operating margin from 2020 to 2021 to 2022? You've got a positive net operating margin projected for 2020 of seven hundred and forty-eight thousand and a negative operating margin of negative three hundred and sixty-seven thousand for 2021, and then, suddenly, we have a positive net operating margin for 2022 of two million, sixty-five

Page 58

thousand dollars, which is an increase of about two point three million dollars in one year. Can you explain that, please?

A. Well, I think we've discussed that in looking at the revenue side that the sales tax revenue and the Medicaid DSH figures there are probably incorrect figures, and that just carries on down to that.

Q. Are there -- okay. Are there any other numbers for 2021 that are incorrect?

A. Nothing that I see right now, no.

Q. In Paragraph 13 of your report, you state that the past monthly payments under the Management Agreement from the date of the contract, December 17, 2018, through the end of February, 2020 are three hundred and sixty-two thousand, five hundred; is that what that says?

A. Yes.

Q. Are you aware that the agreement was not even signed until January 23rd, 2019, and that the parties agreed that the start date would be February 1st, 2019?

Page 59

A. No, I'm not aware of that.

Q. I want to show you what I'm marking as Exhibit 5, which is an email produced by Boa Vida in this matter.

(Whereupon, Defendant's Exhibit 5 was marked for identification and copy of same is attached hereto.)

MS. MAUGHAN: Well, now that I've stamped it, I can't see the Bates number.

A. It looks like -- I'm sorry. You're talking about the Bates number.

Q. (BY MS. MAUGHAN) Yes, the exhibit sticker is on top of it. In any event, it is an email from Kirnjot Singh to Shawn McDaniel in which Dr. Singh says, thanks, Shawn. By email, we acknowledge the start date is February 1st, 2019. And the attachment references the Management Agreement being signed; do you see that?

A. I see the email. I don't see the attachments.

Page 60

Q. Yeah, there's not an attachment to this email, but it's referenced --

A. Oh, okay.

Q. -- at the top, or it says Subject: Forward, Benjamin Shawn McDaniel has signed Management Agreement, and then, it indicates the attachment is the Management Agreement.

A. Okay. I see that now, yeah.

Q. Okay. So, if the start date was actually February 1st, 2019, would that change your calculations of the amount due under the Management Agreement?

A. For the -- for the past losses, it would. And what I'd have to do is add those periods of time over to the future losses in order to come up with a twenty-year period. So, it would be taking some away from the past losses and adding to the future losses.

Q. I see, because you projected twenty years from December instead of February; is that right?

Page 61

A. That's correct.

Q. Okay. I see what you're saying.

Paragraph 14 of your report, you've made an estimate of amounts due under the Billing and Services Agreement based on six percent of net patient revenue computed from March 1st, 2019, until the end of February, 2020. And that's shown in your Table 1; is that correct?

A. That's where the information came from in order to compute that, yes.

Q. Compute that number. Okay. And we've already talked about the fact that the projections for 2019 and 2020 came from Boa Vida?

A. That's correct.

Q. And does the fact that the actual revenue for that time period was lower than projected by Boa Vida change your opinion at all?

A. No, because my opinion is based upon the fact that Boa Vida would have been running the hospital and implementing its

Page 62

strategy in order to improve its performance and not based upon what someone else did.

Q. Okay. So, actual revenue doesn't matter, you're just going to base your opinion on Boa Vida's projections of what they believe revenue could have been?

MR. GREEN: Object to form.

A. In effect, what I'm looking at is the but-for world that this -- what the expectations were had Boa Vida been able to continue its relationship with the hospital as opposed to having their contract terminated.

Q. (BY MR. MAUGHAN) Right. But those expectations have not been independently verified or substantiated by you, they're just what Boa Vida has expressed or its expectations, correct?

MR. GREEN: Object to form.

A. In terms of revenue, on the revenue side, gross patient revenue. But as I mentioned before, I did go back and look at the other assumptions and compare them to the

Page 63

actual performance of the hospital for the previous four years to confirm that those assumptions were realistic.

Q. (BY MR. MAUGHAN) So, you believe that an increase in revenue of eight percent is realistic based on the hospital's past performance?

A. No, not based upon the way the hospital was managed in the past, no. Based upon what it could have been managed in the future, yes.

Q. Right. So, what you just said was that you went back and verified that it was reasonable based on past performance that the hospital has never shown an increase of eight percent in patient revenue in one year, has it?

A. No, I think you misunderstood my comment on that. Just for clarity purposes --

Q. Okay.

A. -- as I mentioned earlier in the deposition, that there were a number of

Page 64

assumptions in there in terms of labor costs and other things that I did go back and verify because, that, we had hard data on that.

Going forward, the revenue side, I did not independently verify that.

Q. Okay. Just to clarify, you did not independently verify the increase in revenue from 2018 to 2019 or from 2019 to 2020?

A. Well, I did not verify that in the sense of this is in a but-for world, and this is what Boa Vida expected to be able to do had it been able to continue working with the hospital as opposed to the actual world is what actually Pickens County Medical Center actually performed. And that's where the divergence comes into play.

Q. Right. That's what I'm getting at, that you didn't do anything to verify independently that Boa Vida's expectations for future revenue are reasonable?

A. Well, other than looking at the

Page 65

recommendations from the Stroudwater report and talking with Dr. Singh and others and Boa Vida in terms of where'd you come up with this revenue projection. But I've not -- and that's -- I've got my information from them. We've determined that already. But based upon my conversations, it seemed to be a reasonable forecast for that short period of time.

Q. You mentioned you looked at the Stroudwater report. It did not contain any financial projections, did it?

A. No, but it talked about things that should be done or could be done to the hospital to improve its financial condition, and these were some of the same items that Dr. Singh and others within their organization related to me that they were going to try to implement within the hospital.

Q. Right. And so, how do you substantiate the amount of revenue increase that would occur from these programs if they

Page 66

were implemented?
A. Well, once again, I'm relying upon management's expectations for those particular numbers.
Q. And do you have any idea --
A. Excuse me.
Q. Go ahead.
A. I didn't mean to cut you off, but I wanted to make sure I complete my thought on that.
I'm relying upon management's expectations at least for the period of time 2019 to 2024, and then, I switched over to my own expectations after that.
Q. Right. And we covered that. Your expectations are based solely on the Department of Labor increase in medical cost?
A. That's correct. As a proxy for growth in revenues.
Q. And just to clarify, you did say you relied on Boa Vida's projections for 2019 through 2024 for patient revenue?
A. I didn't mean to talk over you.

Page 67

Yes, ma'am, that's correct.
Q. No, I understand. It's difficult with this Zoom proceeding to not talk over each other.
Do you have any idea where Boa Vida came up with its numbers for financial projections?
A. I've not looked at any supporting documentation. Just from conversations with them, that was their expectation.
MS. MAUGHAN: Michelle, can we go off the record for a minute?
THE COURT REPORTER: Yes.

(Whereupon, a brief recess was taken.)

Q. (BY MS. MAUGHAN) Looking again at Exhibit 4, the financial projections provided by Boa Vida, the assumption down at the bottom left corner in Number 1, did Boa Vida provide you with any projections for each of these programs individually? For

Page 68

example, did it tell you how much increased revenue expected to come in from the detox program?
A. No.
Q. Did it tell you how much it expected to increase from RHC volume increases?
A. No.
Q. So, Boa Vida just came up with a lump sum that it expected to see in revenue increases due to all of these potential programs?
A. Once again, in terms of looking at it from the standpoint of did it seem reasonable, I was just thinking that 2000 -- well, at the time that Boa Vida was being -- taking over as the manager, it seems to me that somewhere in, I think, the Stroudwater report, the census was down to maybe two or three people, single digits. And so, moving down from there, it's not something that would, to me, be unattainable and result in a major increase in revenues. You know, to go

Page 69

from two people to four people, that's a hundred percent increase, you know, generated off that aspect of it. So, if your census is really low, you know, it would certainly be a lot of room for improvement. So --
Q. True, but how much --
A. But I don't have specific numbers -- I don't have specific numbers for each of those.
Q. Okay. I mean, how much of an increase in revenue would you get by increasing your census from two patients to four?
A. I don't know exactly what that number would be, but it would be an increase for sure.
Q. In coming up with your projections in Table Number 2 in your report, did you look at any revenues for comparable rural hospitals?
A. No, I did not.
Q. Did you --
A. Because these projections --

Page 70

unless the other hospitals had projections, I have nothing to which I can compare.
Q. Well, I mean, did you try to compare historical revenues from any comparable rural hospital?
A. No, I did not.
Q. Have you looked at the average percentage revenue increase from year to year by rural hospitals in Alabama?
A. No.
Q. Looking back at your report, Paragraph 15, you state, the Management Agreement also has a provision for an incentive bonus of ten percent if the hospital has a positive EBITDA at any given quarter. And you say since EBITDA is not projected to be positive until the fiscal year ended 9/30/2022, there's no estimated past loss of the incentive bonus.
And just to be clear for the record, I mean, the projected EBITDA is based on the projections from Boa Vida for 2022?
MR. GREEN: Object to form.

Page 71

A. Yes, that's correct.
Q. (BY MS. MAUGHAN) In Paragraph 16, you state, the Services Agreement calls for a payment of cost plus ten percent for equipment, supplies, and staff -- I'm not going to read the whole paragraph, but, basically, the end of your paragraph says, the unreimbursed services expenses as of March, 2020 -- sorry, 22nd, 2019, were ninety-nine thousand five seventy-four.
And the Services Agreement was between Pickens and Monroe Regional Hospital; is that correct?
A. That's my understanding, yes.
Q. And I think we may have covered this earlier, but do you have any personal knowledge about whether these expenses were actually incurred by Monroe Regional Hospital?
A. I've seen the receipts.
Q. Okay. Do you have any personal knowledge about whether Pickens actually received the services or supplies?

Page 72

A. No, I do not.
Q. So, you're relying on Boa Vida for this information?
A. That the invoices and receipts they provided to me were indeed used for Pickens is what they recommended this to be, so I'm assuming that that's correct, yes.
Q. And did you do any independent evaluation of the contract to make sure that the expenses that they seek reimbursement for are actually covered by the contract?
A. I did look through the various receipts, and they -- from my knowledge of the contract and the -- I think in an appendix outlining what costs were reimbursable, they appeared to be in line.
Q. What about expenses that were incurred before the Services Agreement was actually entered into; are you saying those are covered by the Services Agreement?
MR. GREEN: Object to form.
A. Well, you could have a situation where you bought supplies prior to the

Page 73

service agreement, but, then, not delivered them until the service agreement was in effect, in which case, it would be certainly allowable.
Q. (BY MS. MAUGHAN) Okay. What if they were delivered prior to execution of the Services Agreement?
MR. GREEN: Object to form.
A. Then, that'd be something they'd have to negotiate with the hospital. If they actually had gotten the benefit of those supplies, then, they would certainly be at least morally obligated to pay for them if not legally.
Q. (BY MS. MAUGHAN) Well, they might be obligated to pay for the supplies but not the extra ten percent profit that Monroe Regional added on under the Services Agreement; is that correct?
A. No, I disagree with that.
MR. GREEN: Object to form.
A. You know, that's part and parcel. Supplies were part of the provision of

Page 74

services under the agreement. You know, if they were not used, then, certainly, the ten percent would not apply. If they were used, I would say the ten percent should apply.

Q. (BY MS. MAUGHAN) Where does the agreement say that it applies to supplies or services provided prior to execution of the agreement?

MR. GREEN: Object to form.

A. It probably doesn't say that.

Q. (BY MS. MAUGHAN) Okay. Paragraph 17 of your expert report, you state, the plaintiff has also incurred loss due to unreimbursed expenses. Which plaintiff does that refer to?

A. Boa Vida.

Q. And the numbers that you have here for CEO and CFO pass-through salaries, did you rely on Boa Vida for those numbers?

A. Yes, I did.

Q. Why are they referred to as pass-through salaries and pass-through expenses?

Page 75

A. My recollection from reading the agreement was that there would be the twenty-five thousand dollars per month payment as well as reimbursement for expenses of the CFO and the CEO. And so, those expenses that were incurred by Boa Vida would be passed through to the hospital in terms of a reimbursement item, reimbursement item.

Q. Did Boa Vida actually pay the salaries of the CEO and CFO or did some other entity pay it?

A. I'm assuming Boa Vida did, but I've not seen paychecks, so I don't know for sure who paid them.

Q. Do you know who the CEO and CFO they were referring to are?

A. No.

Q. In Paragraph 18, you say, the total of unreimbursed expenses, one hundred fifty-one thousand, three hundred ten dollars. Where does that number come from?

A. That's from the information in Paragraph 16 and 17, the sum of those two.

Page 76

Q. Okay. In Paragraph 19, your estimation about future damages under the Management Agreement associated with the monthly payment of twenty-five thousand dollars per month, which you say equals five million, six hundred seventy-seven dollars -- I'm sorry, thirty-seven thousand, five hundred dollars for the remaining two hundred and twenty-five point five months of the agreement. Your opinion here is assuming that the Management Agreement has not been previously terminated; is that correct?

A. The assumption is that the Management Agreement was entered into initially with the one that would be continued for the entire twenty-year period.

Q. And so, if the Management Agreement was terminated prior to the end of the twenty-year period, would your projections for Paragraph 19 change?

MR. GREEN: Object to form.

A. If Boa Vida decided that it did not want to continue this relationship at any

Page 77

time in the future, then, you'd have to determine what that date would be. Then, whatever that date would be would the termination date for benefits.

Q. (BY MS. MAUGHAN) And what about if Pickens decided it didn't want to continue the relationship in the future?

MR. GREEN: Object to form. Calls for a conclusion about what the contract said.

A. Okay.

Q. (BY MS. MAUGHAN) You can answer.

A. Okay. In terms of my -- I did read the contract agreement. It'd have to be termination with cause is my understanding of what the contract said. But, then, we'd have to determine, you know, when that cause would occur and establish the date for damages to that particular date.

Q. Are you aware that the closure of the hospital is also an event of termination of the Management Agreement?

A. I'd have to go back and review

Page 78

the agreement.

Q. Okay. Well, if that is the case, would that change your opinions in this report?

MR. GREEN: Object to form.

A. Well, in terms of my report, it's looking at the but-for world. In the but-for world, the hospital would not be shut down, and, therefore, these damages would continue for the term of the contract.

Q. (BY MS. MAUGHAN) But we know in actuality, the hospital is closed down, correct?

A. That's my understanding, yes.

Q. Okay. And so, what factual substantiation do you have to prove that the hospital would not have shut down had Boa Vida continued to manage it?

A. Other than the pro forma statements and expectations based upon those pro forma statements, it would have been a profitable enterprise and it would not have shut down, in my opinion, if it were

Page 79

profitable.

Q. And those were, again, based on Boa Vida's projections?

MR. GREEN: Object to form.

A. Through 2004, and then, mine afterwards.

Q. (BY MS. MAUGHAN) Right. And yours are based on the Department of Labor statistics on cost of medical -- medical care generally?

MR. GREEN: Object to form.

A. Well, in terms of the top line, yes. By top line, I mean the revenue side.

Q. (BY MS. MAUGHAN) Does the Department of Labor statistics have any specific application to rural hospitals or do they just refer to medical care generally?

A. In general.

Q. In Paragraph 20 of your report, you reference future damages under the Billing and Services Agreement assuming that the agreement was renewed for the remaining two hundred and twenty-five point five months

Page 80

of the Management Agreement. Now, why would you make that assumption given that the hospital board has already terminated the Management Agreement?

MR. GREEN: Object to form.

A. Once again, in the but-for world, as we just discussed, the assumption was that the relationship would have continued for the entire twenty-year period of the contract. And, as such, it was reasonable to assume that if that were to continue, then, the Billing and Services Agreement, even though it was for a shorter period of time, would have been renewed for that same period.

Q. (BY MS. MAUGHAN) And so, is it also possible that it would not have been renewed after five years even if the Management Agreement had been continued?

MR. GREEN: Object to form.

A. That is possible, and that's the reason Paragraph 21, I computed it based upon just the five-year period of time for the contract.

Page 81

Q. (BY MS. MAUGHAN) And then, in Paragraph 22, you reference future damages for loss of the ten percent incentive bonus included in the Management Agreement. And you state that the payment of the incentive bonus is contingent upon a positive EBITDA in the quarter, and it's not anticipated the incentive bonus would be payable till fiscal year ending September 30, 2022, as seen in Table 2.

Do you know if the Pickens County Medical Center had ever had a positive EBITDA in the past years?

MR. GREEN: Object to the form.

A. I could look at it very quickly. It would have had a positive in 2015, a positive in 2016, a positive in 2018 but a negative in 2017. So, three out of the four years, it had a positive EBITDA.

Q. (BY MS. MAUGHAN) Okay. Now, in addition to a positive EBITDA, doesn't the Management Agreement require that for the ten percent incentive bonus that the facility

Page 82

accounts payable more than a hundred and twenty days old not be greater than fifty percent of the total facility accounts payable?

A. I'm not sure about that exact wording. I would have to go back and review it.

Q. Okay. So, you didn't take that into consideration in forming your opinion?

A. Well, based upon the anticipated revenue and performance, it would -- it would have been in compliance in my opinion.

Q. Do you have any idea what the unpaid accounts payable is at the hospital or was in 2019?

A. Not in 2019, no, I do not.

Q. Do you know what it was in any year?

A. I'd have to go back and look at the accountant's report. All I have is 2016, 2017. I can certainly review it from there, but I don't have 2018 or '19 financials, audited financial statements to review.

Page 83

Q. But you don't know as you sit here what the amount of the accounts payable that was over a hundred and twenty days old in any given year?

A. I'd have to go back and look at the accountant's report. It generally should be in there.

Q. So, how can you say that you believe it would have been in compliance with the fifty percent provision not knowing what that amount is?

A. Well, in terms of looking at the projected performance, when you're losing money or barely surviving, the natural effect -- and this is also in the Stroudwater report -- was the increase in days outstanding for payables and problems with making the payment, timely payment, which is part of the reason for entering into a relationship with something like Boa Vida or Monroe in order to have the ability to provide those things that are necessary to run the hospital while they were working

Page 84

through the accounts payable with the existing suppliers that they had.

Q. Right. But if, for example, the hospital had accounts payable over a hundred and twenty days of five million dollars, it would take a long time to pay that down, wouldn't it?

MR. GREEN: Object to form.

A. Well, it would take a period of time to do so, yes.

Q. (BY MS. MAUGHAN) So, you don't really know when it might meet the requirement that accounts payable older than a hundred and twenty days would be less than fifty percent of the total accounts payable?

MR. GREEN: Object to form.

A. I have not run that computation.

Q. (BY MS. MAUGHAN) Okay. Going back to what I just asked you a minute ago about EBITDA, you testified that there was a positive EBITDA in 2015, 2016, and 2018. So, on your Table 1 in your report, you show a negative EBITDA for all of those years; isn't

Page 85

that correct?

A. It does show that, but I'm looking at the total revenue minus total operating expenses, it's about a negative three hundred and forty-eight as you can see. But in order to get EBITDA, you add back in interest and depreciation, which are one point seven five million, which would turn that into a positive number. So, I'd have to go back and check on that EBITDA number. So, it appears that that's probably not a correct number there.

Q. Well, these are your numbers on EBITDA, aren't they?

A. Let me see. Yeah, they're my numbers, but I -- they're not -- there's a computational error there somewhere.

Q. So, you're telling us that those -- go ahead.

A. I just -- because it appears to be from just looking at it now that there would be a positive EBITDA certainly in 2000 -- the first year. The second year,

Page 86

which would be 2016, it would be close.
Q. Explain why you're -- go ahead.
A. Well, you asked me to explain how. But the EBITDA --
Q. Yeah, explain why you're now -- I was going to say, explain why you're now saying that there's a positive EBITDA even though year-end table calculating EBITDA shows negative EBITDA for 2015 through 2020.
A. I'd have to go back and look at my spreadsheet to see. But looking at it as we're talking right now -- oh, I see. If you're computing it based upon net income -- well, that'd still be positive. I was trying to see if I was basing it off of net profit margin or net income here. And -- yeah, it would be negative.
Yeah. I'd have to go back and look at my spreadsheet and see on that, but, normally, it's -- you take the net income and add back interest, taxes, and depreciation to come up with EBITDA. And so, I'd just have to look at my spreadsheet on that to make

Page 87

sure that's a correct number.
Q. And doesn't EBITDA stand for earning before interest, taxes, and depreciation?
A. And amortization, yes.
Q. Amortization. So, why would you add it back in?
A. Well, when you have a net income figure, you've already taken it out. So, if you look under your operating expenses, you'll see that you've taken out for interest and depreciation. And since it's a not-for-profit organization, there are no taxes. So, taxes are not applicable here. So, basically, you take your net income, which includes these items, then, add them back in to come up with EBITDA.
Q. So, walk me through it again because I'm not, you know, a mathematical person. What would you need to do on the Table 1 of 2015 to come up with an accurate EBITDA?
A. Well, if you're looking at it

Page 88

from a total operations, then, you'd take the bottom line net income or loss, for example, for 2015, one thousand -- one million, five oh six. You'd add back to that interest of four hundred and sixty-two thousand and depreciation of one million, two hundred and ninety-seven thousand. And then, that would give you have the EBITDA number for that year.
Q. Does that take into account non-operating income?
A. Well, there are a couple ways you can compute it. If you're looking at truly a net income figure, you would consider all sources of income and expenses, and then, you'd add back in depreciation and amortization. A lot of companies will base it on just income from operations. So, if you take net income of operations and then add back in depreciation and amortization, that would give you another figure there.
Q. Well, which way did you calculate it here on Table 1?

Page 89

A. Let's see. I'll pull it up on mine so I can see it a little bit easier. It looks like it's on net operating margin. I'd have to compute it again just to make sure.
Well, just looking back on Table 1, the EBITDA calculation is not correct is the simplest way to put it.
Q. Okay. And just to be clear, and those are your calculations that you included on Table 1, correct?
A. They are, yes.
Q. Do you have any knowledge about the financial condition of rural hospitals generally?
A. In general, they've not been doing well.
Q. Well, do you know how many rural hospitals in the United States have closed since 2005?
A. I do not have an exact number, no.
Q. Would it surprise you to know that it's around a hundred and seventy?

A. It would not surprise me that a number of rural hospitals closed.
Q. And do you know the percentage of rural hospitals in Alabama that have a negative operating margin?
A. No.
Q. Would it surprise you to know that it's about eighty-five to ninety percent?
MR. GREEN: Object to form.
A. It wouldn't necessarily surprise me.
Q. (BY MS. MAUGHAN) Does that information in any way affect your opinions in this matter?
A. Well, each hospital is unique in its on right in terms of the market it serves and the services it provides. So, you know, certainly, in general, my understanding of regional -- or rural hospitals, rather, have been under very high levels of stress financially. But it doesn't necessarily mean that every hospital is experiencing the same

impacts in terms of negative operating income and retainage on margins.
Q. And did you do any research with the Alabama Hospital Association in preparing your opinions?
A. Not for this case, no.
Q. Okay. Do you know why rural hospitals are struggling financially?
A. Lack of census, average daily census. Lack of specialty services would be another major contributing factor.
Q. Is it related to reduced reimbursement for services?
A. That certainly could have an impact as well.
Q. But going back to -- I think -- I don't know the answer to my question when I asked you about whether the facts that eighty-five to ninety percent of Alabama rural hospitals have a negative operating margin, does that affect your opinions in this case at all?
MR. GREEN: Object to form.

A. That's based on historical data. And what we're looking at here is what we expect to happen in the but-for world.
Q. (BY MS. MAUGHAN) Based on historical data from Pickens County Medical Center, they've also had a negative operating margin, haven't they?
A. Yes.
Q. Okay. But you're just assuming that Boa Vida is going to turn all that around and Pickens is going to be one of the ten percent of rural hospitals that becomes economically viable --
MR. GREEN: Object to form.
Q. (BY MS. MAUGHAN) -- is that right?
MR. GREEN: Object to the form.
A. It would be embedded in the assumption and the projections that they would become a profitable hospital.
Q. (BY MS. MAUGHAN) Based on Boa Vida's assumptions and projections?
MR. GREEN: Object to form.

A. According to my analysis, yes.
Q. (BY MS. MAUGHAN) Have you done any research or analyzation on the effect of COVID-19 on rural hospitals?
A. No, I've not seen any data, current data, on that.
Q. Okay. So, you don't know what kind of financial effect that's had on rural hospitals?
A. It could be positive or perhaps negative depending upon the circumstances.
Q. Well, if the research shows it's been very negative, would that change your opinion in any way in this case?
MR. GREEN: Object to form.
A. I would have to review the research and see, you know, where it was generated, how it was generated. And that would be something that might show some hospitals are positively impacted and some negatively. It could be just an average -- on average, it may be a negative impact on average. You know, that's something you

Page 94

would look at.

But with COVID or any other infectious disease, you would expect that it would have an impact in terms of admissions based upon those impacted by it. And whether or not it affected other services would depend upon the mix of other services provided as to the extent of impact it would have.

Q. (BY MS. MAUGHAN) So, you haven't read any reports showing that hospitals generally are seeing a reduction in patient revenue because people are not having elective surgeries, they're not going to the ER for nonemergent care because they're scared they're going to get COVID if they go?

MR. GREEN: Object to form.

A. Well, in terms of, for example, elective surgery, you know, elective surgery, by definition, is something the individual can do or not do at a particular point in time. So, if, because of COVID-19, hospitals or physicians and surgeons are not performing

Page 95

elective surgeries today doesn't mean they're not going to perform them tomorrow. It's just a delayed factor as opposed to a permanent loss in revenues.

Q. (BY MS. MAUGHAN) Right, and the delay so far has been about four months, and we don't know when COVID is going to be gone, do we?

MR. GREEN: Object to form.

A. No, but I know of hospitals who are doing elective surgery now. So, it's not something that's uniform across all hospitals. And to generalize it that way would be inappropriate.

THE WITNESS: I've lost you once again, Diane.

MR. GREEN: Can't hear you.

THE WITNESS: Can't hear you.

MR. WILSON: Hey, Michelle, can you hear me?

THE COURT REPORTER: I can hear you. I can't hear Diane.

Page 96

(Whereupon, a discussion was held off the record.)

Q. (BY MS. MAUGHAN) I guess just to follow up on what I was asking you, your opinions in this case do not take into account any effect of COVID-19 on rural hospitals; is that accurate?

A. Neither positive nor negative impacts.

Q. Are there any additional opinions that you're planning to offer in this case that are not included in your report?

A. Well, based upon the discovery of a couple of, it looks like, computer input errors on the part of myself, I would probably go back and correct those items. Other than that, nothing else.

Q. Okay. So, you're planning to revise your opinions based on mathematical calculations that you're going to go back and do?

A. Yeah, there appear to be a couple

Page 97

of things that we discussed on -- for example, sales tax revenue in 2021 appear to be down. In fact, they are when you compare it to the actual original forecast by Boa Vida. And then, the EBITDA numbers. So, there are a couple of numbers in there I want to go back and review. And -- but those are the only areas that I'd probably make a change.

MS. MAUGHAN: Okay. Well, I guess, Wilson, I'm just going to put on the record, to the extent there's any changes to the report that are more than mathematical, then, I reserve the right to continue this deposition at a later time.

MR. GREEN: Duly noted without concession.

MS. MAUGHAN: Okay.

Q. In your report, in Appendix B, there is a list of documents that you have stated that you reviewed. Here it is. I guess I'm going to go ahead and mark each of these. But looking at this list in Appendix

Page 98

B, are there any other documents that you've reviewed in forming your opinions in this case that are not on the list in Appendix B?

A. I think we referred to that I looked at a couple of hospital management companies in terms of their returns to use as a discount rate. So, I don't see that on that list.

Q. Do you have documents for that?

A. I do have a document for that that I'll -- I can make available.

Q. Yes, would you please provide that to Wilson, and he can provide it to me?

A. Sure. Be happy to.

Q. Okay. Okay. Well, I'm just going to go ahead and mark Number -- I don't know what number we're on. Let's see what comes up. Number 6 --

MR. GREEN: It will be 6.

Q. (BY MS. MAUGHAN) -- is the complaint in this case.

(Whereupon, Defendant's Exhibit 6

Page 99

and Defendant's Exhibit 7 was marked for identification and copies of same are attached hereto.)

(Whereupon, a discussion was held off the record.)

MS. MAUGHAN: Just for the record, I've marked the complaint in this action as Exhibit 6, but it would not show up on the Exhibit Share. So, I have remarked the complaint as Exhibit 7. And it appears to be there at the moment.

THE WITNESS: When I pull 6 and 7 up from the witness side, they're the same missing pages.

MS. MAUGHAN: Yep.

THE WITNESS: So, I only have Pages 3 and 4 on both Exhibit 6 and 7. Just FYI for everybody, if they have to do one of these again, the witness may not be able to see it on his screen. But I can see it when

Page 100

you pull it up on yours. So, you know --

MR. GREEN: Guys, the same -- I have the same problem.

THE COURT REPORTER: Me, too.

MS. MAUGHAN: Well, I can't see it now when I click on it out of the Marked Exhibits folder.

(Whereupon, a discussion was held off the record.)

Q. (BY MS. MAUGHAN) So, just to confirm, this is the complaint that is marked as Exhibit 7. And this is one of the documents you reviewed, correct?

A. That's correct.

Q. Okay. It may take a while.

(Whereupon, Defendant's Exhibit 8 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) Now, I'm

Page 101

marking as Exhibit 8 the Management Agreement, which -- I mean, we can at least see it from this screen. Is this the management agreement that you reviewed?

A. It appears to be the one.

Q. I'm afraid when I hit --

(Whereupon, a discussion was held off the record.)

Q. (BY MS. MAUGHAN) Okay. And now, I'm marking as Exhibit 9 the Billing and Services Agreement.

(Whereupon, Defendant's Exhibit 9 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) That one showed up.

(Whereupon, Defendant's Exhibit 10 was marked for identification

and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) Okay. Now, I'm marking as Exhibit 10 the Services Agreement that was filed with the complaint in this case. Does that appear to be one of the documents you reviewed?

A. With the exception I don't have the Bates stamp numbers on mine, but it looks like to be the same.

Q. Oh, okay. Yeah, I think Wilson stamped those when he produced them to me.

(Whereupon, Defendant's Exhibit 11 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) I'm marking as Exhibit 11 the termination letter from Pickens County Medical Center to Boa Vida. It's, I believe, what you referenced as

Number 5 in your Appendix B of documents reviewed; is that correct?

A. I believe that's -- it's in my file, so I'm pretty sure that's what -- which one it is.

Q. I've already marked document Number 6 in your Appendix B, which is the Stroudwater report. That was Exhibit Number 3. Well, sorry. I forgot to mark it.

(Whereupon, Defendant's Exhibit 12 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) I'm marking as Exhibit 12 Pickens County Health Care Authority's financial statements and supplementary information, September 30, 2017, and 2016. Are these the financial statements referenced in Number 7 on Appendix B in your report?

A. Okay. That's correct.

Q. Okay. Number 8 says expense data from Boa Vida Health and Monroe Regional Hospital. I think I have a couple of different things that were produced to me. I'm going to mark -- okay. Is that something that you reviewed?

A. Yes. Uh-huh.

Q. Okay. Let me mark that as Exhibit 13.

(Whereupon, Defendant's Exhibit 13 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) And just for the record, this document says at the top Boa Vida Healthcare and Monroe Regional Hospital Loss from Pickens Engagement February 4th, 2019, through March 22, 2019.

A. And there's some supporting documentation behind that.

Q. Oh. You're right. There's a

second page that says Pickens expenses, and then, a third page that says Monroe Regional Hospital?

A. Correct.

(Whereupon, Defendant's Exhibit 14 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) I'm showing up on the screen, it appears to be some credit card statements, invoices, things of that nature. Is that something that you reviewed in connection with this case?

A. That goes back to the previous exhibit in terms of the documentation that goes along with, I guess, Exhibit 13.

Q. And Boa Vida provided you with these documents?

A. That's correct.

Q. Okay. I'm going to mark that as Exhibit 14.

Okay. And other than what we've marked here today, there are no other documents that you reviewed in forming your opinions other than the hospital management company returns that you referenced in Paragraph 8 -- I'm sorry Footnote 8 of your report; is that accurate?
A. I believe that is accurate, yes.
There's one that's on there that you didn't put in I just noticed. If you'll scroll down just a little bit, I'll point it out. There was a file -- that daily cash receipts file was something I did have in my file, but I didn't use it for my report.
Q. Okay. Well, let me go ahead and mark it, and we'll just note for the record that you didn't use it in your report. Is this the document that you're referencing (indicating)?
A. That's it, yes.
Q. Okay. I'm going to mark that as Number 15.

(Whereupon, Defendant's Exhibit 15 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) I want to show you what I'm marking as Exhibit 16.

(Whereupon, Defendant's Exhibit 16 was marked for identification and copy of same is attached hereto.)

Q. (BY MS. MAUGHAN) Is this the copy of your invoice for services rendered in this case to date?
A. Well, no, through July 23rd. It does not --
Q. Right.
A. -- include preparation for the deposition nor the giving of the deposition.
Q. What did you do to prepare for your deposition?

A. Went back through my document file and went back through the report.
Q. Your expert report?
A. Yes.
Q. Did you talk to anybody in preparation for your deposition?
A. I had a short conversation with Wilson Green on Friday and then about a five-minute conversation this morning.
Q. With Wilson?
A. Yes.
Q. How much time did you spend in deposition preparation?
A. Probably three or four hours.
Q. Okay. And do you charge the same rate for deposition preparation and testimony?
A. Yes.
Q. Four hundred dollars an hour?
A. That's correct.
Q. In your report, in Paragraph 2, you stated that as the head of FECG's litigation support services, I've worked on

numerous assignments involving estimation of lost earnings and profits.
How do you normally go about providing an estimation of lost earnings and profits?
A. It depends upon the nature of the case, but, normally, if you're projecting out loss profits, what you have to look at is the expectation of what the revenue stream would be and the expenses that will be associated with that. In many cases, it's a marginal analysis, which means you're looking at the difference or the incremental change that would have occurred but for the occurrence of a certain event. And since you're normally dealing with projections in the future, you'll have to reduce those to present value using some appropriate discount rate.
So, the approaching methodology is fairly similar regardless of case. It's an estimation of lost benefits today or in the past and in the future. And if it's a future loss benefit, reducing that to present

Page 110

value to come up with today's value for that loss.
Q. Would you normally consider the historical performance of a business in projecting lost profits or earnings?
MR. GREEN: Object to form.
A. It depends on the circumstances. If you've got an underperforming company that is expected to improve, you certainly would not depend upon the past performance if it's not appropriate for your projections. In a lot of personal injury cases, you don't depend upon past earnings for maybe people who are in college or people who are younger because their earnings potential is not reflected with the past earnings. So, there are a lot of cases where you don't depend upon the past in order to project the future.
Q. (BY MS. MAUGHAN) What about an ongoing business in operation, you wouldn't consider the historical performance at all?
A. Well, in this particular case, as I mentioned, I did go back and look at the

Page 111

expense side, the relative amount of expenses, because, generally, your expenses are more consistent than are your revenue stream. And if your revenue stream is tainted by poor performance or bad management, going forward, you'd look at what could be in the but-for world as opposed to what was in the past.
Q. All right. But my question was: And this is not specific to this case, but, generally, in projecting lost earnings or lost profits, wouldn't the historical performance of the business be considered?
A. Well, you wouldn't ignore it, but you wouldn't necessarily put a lot of weight on it depending upon the facts and circumstances.
Q. In providing an estimation of lost profits or earnings, would you normally look at comparable businesses?
A. If you can find one.
Q. Would you consider market trends or industry trends?

Page 112

A. If they're applicable to the case involved.
Q. But you didn't do that in this case?
A. No.
Q. In providing an estimation of lost profits or earnings for a business, would you normally talk to the current owner or operator of the business?
MR. GREEN: Object to form.
A. Well, in -- if I were doing a business valuation, yes. In a contested situation, I normally don't have the opportunity to speak with the opposing management.
Q. (BY MS. MAUGHAN) Did you ask to speak to the management of the hospital?
A. No, I did not.
MS. MAUGHAN: Y'all give me just a minute or two. Let me look through my notes. I may be about done.

(Whereupon, a brief recess was

Page 113

taken.)

MS. MAUGHAN: So, I'm finished for now. Just to reiterate what I said earlier that I want to reserve the right to reopen the deposition if there are substantive changes made to the expert report by Dr. McLeod.
MR. GREEN: Okay. That's fine.
FURTHER DEPONENT SAITH NOT.

C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I an anywise interested in the result of said cause.

MICHELLE L. PARVIN
Certified Court Reporter
License Number 126
Commission expires 9/30/20
Notary Public expires 1/26/22

EXHIBIT 0001

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA WESTERN DIVISION**

**BOA VIDA HEALTHCARE, LLC, an Indiana limited liability company, and BOA VIDA HOSPITAL OF ABERDEEN, MS, LLC, d/b/a Monroe Regional Hospital,**

**Plaintiffs,**

**v.**

**PICKENS COUNTY HEALTH CARE AUTHORITY, an Alabama non-profit corporation,**

**Defendant.**

**Case 7:19-cv-840-TMP**

## EXPERT REPORT OF ROBERT MCLEOD, PH.D.

1. I am a professor in the Department of Economics, Finance and Legal Studies at The University of Alabama in Tuscaloosa, Alabama. I have served on the faculty there for forty-one years. Prior to coming to the University of Alabama, I taught at Louisiana State University and the University of Central Florida. I received my undergraduate degree in finance from the University of Southern Mississippi in 1971. I received my MBA degree, with an emphasis in Finance, from the same institution in 1972. I received my Ph.D. in finance with a supporting field in economics from the University of Texas at Austin in 1977. I hold the professional designations

of Chartered Financial Analyst, Certified Financial Planner, Chartered Life Underwriter, and Certified Valuation Analyst. At the University of Alabama, I have taught a number of undergraduate and graduate finance courses including courses in investments, corporate valuation, and financial management. A more complete listing of my educational and professional experience, including a list of publications, is contained on my curriculum vitae which is attached hereto as Appendix A.

2. I am a co-founder of Financial Economics Consulting Group, Inc. ("FECG"), a firm located in Tuscaloosa, Alabama, which since 1986 has provided economic and financial consulting services to a wide range of businesses and individuals. As the head of FECG's litigation support services, I have worked on numerous assignments involving the estimation of lost earning and profits.

3. I have provided expert economic analysis in actions held in state or federal courts, or both, in Alabama, California, Florida, Georgia, Louisiana, Mississippi and Tennessee, and I have provided expert testimony in numerous types of cases, including wrongful death and personal injury related matters; business valuation issues; securities and insurance issues; damage calculations, class action and antitrust proceedings.

4. I have been asked by the plaintiffs, through their attorneys, to opine as to the lost profits which occurred as a result of the termination of a management agreement entered into by Pickens County Health Care Authority (Authority) with Boa Vida Healthcare, LLC (Boa Vida). In order to formulate my opinion, I have reviewed a number of documents found in Appendix B along with discussion with Boa Vida management.

**Background**

5. According to the complaint, Pickens County Health Care Authority (the authority) entered into contracts with Boa Vida to provide management of the Pickens County Medical Center (Hospital) and for Monroe General Hospital (Monroe) to provide services to the Authority.

6. On December 17, 2018 a "Management Agreement" was signed by Boa Vida and the Authority giving Boa Vida which enabled Boa Vida to assume management responsibilities for the Hospital. A Billing and Services Agreement (BSA) was entered into by the Authority and Boa Vida on February 25, 2019 which billing and revenue cycle services were provided to the Authority. On March 11, 2018, the Authority and Monroe entered into a "Services Agreement" where Monroe would provide supplies and services to the Authority to support hospital operations.[1]

7. The Management Agreement called for payments of a minimum of $25,000 per month for a period of 20 years, plus expense. In addition, there were to be incentive payments of 10% of net revenue based upon the achievement of a positive quarterly earnings before interest, taxes, depreciation, and amortization (EBITDA).[2]

8. The BSA was for an initial period of five years and was renewable. The BSA provided for payments of 6% of gross collections of all hospital services except for rents, tax revenue, and grants.[3]

9. The Service Agreement was a one-year, renewable contract. Fees for services were described Exhibit A to the contract.[4]

10. The Management Agreement was terminated by the Authority via a letter dated March 22, 2019. The plaintiffs allege that this termination was a breach of the agreement and that the BSA and Services agreements were never terminated. As such, the plaintiffs are seeking damages for this breach of the agreements.

**Damages Analysis**

11. Damages arise from the lost compensation from the three agreements. The damages are for

[1] Complaint, ¶9.
[2] Management Agreement, ¶ 7.1-7.3.
[3] Billing and Services Agreement, ¶ 3 and 4.
[4] Services Agreement, ¶ 4.1 and 3.1 respectively.

amounts that should have been paid (past damages) as well as amounts that are estimated to be paid in the future (future damages).

**Past Damages**

12. Past damages are computed from the date of the agreements until March 1, 2020. Past damages will be offset by any payments made by the defendant over this period of time. The past damage amounts include payments due under the Management Agreement of $25,000 per month; 6% of net patient revenue; and a 10% incentive bonus. The damages for lost profits under the Service Agreement are not included in this analysis.

13. The past monthly payments under the Management Agreement from the date of the contract December 17, 2018 through the end of February 2020 are $362,500.[5]

14. The Billing and Services agreement calls for payment of 6% of net patient revenue and is computed for the period from March 1, 2019 until the end of February 2020. The estimated payments are computed from Table 1 below as $833,623.[6]

15. The Management Agreement also has a provision for an incentive bonus of 10% if the Hospital has positive EBITDA in any given quarter. Since EBITDA is not projected to be positive until the fiscal year ended 9/30/22, there is no estimated past loss of the incentive bonus.

16. The Services Agreement calls for a payment of cost plus 10% for equipment, supplies and staff as well as payments for licensed personnel at 94% of collected receivables for Dr. Anderson and $200 per hour for ER Physicians and $200 per day for Hospital Physician. The unreimbursed services expenses as of March 22, 2019 were $99,574.

[5] Amount is for 14 and ½ months and would be reduced by actual payments received under the Management Agreement but it is my understanding that no payments were made.

[6] Computed over 12 months of estimated Net Patient Revenue as per the proforma statements found in the Strategic, Financial, and Operational Assessment conducted by Stroudwater dated January 23, 2019.

17. The plaintiff has also incurred loss due to unreimbursed expenses. The unreimbursed expenses are for CEO & CFO pass-through salaries and benefits of $25,153 and other pass through expenses of $26,583. The total of these unreimbursed expenses is $51,736.

18. The total of unreimbursed expenses is $151,310.

**Table 1**[7]

| | FYE^ 9/30/2015 | FYE^ 9/30/2016 | FYE^ 9/30/2017 | FYE^ 9/30/2018 | FYE* 9/30/2019 | FYE* 9/30/2020 |
|---|---|---|---|---|---|---|
| **Operating Revenue (000s)** | | | | | | |
| **Gross Patient Revenue** | $ 31,971 | $ 31,519 | $ 30,349 | $ 33,095 | $ 35,743 | $ 38,781 |
| Contractual Allowances | (17,866) | (17,915) | (17,991) | (17,864) | (20,373) | (22,105) |
| Bad Debt | (2,566) | (1,679) | (1,946) | (3,430) | (1,787) | (1,939) |
| Charity Care | (29) | (233) | (230) | (133) | (156) | (188) |
| **Net Patient Revenue** | 11,510 | 11,692 | 10,182 | 11,668 | 13,426 | 14,549 |
| Other Operating Revenue | 723 | 476 | 388 | 768 | 589 | 592 |
| Sales Tax Revenue | 1,301 | 1,183 | 1,208 | 1,234 | 1,232 | 1,206 |
| Medicaid DSH | 740 | 426 | 614 | 589 | 592 | 590 |
| **Total Revenue** | 14,274 | 13,777 | 12,392 | 14,259 | 15,838 | 16,937 |
| | | | | | | |
| **Operating Expenses (000s)** | | | | | | |
| Salaries & Wages | 6,322 | 6,688 | 7,154 | 6,692 | 6,713 | 7,274 |
| Benefits | 862 | 1,034 | 1,194 | 1,152 | 1,141 | 1,237 |
| Supplies & Other | 5,679 | 6,015 | 5,592 | 5,998 | 5,646 | 5,638 |
| Revenue Cycle Fee | 0 | 0 | 0 | 0 | 806 | 873 |
| Management Fee | 0 | 0 | 0 | 0 | 300 | 300 |
| Interest | 462 | 451 | 436 | 405 | 439 | 433 |
| Depreciation | 1,297 | 1,202 | 1,036 | 886 | 709 | 567 |
| **Total Operating Expense** | 14,622 | 15,390 | 15,412 | 15,133 | 15,753 | 16,322 |
| | | | | | | |
| EBITDA | (2,107) | (3,266) | (4,492) | (2,165) | (1,062) | (385) |
| | | | | | | |
| **Net Operating Margin (Loss)** | (348) | (1,613) | (3,020) | (874) | 85 | 615 |
| | | | | | | |
| **Non-Operating Inc/(Exp)** | 48 | 41 | 146 | 0 | 50 | 50 |
| **EMR Incentive Revenue** | 95 | 596 | 0 | 0 | 0 | 0 |
| **Net Income (Loss)** | $ (205) | $ (976) | $ (2,874) | $ (874) | $ 135 | $ 665 |
| **Net Income (Loss) (w/o sales taxes)** | (1,506) | (2,159) | (4,082) | (2,108) | (1,096) | (541) |

[7] Table 1 is from the Strategic, Financial, and Operational Assessment by Stroudwater, January 23, 2019.

**Future Damages**

19. Future damages under the Management Agreement are estimated for the period from March 1, 2020 until the end of the term of the Management Agreement which is December 16, 2038. The damages associated with the monthly payment of $25,000 are $5,637,500 for the remaining 225.5 months of the agreement. The present value of the remaining payments is $2,314,654.[8]

20. The future damages for provision of services under the Billing and Services agreement are estimated to be $28,092,275 assuming that the agreement was renewed for the remaining 225.5 months of the Management Agreement. The computation of compensation for these services is 6% of the estimated Net Patient Revenue as shown in Table 2. The present value of these payments is $9,467,986.

21. If the Billing and Services agreement was not renewed, it would have expired on February 24, 2024. The estimated future damages for the remainder of the five-year term would be $4,379,733. The present value of these payments is $3,785,897.

22. The future damage for loss of the 10% incentive bonus included in the Management Agreement is estimated to be $48,345,876. The present value of these estimated payments is $12,488,459. The payment of the incentive bonus is contingent upon a positive EBITDA in the quarter. It is not anticipated that the incentive bonus would be payable until the fiscal year ended September 30, 2022 as can be seen in Table 2.

23. The computation of the incentive bonus is based on Net Revenue which is defined as Net Patient Revenue plus other revenue exclusive of sales tax and rent from the dialysis center.[9]

---

[8] Based on 225.5 remaining payments due using a discount rate of 13.53% which is the average return on equity of Universal Health Services and Community Health Systems.

[9] The rent from the dialysis center was estimated to be $43,275 from the Pickens County Health Care Authority notes to financial statements for fiscal year ended September 30, 2017.

Table 2

| | FYE* 9/30/2020 | FYE* 9/30/2021 | FYE* 9/30/2022 | FYE* 9/30/2023 | FYE* 9/30/2024 | FYE* 9/30/2025 | FYE* 9/30/2026 | FYE* 9/30/2027 | FYE* 9/30/2028 | FYE* 9/30/2029 | FYE* 9/30/2030 | FYE* 9/30/2031 | FYE* 9/30/2032 | FYE* 9/30/2033 | FYE* 9/30/2034 | FYE* 9/30/2035 | FYE* 9/30/2036 | FYE* 9/30/2037 | FYE* 9/30/2038 | FYE* 9/30/2039 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating Revenue (000s) | | | | | | | | | | | | | | | | | | | | |
| Gross Patient Revenue | $ 38,781 | $ 42,271 | $ 46,287 | $ 50,916 | $ 56,262 | $ 57,927 | $ 59,642 | $ 61,407 | $ 63,225 | $ 65,096 | $ 67,023 | $ 69,007 | $ 71,050 | $ 73,153 | $ 75,318 | $ 77,548 | $ 79,843 | $ 82,206 | $ 84,640 | $ 87,145 |
| Contractual Allowances | (22,105) | (24,095) | (26,384) | (29,022) | (32,069) | (33,019) | (33,996) | (35,002) | (36,038) | (37,105) | (38,203) | (39,334) | (40,498) | (41,697) | (42,931) | (44,202) | (45,511) | (46,858) | (48,245) | (49,673) |
| Bad Debt | (1,939) | (2,114) | (2,314) | (2,546) | (2,813) | (2,896) | (2,982) | (3,070) | (3,161) | (3,255) | (3,351) | (3,450) | (3,552) | (3,658) | (3,766) | (3,877) | (3,992) | (4,110) | (4,232) | (4,357) |
| Charity Care | 188 | 177 | 164 | 171 | 175 | 172 | 170 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 |
| Net Patient Revenue | 14,925 | 16,240 | 17,753 | 19,519 | 21,555 | 22,184 | 22,834 | 23,507 | 24,198 | 24,908 | 25,640 | 26,395 | 27,171 | 27,970 | 28,793 | 29,640 | 30,512 | 31,410 | 32,335 | 33,287 |
| Other Operating Revenue | 592 | 148 | 592 | 333 | 416 | 372 | 428 | 387 | 401 | 397 | 404 | 397 | 400 | 400 | 400 | 399 | 400 | 400 | 400 | 400 |
| Sales Tax Revenue | 1,206 | 302 | 1,206 | 678 | 848 | 758 | 873 | 789 | 817 | 809 | 822 | 810 | 815 | 814 | 815 | 813 | 814 | 814 | 814 | 814 |
| Medicaid DSH | 590 | 148 | 590 | 332 | 415 | 371 | 427 | 386 | 400 | 396 | 402 | 396 | 398 | 398 | 399 | 398 | 398 | 398 | 398 | 398 |
| Total Revenue | 17,313 | 16,837 | 20,141 | 20,862 | 23,234 | 23,686 | 24,562 | 25,070 | 25,816 | 26,511 | 27,268 | 27,998 | 28,784 | 29,581 | 30,407 | 31,250 | 32,124 | 33,022 | 33,947 | 34,899 |
| Net Revenue for Incentive Bonus | 16,064 | 16,492 | 18,892 | 20,141 | 22,342 | 22,884 | 23,646 | 24,237 | 24,955 | 25,658 | 26,403 | 27,145 | 27,926 | 28,724 | 29,548 | 30,394 | 31,267 | 32,165 | 33,090 | 34,041 |
| Operating Expenses (000s) | | | | | | | | | | | | | | | | | | | | |
| Salaries & Wages | 7,462 | 8,120 | 8,877 | 9,759 | 10,777 | 11,092 | 11,417 | 11,753 | 12,099 | 12,454 | 12,820 | 13,197 | 13,585 | 13,985 | 14,396 | 14,820 | 15,256 | 15,705 | 16,167 | 16,643 |
| Benefits | 1,269 | 1,380 | 1,509 | 1,659 | 1,832 | 1,886 | 1,941 | 1,998 | 2,057 | 2,117 | 2,179 | 2,244 | 2,310 | 2,377 | 2,447 | 2,519 | 2,594 | 2,670 | 2,748 | 2,829 |
| Supplies & Other | 5,638 | 5,547 | 5,536 | 5,424 | 5,370 | 5,305 | 5,247 | 5,177 | 5,117 | 5,055 | 4,994 | 4,933 | 4,874 | 4,815 | 4,757 | 4,699 | 4,643 | 4,587 | 4,531 | 4,477 |
| Revenue Cycle Fee | 895 | 974 | 1,065 | 1,171 | 1,293 | 1,331 | 1,370 | 1,410 | 1,452 | 1,494 | 1,538 | 1,584 | 1,630 | 1,678 | 1,728 | 1,778 | 1,831 | 1,885 | 1,940 | 1,997 |
| Management Fee | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Interest | 433 | 428 | 426 | 431 | 429 | 429 | 429 | 430 | 429 | 429 | 429 | 429 | 429 | 429 | 429 | 429 | 429 | 429 | 429 | 429 |
| Depreciation | 567 | 454 | 363 | 290 | 232 | 186 | 149 | 119 | 95 | 76 | 61 | 49 | 39 | 31 | 25 | 20 | 16 | 13 | 10 | 8 |
| Total Operating Expense | 16,565 | 17,204 | 18,076 | 19,036 | 20,235 | 20,529 | 20,853 | 21,187 | 21,548 | 21,926 | 22,322 | 22,736 | 23,167 | 23,616 | 24,082 | 24,566 | 25,068 | 25,588 | 26,127 | 26,684 |
| EBITDA | (251) | (1,248) | 1,276 | 1,105 | 2,337 | 2,543 | 3,132 | 3,334 | 3,743 | 4,080 | 4,456 | 4,784 | 5,148 | 5,505 | 5,870 | 6,235 | 6,611 | 6,992 | 7,381 | 7,777 |
| Net Operating Margin (Loss) | 748 | (367) | 2,065 | 1,827 | 2,999 | 3,157 | 3,710 | 3,883 | 4,267 | 4,585 | 4,946 | 5,262 | 5,616 | 5,965 | 6,324 | 6,684 | 7,056 | 7,434 | 7,820 | 8,214 |
| Non-Operating Inc/(Exp) | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| EMR Incentive Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Income (Loss) | $ 798 | $ (317) | $ 2,115 | $ 1,877 | $ 3,049 | $ 3,207 | $ 3,760 | $ 3,933 | $ 4,317 | $ 4,635 | $ 4,996 | $ 5,312 | $ 5,666 | $ 6,015 | $ 6,374 | $ 6,734 | $ 7,106 | $ 7,484 | $ 7,870 | $ 8,264 |
| Net Income (Loss) (w/o sales taxes) | (408) | (618) | 909 | 1,198 | 2,201 | 2,449 | 2,887 | 3,143 | 3,500 | 3,825 | 4,174 | 4,502 | 4,852 | 5,201 | 5,559 | 5,921 | 6,292 | 6,670 | 7,056 | 7,451 |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Billing and Services | $ 522 | $ 974 | $ 1,065 | $ 1,171 | $ 1,293 | $ 1,331 | $ 1,370 | $ 1,410 | $ 1,452 | $ 1,494 | $ 1,538 | $ 1,584 | $ 1,630 | $ 1,678 | $ 1,728 | $ 1,778 | $ 1,831 | $ 1,885 | $ 1,940 | $ 416 |
| 5 year term | $ 522 | $ 974 | $ 1,065 | $ 1,171 | $ 647 | | | | | | | | | | | | | | | |
| Incentive Bonus | | | $ 1,889 | $ 2,014 | $ 2,234 | $ 2,288 | $ 2,365 | $ 2,424 | $ 2,496 | $ 2,566 | $ 2,640 | $ 2,714 | $ 2,793 | $ 2,872 | $ 2,955 | $ 3,039 | $ 3,127 | $ 3,216 | $ 3,309 | $ 3,404 |

**Summary**

24. The total of past damages is $1,347,433 which is comprised of the unreimbursed expenses of $151,310 plus the management fees of $362,500 and billing and services fees of $833,623. The present value of future damages, assuming that the Billing and Services agreement is extended, include $2,314,654 for the monthly management fee plus $9,467,986 for Billing and Service and $12,488,459 for the Incentive Bonus for a total future damages amount of $24,271,099.[10] The total of the past and the present value of the future damages is $25,618,532.

25. If the Billing and Services agreement is not renewed after the initial five-year term, the total of the past and future damages is $19,936,443.

26. I am being compensated at my normal hourly rate of $400 and payment for my services is not contingent of the outcome of this matter. If new information becomes available, my opinions may change. As such, I reserve the right to amend this report.

Dated this 6th day of March 2020

Robert W. McLeod
Financial Economics Consulting Group, Inc.

[10] No future damages calculations were made for the Service Agreement.

# APPENDIX A

# CURRICULUM VITAE

# ROBERT W. McLEOD

**HOME ADDRESS**

1321 Downing Ridge
Tuscaloosa, AL 35406
(205) 759-5390

**OFFICE ADDRESSES**

Department of Economics & Finance
Box 870224
Tuscaloosa, AL 35487-0224
(205) 348-8993
email: rmcleod@cba.ua.edu

Financial Economics Consulting Group, Inc.
2316 University Blvd., Suite 201
Tuscaloosa, AL 35401
(205) 345-0934
Email: rmcleod@fecg.com

**EDUCATION**

Ph.D. The University of Texas at Austin (May 1977)

Fields of Study:
- Major: Finance-Financial Institutions and Markets
- Secondary: International Business
- Supporting: Economics

Dissertation: The Role of Bank Cards in Electronic Funds Transference

M.B.A. The University of Southern Mississippi (1972)

B.S. in B.A. The University of Southern Mississippi (1971)

**PROFESSIONAL DESIGNATIONS**

CFA Chartered Financial Analyst designation awarded September 1986.

CFP® Certified Financial Planner designation received May 1982.

CLU Chartered Life Underwriter designation received October 1998

CVA Certified Valuation Analyst designation received August 2002

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| June 2007 – August 2010 | Director, Masters of Global Management Program, Manderson Graduate School of Business, University of Alabama |
| August 2005 – August 2010 | Director, General Business Program, Culverhouse College of Commerce and Business Administration, University of Alabama |
| August 2005 – Present | Academic Misconduct Monitor, Culverhouse College of Commerce and Business Administration, University of Alabama |
| December 1999- Present | John Bickley Faculty Fellow in Insurance and Finance at The University of Alabama |
| May 1998 – August 2003 | Executive Director of MBA Programs and Professional Education at The University of Alabama |
| October 1997 – August 1999 | Director of the Family Business Forum at The University of Alabama |
| August 1995 - Present | Professor of Finance at the University of Alabama |
| August 1982-July 1995 | Associate Professor of Finance at The University of Alabama |
| June 1982 – Present | Program Director, Personal Wealth Management Minor; CFP Registered Program |
| August 1978-July 1982 | Assistant Professor of Finance at The University of Alabama |
| January 1978-May 1978 | Visiting Assistant Professor of Finance at Louisiana State University |
| January 1977-Dec. 1977 | Assistant Professor of Finance at The University of Central Florida (FTU) |
| September 1974-Dec. 1976 | Assistant Instructor or Teaching Assistant at The University of Texas Austin, Texas |
| September 1973-Aug. 1974 | Assistant Professor of Business Administration at The University of Southern Mississippi - Gulf Park |
| September 1972-Aug. 1973 | Adjunct Professor of Business Administration at The University of Southern Mississippi - Gulf Park, Long Beach, Mississippi |

## BOOKS

*Money, Banking, and Credit, Instructors Manual* to accompany text by Dwight Jaffee, Worth Publishers, New York, 1989 (with Peter Locke).

*Money, Banking, and Credit, Test Bank* to accompany text by Dwight Jaffee, Worth Publishers, New York, 1989 (with Peter Locke).

*Bank Credit Cards for EFTS: A Cost Benefit Analysis.* Ann Arbor, Michigan: UMI Research Press, 1979.

## CHAPTERS IN BOOKS OR SERIES

"Mutual Funds and Taxes," in *Adding Value in a Virtual World*, College for Financial Planning, Denver, Colorado, 2000.

"Tailoring Investment Policies for Various Client Types," in *Financial Planning Perspectives: Investment Planning*, College for Financial Planning, Denver, Colorado, 1995.

"Determining the Tax Basis in Investments," in *Financial Planning Perspectives: Tax Planning Viewpoint*, College for Financial Planning, Denver, Colorado, 1991.

"Health Care in Alabama," in *The Alabama Economy: Critical Issues for the 1990's,* Center for Business and Economic Research, University of Alabama, 1990 (with Edward Smith).

## CONTRIBUTIONS TO BOOKS

"Getting a Handle on Your Financial Future," End of chapter financial planning applications in *Personal Financial Planning, 6th Edition,* by Lawrence Gitman and Michael Joehnk. Dryden Press, 1993.

## RESEARCH MONOGRAPHS

"Alternative Financing Sources for Alabama Highways," *University Transportation Center for Alabama*, UTCA Report 05114, August 2006 (with Virginia Sisiopiku, Johnnie Wald, Tarek Rizk, and Walt Robbins).

## PAPERS UNDER REVIEW OR ABOUT TO BE SUBMITTED

"Relative Performance of Real Estate Exchange Traded Funds," (with Srinidhi Kanuri).

"Commodity ETFs: Do They Add Value?" (with Srinidhi Kanuri).

## PUBLICATIONS

"Performance of Dividend ETFs During Bull and Bear Markets," *The Journal of Index Investing*, Summer 2017, Vol. 8, No. 1: pp. 19–28 (with Srinidhi Kanuri and D. K. Malhotra).

"RiskTRACK: The Five Factor Model for Determining Financial Risk Tolerance", Journal of Risk Finance, Vol. 17, No. 4, 2016 (with H. Holzhauer, X. Lu, and J. Wang).

"Sustainable Competitive Advantage and Stock Performance: The Case for Wide Moat Stocks," *Applied Economics*, May 2016, (with Srinidhi Kanuri).

"An Examination of the Performance of Commodity Mutual Funds," *Journal of Wealth Management*, Spring 2016, Vol. 18, No. 4: pp. 90–106 (with Srinidhi Kanuri and D. K. Malhotra).

"Does is Pay to Diversify Internationally: U.S. vs. International ETFs", *Financial Services Review,* Vol. 24, No. 3, Fall 2015, pp. 249-270 (with Srinidhi Kanuri).

"Performance of Alternative Mutual Funds," *Financial Services Review,* Vol. 23, No. 2, Summer 2014, pp. 93-121(with Srinidhi Kanuri).

"How Long Is Too Long?  Volatility-Based Holding Strategies for Leveraged Bull and Bear ETFs," *Journal of Financial Issues*, Vol. 12, Issue 1, Fall 2013 (with H. Holzhauer, X. Lu and J. Mehran).

"Bad News Bears: The Effects of Market Volatility on Daily Tracking Error of Leverage Bull and Bear ETFs." *Managerial Finance*, Vol.39, No. 12, December 2013, pp.1169-1187 (with H. Holzhauer, X. Lu and J. Mehran).

"Cost Efficiencies and the Selection of Closed-End Funds," *Financial Services Review,* Volume 19, No. 2, Summer 2009, pp. 105-122 (with D.K. Malhotra and Rand Martin).

"A Non-Parametric Examination of Real Estate Mutual Fund Efficiency," *International Journal of Business and Economics*, Vol. 3, No. 3, pp. 225-238, 2005 (with Chris Brockman and Randy Anderson).

"A Relative Efficiency Approach to Modern Performance Measurement Using Data Envelopment Analysis," *Journal of Financial Education,* Vol. 32, Spring 2006, pp23-44 (with Chris Brockman and Randy Anderson).

"An Expert System for Financial Ratio Analysis," *The International Journal of Financial Services Management,* Vol. 1, Nos. 2/3, 2006, pp.141-154 (with G. Moynihan, V. Jain, and D. Fonseca).

"Investment Selection and Open- and Closed-end Bond Fund Expenses," *Journal of Business and Economic Studies,* Vol. 9, No. 1, 2003, pp. 42-64 (with D.K. Malhotra and Rand Martin).

"A Comparative Analysis of the Expense Ratios of Domestic and International Open-end and Closed-end Equity Funds," *Financial Planning and Counseling Journal*, Fall 2001, pp. 61-71 (with D.K. Malhotra and Rand Martin).

"DSSALM: A Decision Support System for Asset and Liability Management," *Decision Support Systems*  Vol. 33, Issue 1 (2002) 23-28. (with Gary Moynihan, P. Purushothaman and W. Nichols)

"Closed-end Funds and Investment Selection," *The Financial Review*, 35 (2000), pp. 85-104 (with D. K. Malhotra).

"An Analysis of Nondeductible IRA Contributions and Roth IRA Conversions," *Financial Services Review*, Vol. 6, No. 4, pp.243-256 (with Stephen Horan and Jeffrey Peterson)

"An Empirical Analysis of Mutual Fund Expenses," *The Journal of Financial Research,* Vol.XX, No. 2, Summer 1997, pp. 175-190,  (with D.K. Malhotra)

"The Effect of Rule 12b-1 on Bond Fund Expense Ratios," *The Journal of Economics and Finance,* Vol. 20, No. 1, Spring 1996, pp.65-78 (with D.K. Malhotra).

"Intra-Year Compounding and Fundamental Bond Valuation," *The Quarterly Journal of Business and Economics,* Vol. 34, No. 3, Summer 1995, pp. 19-31 (with Hann-Tarn Jeng).

"Hedging Interest Rate Risk in Real Estate Financing: The Use of Interest Rate Swaps and Swaptions," *Real Estate Finance Journal,* Spring 1995, pp. 60-65 (with D.K. Malhotra).

"Artificial Neural Systems in Commercial Lending," *Bankers Magazine*, Vol. 177, No. 6, Nov./Dec. 1994, pp.40-44 (with D.K. Malhotra and Rashmi Malhotra).

"A Reexamination of Equity Fund Expense Ratios and 12b-1 Plans," *Journal of Financial Research,* Vol. XVII, No. 2. Summer 1994, pp. 231-240 (with D.K. Malhotra).

"The Risks of Pension Plans," *Financial Services Review*, Vol. 2, No. 2, 1993, pp. 131-156 (with Aaron Phillips and Sharon Moody).

College Planning: Shake Hands with the Taxman," *Financial Executive,* Sept./Oct. 1993, pp. 14-16 (with Bill Samson).

"Predicting Credit Risk - A Neural Network Approach," *Journal of Retail Banking,* Vol. 15, No. 3, Fall 1993, pp. 37-40 (with D.K. Malhotra and Rashmi Malhotra).

"Emerging Trends in Interest Rate Swaps," *The Bankers Magazine,* May/June 1993, pp. 44-50, (with D.K. Malhotra).

"Planning for Retirement: Defined Benefit Plans and Planner Due Diligence," *Journal of the American Society of CLU & ChFC*, Vol. XLVII, No. 2. March 1993, pp. 46-52 (with Sharon Moody and Aaron Phillips).

"The Option Pricing Model and the Risk Factor of Stock: A Pedagogical Note," *New York Economic Review*, Spring 1992, pp. 40-45 (with Jeffrey Peterson, W. Steven Smith and Richard Rudolph).

"Financial Markets of the Future," *Focus*, Volume 1, No. 1, Spring 1991, pp. 9-13.

"Health Care - Breaking the Poverty Cycle," *Business Alabama Monthly*, January 1991, p. 39 (with Edward Smith).

"Choosing Between C versus S Corporate Status in the Closely Held Corporation," *Journal of the American Society of CLU & ChFC,* Volume XLIV, No. 5, September 1990, pp. 62-75 ( With William D. Samson). Recipient of the Outstanding Paper Award for the Journal for 1990.

"Health Care in Alabama," *Alabama Business,* Volume 59, No. 2, February 1990, pp. 3-8 (with Edward M. Smith).

"Interest Rates and Bank Portfolio Adjustments," *Journal of Banking and Finance* 13, (1989), pp. 151-161 (with Paul Thistle and B.L. Conrad).

"College Planning: Hitting the Mark," *Best's Review,* Vol. 90, No. 4, August 1989, pp. 32ff (with William D. Samson).

"Family Income Splitting Techniques after Tax Reform," *Journal of Financial Planning,* Volume 2, No. 1, January 1989, pp. 26-31 (with William D. Samson).

"Credit Union Investments: The Mortgage Lending Factor," *Credit Union Management*, Vol. 11, No. 9, September 1988, pp. 8-12.

"EE Bonds Still a Sound Investment," *Journal of the Institute of Certified Financial Planners*, Vol. 8, No. 3, Fall 1987, pp. 201-212, (with Bill Samson and Ed Schnee).

"The Use of Financial Futures in Banking," *The Journal of Commercial Bank Lending,* Vol. 65, No. 12, August 1983, pp. 6-22 (with George McCabe).

"The Effect of Money Market CDs on the Growth of Money Market Mutual Funds," *Business Economics*, Vol. XVI, No. 1, January 1981, pp. 75-78 (with Walter S. Misiolek).

"The Long and Short of Hedging," *Business*, Vol. 30, No. 6, November-December 1980, pp. 36-39 (with George McCabe).

"Hedging for Better Spread Management," *The Banker's Magazine*, Vol. 163, No. 4, July-August 1980, pp. 47-52 (with George McCabe).

"Regulation and Bank Trading in the Futures Market," *Issues in Bank Regulation*, Vol. 3, No. 1, Summer 1979, pp. 6-14 (with George McCabe).

"Regulatory Problems of EFTS," *Issues in Bank Regulation*, Vol. 2, No. 1, Summer 1978, pp. 36-38 (with Bruce H. Fairchild).

"Evaluation Model Can Improve Performance in FNMA Auction," *Mortgage Banker*, March 1978, pp. 53-57 (with H. A. McKinnon and Mike E. Miles).

"Thoughts on Monetary Policy," *The Business Barometer of Central Florida*, Vol. 2, No. 2, April 1977.

**PUBLISHED PROCEEDINGS**

"Small Manufacturer's Perceptions of Banks Level of Assistance in the Exporting Process," *Conference Proceedings of SBIDA*, February 1986, pp. 23-28 (with Mark Weaver and Donald Selheimer).

"An Evaluation of the Effectiveness of a Secret Shopper Program in the Implementation of a Personal Service Policy in an Independent Bank," *Proceedings of the Southern Management Association*, November 1984, pp. 407-409 (with M. M. Petty).

"Regulation of EFTS as a Public Utility," *Proceedings of a Conference on Bank Structure and Competition*, Federal Reserve Bank of Chicago, April 1978, pp. 382-395 (with Bruce H. Fairchild).

"A Simulation Model to Determine a Competitive Bid Strategy for a Mortgage Banking Firm Operating in the Secondary Mortgage Market," *Proceedings of the Southwestern Finance Association*, March 1977, pp. 186-194 (with H. A. McKinnon).

**REPRINTS OF PUBLICATIONS**

"The Use of Financial Futures in Banking," in *Classics in Commercial Bank Lending*, Philadelphia, PA: Robert Morris Associates, 1985, pp. 413-430.

"The Use of Financial Futures in Banking," in *Futures Training Manual*. New York: Citicorp Futures Corporation (Subsidiary of Citicorp), 1984.

"The Use of Financial Futures in Banking," in *Orientation to U. S. Banking*. San Francisco, CA: Bank of America, 1984, pp. R-123-143.

"The Use of Financial Futures in Banking," in *Commercial Banking Text and Readings*. By John R. Brick. Haslett, MI: Systems Publications, Inc., 1984, pp. 409-422.

"Hedging for Better Spread Management," in *Interest Rate Futures Concepts and Issues*. Edited by Gerald D. Gay and Robert W. Kolb, Richmond, VA: Robert F. Dame, Inc., 1982, pp. 255-264.

"Hedging for Better Spread Management," in *Funds Management Under Deregulation*. Edited by George H. Hempel, Washington, D.C.: American Bankers Association, 1981, pp. 652-660.

"Regulatory Problems of EFTS," reprinted in the *Illinois Banker*, Vol. 60, No. 7, January 1979, pp. 12-13.

**PAPERS PRESENTED**

Have State Pension Plans Taken Additional Investment Risk to Reduce Required Contributions? Presented to the Southwest Finance Association Annual Meeting, March 15, 2019, Houston,TX ( with Charles Hanby and Srinidhi Kanuri).

"Relative Performance of Real Estate Exchange Traded Funds," presented to the Academy of Financial Services Annual Meeting, Chicago, IL, October 2, 2018 (with Srinidhi Kanuri).

"Commodity Mutual Funds: Do They Add Value?" presented to the Southwestern Finance Association Annual Meeting, Houston, TX, March 15, 2015 (with Srinidhi Kanuri).

"Commodity Mutual Funds: Do They Add Value?" presented to the Academy of Financial Services Annual Meeting, Nashville, TN October 17, 2014.

"Performance of Alternative Mutual Funds," presented to the Southern Finance Association Annual Meeting, November 22, 2013, San Juan, Puerto Rico (with Srinidhi Kanuri)

"Bad News Bears: Effects of Expected Market Volatility on Daily Returns," presented to the Southern Finance Association Annual Meeting, November 17, 2011, Key West, FL (with Hunter Holzhauer).

"Five Factor Model for Measuring Financial Risk Tolerance," presented to the Southern Financed Association Annual Meeting, November 18, 2010, Ashville, North Carolina (with Hunter Holzhauer).

"Five Factor Model for Measuring Financial Risk Tolerance," presented to the Academy of Financial Services Annual Meeting, October 9, 2010, Denver, Colorado (with Hunter Holzhauer).

"Determinants of Cost Efficiencies in the Closed-end Fund Industry," presented to the Southern Finance Association Annual Meeting, Nov. 20, 2008, Key West, Florida (with D.K. Malhotra and Rand Martin).

"Investment Focus and Closed-end Funds," presented to the Southern Finance Association Annual Meeting, Nov. 19, 2004, Naples, Florida (with D.K. Malhotra and Rand Martin).

"A DEA Approach to Real Estate Mutual Funds and Real Estate Investment Trust Performance," presented to the Southern Finance Association Annual Meeting, Nov. 22, 2002, Key West Florida (with Chris Brockman and Randy Anderson).

"Leverage and Closed-end Bond Funds Performance," presented to the Southern Finance Association Annual Meeting, Nov. 22, 2002, Key West Florida (with Anita Pennathur and D. K. Malhotra).

"A Relative Efficiency Approach to Modern Performance Measurement Using DEA," presented to the Academy of Economics and Finance Annual Meeting, February 15, 2001, Biloxi, Mississippi (with Chris Brockman and Randy Anderson).

"Fund Efficiency, Industry Efficiency, Scale Economies and Relative Fund Type Efficiencies: A Baysian's Approach," presented to the Financial Management Association Annual Meeting, Seattle, Washington, Oct. 26, 2000 (with Randy Anderson and Danielle Lewis).

"A Comparative Analysis of the Expense Ratios of Open-end and Closed-end Equity Funds," presented to the Financial Management Association Annual Meeting, Seattle, Washington, Oct. 27, 2000 (with Rand Martin and D.K. Malhotra).

"Mutual Funds and Taxes," presented to the 2000 National Conference of the College for Financial Planning, July 22, 2000, Denver, Colorado.

"A Comparative Analysis of Open-end and Closed-end Bond Fund Expenses," presented to the Eastern Finance Association Annual Meeting, April, 3, 2000, Myrtle Beach, South Carolina (with D.K. Malhotra and Rand Martin).

"A Comparative Analysis of Open-end and Closed-end Bond Fund Expense Ratios," presented to the Academy of Financial Services Annual Meeting, Oct. 6, 1999, Orlando, Florida, (with D. K. Malhotra and Rand Martin).

"Leverage and Closed-end Bond Funds Performance," presented to the PACAP/FMA Finance Conference Annual Meeting, July 9, 1999, Singapore (with D.K. Malhotra).

"The Right Offer? Evidence from Rights Issues in Closed-end Funds," presented to the Eastern Finance Association Annual Meeting, April 24, 1998, Williamsburg, VA (with Anita Sigler)

"The Impact of Leverage on Closed-end Bond Funds," presented to the Midwest Finance Association Annual Meeting, March 19, 1998, Chicago, Illinois (with Anita Sigler).

"An Empirical Examination of Closed-end Fund Expenses," presented to the Financial Management Association Annual Meeting, Oct. 17, 1997, Honolulu, Hawaii (with D.K. Malhotra and Gintaras Labutis).

"The Performance of Leveraged Closed-end Funds," presented to the Annual Meeting of the Academy of Financial Services, Oct. 15, 1997, Honolulu, Hawaii, with Anita Sigler.

" Closed-end Fund Expenses and Returns: An Empirical Investigation," presented to the Annual Meeting of the Academy of Financial Services, Oct. 15, 1997, Honolulu, Hawaii, with D.K. Malhotra.

"An Object-Oriented Back-Propagation Simulator for Predicting Default Risk in Consumer Lending," presented to the Decisions Sciences Institute Annual Meeting, Nov. 25, 1996, Orlando, FL (with D.K. Malhotra and Rashmi Malhotra)

"An Empirical Examination of Closed-end Fund Expenses," presented to the Southern Finance Association Annual Meeting, Nov. 22, 1996, Key West, FL (with D.K. Malhotra and Gintaras Labutis).

"An Empirical Analysis of Mutual Fund Expenses," presented to the Academy of Financial Services Annual Meeting, St. Louis, MO, Oct. 12, 1994 (with D.K. Malhotra).

"Pricing Interest Rate Swaps - Theory and Practice," presented to the Southern Finance Association Annual Meeting, New Orleans, LA, November 18, 1993 (with D. K. Malhotra).

"Credit Risk in Interest Rate Swaps and Capital Adequacy Requirements," presented to the Midwest Finance Association Annual Meeting, Indianapolis, IN, April 1, 1993 (with D.K. Malhotra).

"A Reexamination of Mutual Fund Expense Ratios and 12b-1 Plans," presented to the Academy of Financial Services Annual Meeting, San Francisco, CA, October 21, 1992 (with D.K. Malhotra).

"Performance and Structural Differences of REITs Offering Dividend Reinvestment Plans," presented to the Financial Management Association Annual Meeting, Orlando, Florida, October 26, 1990 (with Aaron Phillips and H. Shelton Weeks).

"An Analysis of Defined Benefit Pension Plans and Corporate Failure: Implications for Retirement Planning," presented to the Academy of Financial Services Annual Meeting, Orlando, Florida, October 24, 1990 (with Sharon Moody and Aaron Phillips).

"An Analysis of Dividend Reinvestment Plans," presented to the Academy of Financial Services Annual Meeting, Boston, October 17, 1989 (with H. Shelton Weeks and Aaron L. Phillips).

"Price Discovery and Futures Trading in Stock Indices," presented to the Southwestern Finance Association Annual Meeting, New Orleans, LA, March 1989 (with Terell R. Keasler).

"Capital Structure Change and the Modigliani and Miller Theorems: some Evidence Regarding Option Market Efficiency," Presented to the Financial Management Association Annual Meeting, New Orleans, LA, October 21, 1988 (with Jeffery Peterson).

"The Kiddie Tax: The 1986 Tax Reform Act Changes Family Income Splitting Incentives," Presented to the Academy of Financial Services Annual Meeting, New Orleans, LA, October 19, 1988 (with William D. Samson).

"The Relation Between Futures Trading and Volatility in the Major Market Index: An Empirical Analysis," presented to the Finance Management Association Annual Meeting, Las Vegas, Nevada, October 17, 1987 (with Terell Ray Keasler).

"A Survey of Costs and Performance of 12b-1 Plans," presented to the Academy of Financial Services Annual Meeting, Las Vegas, Nevada, October 14, 1987.

"Utility Regulation and the Cost of Capital," presented at the Financial Management Association Annual Meeting, Denver, Colorado, October 1985 (with John Formby and Paul D. Thistle).

"Deregulation and Commercial Bank Portfolio Adjustments," presented to the Southwestern Economics Association Annual Meeting, Houston, Texas, March 1984 (with Paul D. Thistle).

"Business Cycles and Bank Portfolio Management," presented to the Southern Economic Association Annual Meeting, Atlanta, Georgia, November 14, 1984 (with Paul D. Thistle).

"Financial Aspects of Corporate Strategies," presented to the Alabama Chapter of the Hospital Financial Management Association, Tuscaloosa, AL, December 1983.

"The Effect on Bank Operations of a One-Account Structure," presented to the Financial Management Association Annual Meeting, New Orleans, Louisiana, October 23, 1980.

"Growth and Development of Money Market Funds," presented to the annual meeting of the Southern Finance Association, November 9, 1979 (with Walter Misiolek).

"Hedging, Spread Management, and Risk Reduction in Banking," presented to the Financial Management Association Annual Meeting, Boston, Massachusetts, October 12, 1979 (with George McCabe.

"An Analysis of the Problems of Regulating Futures Trading by Commercial Banks," presented to the Southwestern Finance Association Annual Meeting, Houston, Texas, March 16, 1979 (with George McCabe).

"An Examination of Some Sources of Risk in Bank Holding Company Stock," presented to the Southwestern Finance Association Annual Meeting, Houston, Texas, March 16, 1979 (with Don Chance).

"Regulation of EFTS as a Public Utility," presented to the Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, April 28, 1978 (with Bruce Fairchild).

"Commitment Coverage Analysis for Mortgage Lending: A Simulation Approach," presented to the Financial Management Association Annual Meeting, October 13, 1978 (with Alexander McKinnon and Patrick Shannon).

"Actual Versus Perceived Risk in Crime," presented to the American Statistical Association Annual Meeting, August 13, 1978 (with Ken White and James Xander).

"Innovations in Commercial Banking," presented to the Fourteenth Annual Conference of the Florida Economic Educational Foundation for the Clergy, Orlando, Florida, October, 1977.

"Bid Strategies in the FNMA Free Market Commitment Auction," presented to the Eastern Finance Association, April, 1977 (with H. A. McKinnon and Mike E. Miles).

## PROGRAM DEVELOPMENT

Established the Graduate Management School for credit union executives at the University of Alabama. This school was held annually from 1987 through 1992 and was sponsored by the Southeastern Regional Credit Union Leagues. This school was revised at the end of 1992 and the sponsor is now the Credit Union National Association (CUNA) and is open to credit union executives from throughout the country.

Coordinated and taught in the Insurance Education Institute sponsored by the Insurance Education Foundation. This two week program was offered to high school teachers for graduate credit through the College of Human Environmental Science, the College of Education, and the College of Business and was one of six such programs sponsored by the Foundation throughout the country. As a result of a consolidation of programs, the Institute is no longer offered at the University of Alabama.

## RESEARCH GRANTS

"Alternative Financing Sources for Alabama Highways. Total funding, $50,000 (co investigator with Walter Robbins and Tarek Rizk), 2004-2005.

"High Speed Sea Lift" funded by the Maritime Administration. Total funding, $278,500 (co investigator with J. Sterling, R. Robicheaux, A. Allaway, J. Cover, H. Elder, and T. Albright).

"Public Utility Commissioner Selection and Electric Utilities cost of Capital" funded by the School of Mines and Energy Development, The University of Alabama. Total funding, $16,000. (with Paul D. Thistle)

"An Analysis of Credit Union Structural Changes" funded by the University Research Grants Committee. Total Funding, $500.

## OTHER PROFESSIONAL ACTIVITY

### Organizational Leadership

President, The Academy of Financial Services - 1996 - 1997

President-Elect, The Academy of Financial Services 1995-1996

Vice President - Programs, The Academy of Financial Services 1994-1995.

Vice President-Finance, The Academy of Financial Services, 1992-1994

Program Committee, Academy of Financial Services, 1993 and 1994.
Associate Editor, *Financial Services Review* - 1994 -1996

Reviewer, *Journal of Financial Research, Journal of Economics and Finance, The Financial Review, Journal of Financial Education, Financial Services Review,* ***and*** the *International Review of Economics and Finance*

Member, Best Paper Award Committee - Academy of Financial Services Annual Meeting 1993.
Member, *ad hoc* review committee for the editor of *The Financial Services Review* - 1993.

CFP Exam Item Writing Committee, International Board of Certified Financial Planners, 1991- 1993

**Professional Meeting Participation**

Chairperson, Issues in Corporate Risk Management Session, Financial Management Association Annual Meeting, Oct. 22, 2010, New York, NY

Chairperson, Open and Closed-end Mutual Funds Session, Southern Finance Association Annual Meeting, Nov. 20, 2008, Key West Florida.

Chairperson, Mutual Fund Session, Southern Finance Association Annual Meeting, Nov. 16, 2005, Key West Florida.

Chairperson, Performance Measurement Session, Southern Finance Association Annual Meeting, Nov. 21, 2002, Key West Florida.

Chairperson, Mutual Fund Evaluation Session, Financial Management Association Annual Meeting, Honolulu, Hawaii, October, 16, 1997

Discussant, The Defined Benefit/Defined Contribution Debate Continues Session, Academy of Financial Services Annual Meeting, St. Louis, MO, October 12, 1994.

Chairperson, Evaluating Retirement Plan Options Session, Academy of Financial Services Annual Meeting, Toronto, Canada, October 13, 1993.

Chairperson, Investment Opportunities for the Individual Investor Session, Academy of Financial Services Annual Meeting, San Francisco, CA, October 21, 1992.

Chairperson, Retirement and Estate Planning Session, Academy of Financial Services Annual Meeting, Orlando, Florida, October 24, 1990.

Discussant, Impacts of Bank Capital Adequacy Session, Financial Management Association Annual Meeting, Boston, October 20, 1989.

Discussant, Academic Symposium, International Association for Financial Planning, Atlanta, GA, October 4, 1987.

Discussant, Issues in Bank Management Session, Southern Finance Association Annual Meeting, New Orleans, Louisiana, November 1986.

Discussant, Personal Financial Planning Session, Financial Management Association Annual Meeting, New York, New York, October 1986.

Discussant, Studies in Bank Valuation and Performance Section, Financial Management Association Annual Meeting, Toronto, Canada, October 1984.

Discussant, The Value of Banks Section, Financial Management Association Annual Meeting, San Francisco, California, October, 1982.

Participant, Asset-Liability Management Workshop sponsored by The Institute of Financial Education, San Diego, California, August, 1982.

Discussant, Risk-Return Studies Section, Southern Finance Association Annual Meeting, November, 1981.

Participant, Educators Conference on Financial Instruments sponsored by the Chicago Board of Trade, Chicago, Illinois, September 24-25, 1981.

Discussant, Financial Institutions: Policies and Procedures Section, Southern Finance Association Annual Meeting, November, 1978.

Participant, 13th Annual Seminar on the Federal Home Loan Bank System, Atlanta, Georgia, October 12-13, 1978.

Discussant, Research in Banking Section, Southwestern Finance Association Annual Meeting, March, 1978.

Discussant, Banking and Financial Markets Section, Southern Finance Association Annual Meeting, November, 1977.

Participant in the Southern Regional Bank Card Management Workshop, Orlando, Florida, April 3-6, 1977, sponsored by the American Banker's Association.

## PROFESSIONAL ORGANIZATION MEMBERSHIPS

Academy of Financial Services
American Finance Association
CFA Institute
Financial Management Association
Financial Planners Association
National Association of Certified Valuation Analysts
Society of Financial Services Professionals
Southern Finance Association
Southwestern Finance Association

## HONORS

Honorary Director, Japan Academic Society for Financial Planning, 2000

Who's Who International, 1993.

Who's Who in Finance and Industry, 1994/1995

Who's Who in the South and Southwest 1993/1994

Outstanding Finance Faculty Member for 1989-90, 1993-94, and 2007-08 presented by the University of Alabama Chapter of the Financial Management Association National Honor Society and the Alabama Finance Association.

Who's Who in Financial Planning, 1985.

Dissertation research grant from the Eugene and Dora Bonham Fund at the University of Texas at Austin, 1976.

President's List, Dean's List, W. B. Harlen Award for the Outstanding Graduate in Finance; Banking and Finance Award; Honor Graduate, Coast Federal Savings and Loan Academic Scholarship; Hancock Bank Academic Scholarship (all at the University of Southern Mississippi, 1969-1972).

## UNIVERSITY, COLLEGE, AND DEPARTMENTAL RESPONSIBILITIES

University: Professional Sports Counseling Panel
Member: 1994 – Present
Chair: 2003 – Present

University: Intercollegiate Athletics Committee
Member: 2003-2005 and 2013 - 2017

University: Athletics and Academics Committee
Co-Chair: 2005-2007
Chair: 2008-2009

University: Campus Master Plan Committee
Member: 1992 - 1995

University: Faculty/Staff Benefits Advisory Committee
Chairman: 1989-1991; 2008-2009; and 2018-19
Member: 1987-1991
1992-1995
2007-2009
2016-present

University: Academic Program Review Committee for the Department of Consumer Sciences
Chairman: 1988-1989

University: Academic Program Review Committee for the Interim Term
Member: 1994-1995

University: Resources and Priorities Committee
Member: 1984-1986
1989-1992

University Recreation Committee
Member: 1981-1984

University: Faculty Senate
Member: 1998-2000 and 2010-2013
Alternate: 1984-1985

University: Financial Affairs Committee
Chair: 2011-2013

C&BA: Faculty Executive Board
Chairman: 1994-1995
Alternate: 1989-1990, 2013-2014
Member: 1984-1985, 2010-2013, 2016 - present

C&BA: Curriculum Task Force
Member: 1995-97

C&BA: International Business Committee
Member: 1993 - 1995

C&BA: Masters Students Placement Task Force
Chairman: 1992-1994

C&BA: Safety Committee
Member: 1992-95

C&BA: EMBA Committee
Member 2000 – 2018

C&BA: MBA Committee
Chairman: 1988-1989
Member: 2002-2006
1997-1998
1995-1996
1987-1990
1981-1983

C&BA: Undergraduate Programs Committee
Chairman: 1987-1988
1983-1984
Member: 1986-1987

Department: Planning and Policy Committee
Member: 1990-1993
2002-2008

Department: Scholarship Committee
Chairman: 1986-1998

Department: Coordinator for the Finance Area
1981-1982

EXPERT REPORT OF ROBERT W. MCLEOD, PH.D.

Department: Coordinator for Money and Banking courses
1979-1986

Department: Coordinator of Finance "SuperSection"
1993 - 1996

24 *Boa Vida Healthcare, LLC. et al. v. Pickens County Health Care Authority*

# APPENDIX B

## Documents Reviewed

1. Complaint
2. Management Agreement
3. Billing and Services Agreement
4. Services Agreement
5. Termination of Management Agreement
6. Strategic, Financial, and Operational Assessment of the Pickens County Medical Center prepared by Stroudwater, Final Report Date: January 23,2019
7. Pickens County Health Care Authority, Financial Statements and Supplemental Information, September 20, 2017 and2016 prepared by Warren Averett, March 15, 2018.
8. Expense data from Boa Vida Health and Monroe Regional Hospital



# Strategic, Financial, and Operational Assessment

Conducted: October 3, 2018

Preliminary Report: December 4, 2018

Final Report: January 23, 2019

Eric Shell, MBA, CPA

Matt Mendez, MHA

Boa Vida v. PCHCA
BV009264 07/22/2020

# Delta Region Health Systems Development Project

DRAFT

STROUDWATER

*This project is supported by the Health Resources and Services Administration (HRSA) of the U.S. Department of Health and Human Services (HHS) under grant number U65RH31261, Delta Region Health Systems Development, $2,000,000 (0% financed with nongovernmental sources). This information or content and conclusions are those of the author and should not be construed as the official position or policy of, nor should any endorsements be inferred by HRSA, HHS or the U.S. Government.*

Boa Vida v. PCHCA
BV009265   07/22/2020

# Overview



DRAFT

- Pickens County Medical Center (PCMC) is an independent, 40-bed, not-for-profit Short Term Acute Care Hospital (STACH), providing acute care, swing bed, emergency medicine, surgery, imaging, rehabilitation, laboratory and related outpatient ancillary services to the residents of Carrollton, AL and surrounding communities
  - In addition to the services listed above, PCMC also operates:
    - A Provider-based Rural Health Clinic (PB-RHC), Carrollton Primary Care
    - A specialty clinic that includes medical and surgical service offerings
    - 10-bed inpatient geriatric psychiatric (IPF) unit
  - PCMC has maintained its independent status since 2014 when the management agreement with DCH Health System was terminated
    - PCMC is currently seeking strategic partnership opportunities again recognizing the need to work more closely with a larger system as payment systems continue to evolve
- PCMC has invested in the development of its primary care network, currently comprised of one PB-RHC as identified above
    - Opportunities exist to pursue an enhanced partnership with multiple independent practices and a Federally Qualified Health Center (FQHC) in the service area
- PCMC's financial performance declined from a (2.4%) operating loss in FY 2015 to a (24.4%) operating loss in FY2017, and now has improved to a (6.1%) operating loss in FY 2018 largely due to the growth of inpatient census as a result of more appropriate emergency department admissions and sale of the home health agency (HHA) which had a negative contribution margin in prior years
  - PCMC's sustained negative operating margin has contributed to near depletion of cash reserves and steady increases in accounts payable

Boa Vida v. PCHCA
BV009266   07/22/2020

# Overview

DRAFT

 

- The Affordable Care Act (ACA) was passed in 2010 and upheld by the U.S. Supreme Court in 2012 and 2015; however, despite attempts at repeal in 2017, the ACA remains largely intact

  - With a majority of significant provisions, such as payment, insurance, and delivery-system reforms currently being implemented, the healthcare industry is moving to address future market changes including:

    - Payment systems transitioning from volume-based to value- and population-based

    - Quality/patient safety as new drivers of hospital market share

    - Payment cuts that are real, forcing increased efficiency

  - It is uncertain how the current administration will affect reform measures that are underway

    - Regardless of the shift in government power, rural hospitals and providers must position themselves for the new market-based competitive environment through the pursuit of strategies that consider the delivery system and payment system transition towards population based payment which includes, but not is not limited to the following: sound financial and operational management, adoption of technology, pursuit of high quality care, alignment with primary care providers, and development of future alignment strategies

- Recommendations in this report are made in the context of best positioning PCMC for the rapidly evolving healthcare market, while recognizing PCMC's current financial challenges

Boa Vida v. PCHCA
BV009267   07/22/2020

# Engagement Purpose and Methodology

DRAFT



- **Overview**
  - PCMC engaged Stroudwater Associates through a grant provided by the Delta Region Health System Development Project to complete a financial and operational assessment for the purpose of:
    - Answering financial, operational, and industry-specific questions presented by administration
    - Helping to identify top opportunities that will result in improved financial and operating performance
    - Best-positioning PCMC for success in the rapidly evolving healthcare market, including new payment and delivery care models, and to promote value within a population health management system
- **Purpose**
  - To identify performance-improvement opportunities that will result in increased financial stability, with areas to address including:
    - Evaluation of historic/potential demand for clinical services
    - Identification of opportunities to appropriately address clinical service line gaps
    - Reimbursement and cash flow with emphasis on selected service lines
    - Hospital expense analysis
    - Organizational architecture and management principles
    - Strategic direction

*Please note that this report was based on our determination of the highest value opportunities for PCMC as identified during the site visit. Additional opportunities may exist for performance improvement that were not reported or detected during the visit.

Boa Vida v. PCHCA
BV009268   07/22/2020

# Engagement Purpose and Methodology

DRAFT



- **Methodology**
  - Gather and review pertinent market, clinical service line, and financial data, including:
    - Detailed inpatient utilization data
    - Detailed outpatient utilization data for all outpatient revenue centers (e.g., rehab, lab, radiology, etc.)
    - Recently-filed Medicare cost report
    - Latest provider statistical and reimbursement reports
    - Historical and most recent audited financial statements
    - Financial and utilization (inpatient and outpatient) projections
  - Conduct an intensive one-day site visit
    - Interviews with CEO, CFO, CNO, senior leadership team members, clinical operations, and selected department managers
    - Preview findings and preliminary recommendations prior to site visit departure
  - Prepare draft and final report of findings and recommendations
  - Action planning
  - Follow-up as required

Boa Vida v. PCHCA
BV009269   07/22/2020

# Financial Summary

- Profit & Loss
- Financial Analysis
- Conclusions

# Financial Summary

DRAFT

STROUDWATER

| Pickens County Medical Center | FY 15 Year Ended 9/30/15 | FY 16 Year Ended 9/30/16 | FY 17 Year Ended 9/30/17 | FY 2018 Year Ended 9/30/18 |
|---|---|---|---|---|
| Operating Revenue: | | | | |
| Gross Patient Revenue | $ 31,971 | $ 31,519 | $ 30,349 | $ 33,095 |
| Contractual Allowances | (17,866) | (17,915) | (17,991) | (17,864) |
| Bad Debt | (2,566) | (1,679) | (1,946) | (3,430) |
| Charity Care | (29) | (233) | (230) | (133) |
| Net Patient Revenue | 11,510 | 11,692 | 10,182 | 11,668 |
| Other Operating Revenue | 723 | 476 | 388 | 768 |
| Sales Tax Revenue | 1,301 | 1,183 | 1,208 | 1,234 |
| Medicaid DSH | 740 | 426 | 614 | 589 |
| Total Operating Revenue | 14,274 | 13,777 | 12,392 | 14,259 |
| Operating Expenses: | | | | |
| Salaries & Wages | 6,322 | 6,688 | 7,154 | 6,692 |
| Benefits | 862 | 1,034 | 1,194 | 1,152 |
| Supplies and Other | 5,679 | 6,015 | 5,592 | 5,998 |
| Interest | 462 | 451 | 436 | 405 |
| Depreciation | 1,297 | 1,202 | 1,036 | 886 |
| Total Operating Expense | 14,622 | 15,390 | 15,412 | 15,133 |
| Income (Loss) from Operations | (347) | (1,613) | (3,020) | (874) |
| Non-Operating Income (Expense) | 48 | 41 | 146 | - |
| EHR Incentive Revenue | 95 | 596 | - | - |
| Net Income (Loss) | $ (205) | $ (976) | $ (2,874) | $ (874) |
| Net Income (Loss) (w/o sales taxes) | $ (1,506) | $ (2,158) | $ (4,082) | $ (2,108) |
| Cash and Investments, End of Period | $ 1,375 | $ 635 | $ 175 | $ 183 |
| AP and Accrued Liabilities | $ 1,936 | $ 1,866 | $ 3,659 | $ 4,026 |
| Days of Operating Cash Available | 39.0 | 16.9 | 4.6 | 4.8 |
| Average Payment Period | 54.9 | 49.6 | 95.8 | 106.2 |
| Days in Net Accounts Receivable | 62.0 | 44.5 | 50.1 | 59.9 |
| Net AR | 1,957 | 1,427 | 1,397 | 1,914 |
| Operating Margin | (2.4%) | (11.7%) | (24.4%) | (6.1%) |

Boa Vida v. PCHCA
BV009271 07/22/2020

# Profitability Analysis

DRAFT

- **Operating Revenue** has remained relatively constant over the measured period, although PCMC has experienced a 15% increase in operating revenue between FY 2017 and FY 2018 due to inpatient volume growth with more appropriate admissions from the emergency department
  - PCMC receives approximately $1.1M to $1.3M in Pickens County sales tax revenue annually, in addition to proceeds from the Medicaid Disproportionate Share (DSH) program of approximately $450K to $750K annually
  - PCMC experienced a 76% increase in bad debt in FY 2018, due to a new early-out company, causing a clean up of old accounts and under-reporting in FY 2016 and FY 2017
- **Operating Expenses** have only increased 3.5% between FY 2015 and FY 2018, due to aggressive management of expenses but has recently decreased between FY 2017 and FY 2018 by 2% due to the decreases in salaries and benefits associated with the closure of the HHA

Boa Vida v. PCHCA
BV009272 07/22/2020

# Liquidity Analysis

DRAFT





- **Days Cash on Hand** decreased from 39 days in FY 2015 to 5 days in FY 2018 due to PCMC's annual negative operating performance

- **Net Days in A/R** increased from best practice 45 days in FY 2016 to 60 days in FY 2018 due to limited oversight and measurement of revenue cycle performance
  - Days A/R is above peer hospital target benchmark range of 45 days

- **Average Payment Period** increased significantly from 55 days in FY 2015 to 106 days in FY 2018 due to limited cash reserves and funding of ongoing losses through debt and accounts payable
  - Days A/P is above range of peer hospital target benchmark of 35 days

Boa Vida v. PCHCA
BV009273   07/22/2020

# Financial Statement Conclusions

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| <u>Overall Condition</u><br>• PCMC's financial performance declined from a (2.4%) operating loss in FY 2015 to a (24.4%) operating loss in FY 2017, but has improved to a (6.1%) operating loss in FY 2018 largely due to the sale of home health and growth of inpatient census in FY 2018, in addition to additional revenue through the county tax proceeds and Medicaid DSH payments<br>  • PCMC's financial position has been largely bolstered by county tax revenue and DSH payments of approximately $9.0M between FY 2015 and FY 2018<br>• Ongoing operating losses incurred have resulted in PCMC's balance sheet deteriorating as seen by increases in Days in A/R and A/P, with Days Cash on Hand decreasing significantly to unsustainable levels and must be targeted for improvement | • PCMC must ensure its long-term financial viability by continuing the following activities:<br>  • Focus on short-term cash infusion through accelerating amounts owed to PCMC from various parties (HHA acquirer, Medicaid DSH, etc.)<br>  • Implement low-cost revenue growth opportunities to accelerate current cash flow<br>  • Pursue careful expense management, increased revenue for services provided, expansion into specialty services needed in the community, and volume growth<br>  • Pursuit of a long-term partner through either an affiliation or acquisition of PCMC<br>• Use the strategies discussed in this report to target a positive operating margin and improved organizational liquidity<br>  • These goals will be achieved through volume and revenue growth driven by acute volume increases, increases in related ancillary services, cost report improvements, re-establishment of the 340B program, and overall business growth through increased primary care alignment |

Boa Vida v. PCHCA
BV009274 07/22/2020

# Service Area

- Overview
- Population Demographics
- Market Share
- Service Area Calculation and Conclusions

Boa Vida v. PCHCA
BV009275   07/22/2020

# Service Area Overview

DRAFT

STROUDWATER

**PCMC is the only hospital in the service area comprised of four ZIP codes**

The service area was determined by looking at contiguous ZIP codes where PCMC had 10% Medicare market share in 2016 or had a significant amount of Medicare cases for FY2016.

North Mississippi Medical Center - West Point
Baptist Memorial Hospital - Golden Triangle
OCH Regional Medical Center
Ethelsville
35461
Reform
35481
Carrollton
35447
Pickens County Medical Center
Northport Medical Center
DCH Regional Medical Center
Winston Medical Center
Noxubee General Hospital
Aliceville
35442
Greene County Health System
John C. Stennis Memorial Hospital
Hale County Hospital
Clay
Oktibbeha
Tuscaloosa
Bibb
Critical Access
Short Term Acute
Primary Service Area

Project Overview Financial Summary Service Area Opportunities Recommendations 13

Boa Vida v. PCHCA
BV009276 07/22/2020

# Service Area Population

DRAFT

**2017 Population Estimates**

| Primary Service Area | Name | 00-17 | 18-44 | 45-64 | 65+ | Total | %of PSA |
|---|---|---|---|---|---|---|---|
| 35447 | Carrollton | 731 | 2,074 | 1,231 | 664 | 4,700 | 29% |
| 35442 | Aliceville | 1,033 | 1,679 | 1,516 | 1,359 | 5,587 | 35% |
| 35461 | Ethelsville | 320 | 618 | 620 | 451 | 2,009 | 12% |
| 35481 | Reform | 653 | 1,102 | 1,117 | 957 | 3,829 | 24% |
| | *PSA Total* | *2,737* | *5,473* | *4,484* | *3,431* | *16,125* | *100%* |
| | **Total Service Area** | **2,737** | **5,473** | **4,484** | **3,431** | **16,125** | |
| | Total Service Area | 17% | 34% | 28% | 21% | 100% | |
| | Alabama | 22% | 35% | 26% | 16% | 100% | |
| | United States | 23% | 36% | 26% | 15% | 100% | |

Source: Truven Health Analytics

- The Total Service Area population was approximately 16,125 in 2017
  - Sixty-four percent (64%) of the total population is younger than 45 years of age
  - The under-18 age cohort has a smaller percentage of people (17%) compared to the State (22%) and the United States (23%)
  - The 18-44 age cohort has a smaller percentage of people (34%) compared to the State (35%) and the United States (36%)
  - The 45-64 age cohort has a larger percentage of people (28%) compared to the State (26%) and the United States (26%)
  - The 65+ age cohort has a larger percentage of people (21%) compared to the State (16%) and the United States average (15%)
  - Twenty-nice percent (29%) of the population resides in Carrollton (35447), the home ZIP code of PCMC

Boa Vida v. PCHCA
BV009277 07/22/2020

# Service Area Population Growth by Zip Code

DRAFT

STROUDWATER

## 2017-2022 Change

| Primary Service Area | Name | 2017 Estimate | 2022 Projection | 2017-2022 % Change | 2017-2022 Ab. Change |
|---|---|---|---|---|---|
| 35447 | Carrollton | 4,700 | 4,948 | 5% | 248 |
| 35442 | Aliceville | 5,587 | 5,876 | 5% | 289 |
| 35461 | Ethelsville | 2,009 | 2,164 | 8% | 155 |
| 35481 | Reform | 3,829 | 4,017 | 5% | 188 |
| | *PSA Total* | *16,125* | 17,005 | *5%* | *880* |
| | Total Service Area | 16,125 | 17,005 | 5% | 880 |
| | Alabama | 4.88 | 4.96 | 2% | |
| | United States | 325 | 337 | 4% | |

State and US in Millions

Source: Truven Health Analytics

- The Total Service Area population is projected to increase by 5% (880 people) over the next five years
  - The hospital's home ZIP code of Carrollton is expected to increase by 5% (248 people) over the next five years
  - All ZIP codes are expected to contribute to the increase in population in the service area

Boa Vida v. PCHCA
BV009278 07/22/2020

# Population Change by Age

DRAFT

STROUDWATER

**2017-2022 Change**

| Total Service Area | 2017 Estimate | 2022 Projection | Absolute Change | Percent Change | Share of Growth |
|---|---|---|---|---|---|
| 00-17 | 2,737 | 2,743 | 6 | 0% | 1% |
| 18-44 | 5,473 | 5,824 | 351 | 6% | 37% |
| 45-64 | 4,484 | 4,424 | -60 | -1% | 0% |
| 65+ | 3,431 | 4,014 | 583 | 17% | 62% |
| Total | 16,125 | 17,005 | 880 | 5% | 100% |

Source: Truven Health Analytics

**2017-2022 Change**

| Primary Service Area | Name | 00-17 | 18-44 | 45-64 | 65+ | Total |
|---|---|---|---|---|---|---|
| 35447 | Carrollton | 9 | 109 | (18) | 148 | 248 |
| 35442 | Aliceville | (2) | 143 | (47) | 195 | 289 |
| 35461 | Ethelsville | (1) | 35 | 10 | 111 | 155 |
| 35481 | Reform | 0 | 64 | (5) | 129 | 188 |
| *PSA Total* | | *6* | *351* | *(60)* | *583* | *880* |
| **Total Service Area** | | **6** | **351** | **(60)** | **583** | **880** |

Source: Truven Health Analytics

- Sixty-two percent (62%) of growth in the total service area is projected to come from those 65 years and older
  - The 65+ age cohort is projected to increase by 17% (583 people)
    - All ZIP codes are expected to contribute growth in the over 65 age cohort
  - The 45 – 64 age cohort is projected to decrease by 1% (60 people)
  - The 18 – 44 age cohort is projected to increase 6% (351 people)
    - All ZIP codes are expected to contribute growth in the 18 – 44 age cohort
  - The 0 – 17 age cohort is projected to increase less than 1% (6 people)

Boa Vida v. PCHCA
BV009279 07/22/2020

# Population Household Income

DRAFT

### 2017 Median Household Income

| Primary Service Area | Name | Median Household Income | % of State | % of US |
|---|---|---|---|---|
| 35447 | Carrollton | $29,420 | 70% | 56% |
| 35442 | Aliceville | $24,158 | 57% | 46% |
| 35461 | Ethelsville | $36,191 | 86% | 69% |
| 35481 | Reform | $36,367 | 86% | 70% |
| *PSA Weighted* | | *$30,090* | *71%* | *58%* |
| **Total Weighted Service Area** | | **$30,090** | **71%** | **58%** |
| Alabama | | $42,099 | 100% | 81% |
| United States | | $52,083 | | |

Source: Truven Health Analytics

- Median household incomes for the service area are 71% of the State of Alabama median and 58% of the US median
  - The weighted median household income for the service area is the sum of each ZIP code income times the ZIP code population divided by the total service-area population

Boa Vida v. PCHCA
BV009280 07/22/2020

# Medicare Market Share 2012 - 2016

| | Medicare Market Share | | | | | Cases (Medicare) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2012 | 2013 | 2014 | 2015 | 2016 |
| Pickens County Medical Center (Carrollton-AL) | 35% | 30% | 26% | 20% | 18% | 437 | 359 | 305 | 241 | 214 |
| DCH Regional Medical Center (Tuscaloosa-AL) | 49% | 48% | 53% | 60% | 60% | 616 | 570 | 627 | 708 | 701 |
| UAB Hospital (Birmingham-AL) | 2% | 4% | 3% | 3% | 4% | 31 | 51 | 41 | 34 | 42 |
| Baptist Memorial Hospital - Golden Triangle (Columbus-MS) | 4% | 7% | 8% | 7% | 7% | 50 | 84 | 90 | 80 | 78 |
| All Other Hospitals | 10% | 10% | 10% | 10% | 11% | 121 | 120 | 112 | 118 | 129 |
| Grand Total | 100% | 100% | 100% | 100% | 100% | 1,255 | 1,184 | 1,175 | 1,181 | 1,164 |

Source: Medicare Data file

- PCMC's inpatient Medicare market share **decreased by 17% points** from 2012 to 2016, while DCH Regional Medical Center's market share **increased by 11% points** from 2012 to 2016 and captured 60% of the Medicare market share in 2016
    - Reported that PCMC has experienced unstable inpatient provider coverage and increases in ED transfers during the measure period
- Total Medicare discharges have **decreased by 7%** (91 cases) since 2012

Boa Vida v. PCHCA
BV009281 07/22/2020

# Market Service Area Calculation

DRAFT

- **Market Service Area**
  - To plan for needed services and to avoid developing excess capacity, total population of the service area is adjusted down based on the market and service area analysis
  - Current adjusted market service area, as defined below, is 14,957; this is based on 2017 population estimates and is projected to increase 5% over the next 5 years with the 2022 estimate being 15,769

| *Primary Service Area* | Zip Code | 2017 Actual Population | 2016 CMS Market Discharges | 2016 CMS Pickens Cty Discharges | 2016 CMS Pickens Cty Market Share | Inpatient Hospital Service Area | Primary Care Service Area | Market Service Area Weighting* | 2017 Weighted Population | 2017-2022 Popuulation Growth | 2022 Est. Service Area Population |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Carrollton | 35447 | 4,700 | 255 | 48 | 19% | Carrollton | Aliceville | 100% | 4,700 | 5% | 4,948 |
| Aliceville | 35442 | 5,587 | 406 | 96 | 24% | Carrollton | Aliceville | 100% | 5,587 | 5% | 5,876 |
| Ethelsville | 35461 | 2,009 | 150 | 21 | 14% | Carrollton | Columbus | 80% | 1,607 | 8% | 1,731 |
| Reform | 35481 | 3,829 | 353 | 49 | 14% | Carrollton | Aliceville | 80% | 3,063 | 5% | 3,214 |
| *PSA Total* | | 16,125 | 1,164 | 214 | 18% | | | 93% | 14,957 | 5% | 15,769 |
| ***Weighted Service Area*** | | **16,125** | **1,164** | **214** | **18%** | - | - | **93%** | **14,957** | **5%** | **15,769** |

* For planning purposes, total population is discounted by market service area weighting, an estimate based on inpatient market share, Hospital Service Area (Dartmouth), and Primary Care Service Area (Dartmouth).

- Quantitative: Inpatient Medicare market share
- Qualitative: Hospital Service Area (Carrollton), Primary Care Service Area (Aliceville, Columbus), proximity of competitors, services offered at PCMC, and field experience of Stroudwater consultants

Sources: Truven Health Analytics (Population)
CMS (IP Discharges)

Boa Vida v. PCHCA
BV009282 07/22/2020

# Market Service Area Conclusion

DRAFT

| Findings and Analysis | Recommendations |
| --- | --- |
| • The primary service area weighted population of 14,957 is an adequate population base to support a rural hospital, but is projected to increase 5% over the next five years<br>• The 65+ age cohort (primary users of rural hospitals) is expected to experience 17% growth from 2017 to 2022, gaining 583 people and comprising 62% of the service area growth<br>  • 65+ age cohort typically are most frequent users of rural hospital services<br>  • All ZIP codes are expected to have positive growth in the 65+ age cohort<br>• Inpatient services demand has contracted, as shown by a 7% decrease in total Medicare market discharges from 2012 (1,255) to 2016 (1,164)<br>• PCMC's inpatient Medicare market share decreased by 17% points to a market share of only 18% in 2016<br>  • DCH Regional Medical Center's market share increased by 11% points to capture 60% of the market as of 2016<br>  • PCMC's inpatient Medicare market share in Carrollton, its home ZIP code (35447), was 19% in 2016, compared to peer rural hospitals that often maintain 40% market share in their local ZIP code<br>    • Peer best-practice rural hospitals target a dominant inpatient market share of 40% within the hospital's home ZIP code | • Target growth efforts to increase captured inpatient market share in PCMC's home ZIP code to 40%<br>  • Consider market segment potential demand when evaluating locations to focus primary care outreach strategy efforts<br>  • Focus service development and marketing efforts on all growing age cohorts with particular attention to the 65+ age cohort<br>  • Improve the efficiency of services available with a focus on ambulatory care and primary care |

Boa Vida v. PCHCA
BV009283 07/22/2020

# Opportunities

Boa Vida v. PCHCA
BV009284   07/22/2020

# Population Health Transition Framework

DRAFT



- The strategic framework on the following page is designed to assist organizations in transitioning from a payment system dominated by the FFS payment model to one dominated by population-based payment models

    - *Delivery System strategic component* addresses the imperative to transform the current "sick care" model for optimal fit with population based payment.

    - *Payment System strategic componen*t addresses the imperative to proactively transform payment from FFS to population based payment.

    - *Population Health/care management component* requires creation of an integrating vehicle so that providers can contract for covered lives, create value through active care management, and monetize the creation of that value

- Strategic imperatives drive the initiatives that must be designed and implemented to make the transition

    - Each initiative is developed in phases that correspond to the evolution of the payment models

    - Work on each initiative needs to begin now so they will be ready to implement when required

- Stroudwater has presented on the Transition Framework and the Future of Rural Healthcare with the presentation available on Stroudwater's website: (http://www.stroudwater.com/?resources=future-of-rural-healthcare)

    - Increasingly, board and leadership should be aware of the transitions occurring in the healthcare industry and incorporate new strategies into their organization

Boa Vida v. PCHCA
BV009285  07/22/2020

# Population Health Transition Framework

DRAFT





Boa Vida v. PCHCA
BV009286   07/22/2020



# Future of Rural Healthcare

DRAFT

STROUDWATER

| Findings and Analysis | Recommendations |
|---|---|
| • PCMC does not currently have a strategic plan<br>• Healthcare reform has created new market competition on patient value, which is especially relevant for rural hospitals like PCMC<br>  • Important strategic opportunities that must be proactively addressed through new strategies include:<br>    • Improving operational efficiencies and financial viability<br>    • Recognizing quality and patient safety as a competitive advantage<br>    • Medical staff recruitment, stabilization, and alignment<br>    • Development of care management strategies to address population health<br>    • Proactive transformation of payment system from fee-for-service to population based | • Use this report as the foundational framework for development of an 18-month strategic plan focused on the following initiatives:<br>  • Increasing alignment and leverage of PCMC's primary care network<br>  • Promoting high quality and patient safety scores to community<br>  • Increasing hospital efficiency and financial viability to position for population-based payment methodologies<br>  • Proactively transforming payment models beginning with self-insured health plan<br>  • Developing care management strategies in anticipation of payment system shifts |

Boa Vida v. PCHCA
BV009287 07/22/2020




# Provider Complement

DRAFT

STROUDWATER

## Physician Shortage/Surplus

Adjusted Service Area Population: **14,399**

| | Supply Study Range | | | Existing[1] | (Shortage)/Surplus Range[2] | | |
|---|---|---|---|---|---|---|---|
| **Primary Care** | | | | | | | |
| Family Practice | 2.0 | - | 7.0 | 6.50 | (0.5) | - | 4.5 |
| Internal Medicine | 1.7 | - | 4.2 | 0.00 | (4.2) | - | (1.7) |
| Pediatrics | 1.2 | - | 1.8 | 0.00 | (1.8) | - | (1.2) |
| **Physician Primary Care Range** | 8.0 | - | 10.0 | **6.50** | **(3.5)** | - | **(1.5)** |
| Non-Phys Providers | 1.0 | - | 3.4 | 3.20 | (0.2) | - | 2.2 |
| **TOTAL Primary Care Range** | 9.9 | - | 13.4 | **9.70** | **(3.7)** | - | **(0.2)** |
| **Medical Specialties** | | | | | | | |
| Allergy | 0.1 | - | 0.2 | 0.00 | (0.2) | - | (0.1) |
| Cardiology | 0.5 | - | 0.5 | 0.18 | (0.4) | - | (0.3) |
| Dermatology | 0.3 | - | 0.4 | 0.00 | (0.4) | - | (0.3) |
| Endocrinology | 0.0 | - | 0.2 | 0.00 | (0.2) | - | (0.0) |
| Gastroenterology | 0.3 | - | 0.4 | 0.37 | 0.0 | - | 0.1 |
| Hem/Oncology | 0.3 | - | 0.3 | 0.09 | (0.3) | - | (0.2) |
| Infectious Disease | 0.1 | - | 0.1 | 0.00 | (0.1) | - | (0.1) |
| Nephrology | 0.2 | - | 0.3 | 0.05 | (0.2) | - | (0.2) |
| Neurology | 0.3 | - | 0.4 | 0.02 | (0.4) | - | (0.2) |
| Pulmonary | 0.1 | - | 0.3 | 0.00 | (0.3) | - | (0.1) |
| Rheumatology | 0.1 | - | 0.2 | 0.00 | (0.2) | - | (0.1) |
| **Surgical Specialties** | | | | | | | |
| ENT | 0.1 | - | 0.5 | 0.00 | (0.5) | - | (0.1) |
| General Surgery | 0.9 | - | 1.1 | 0.00 | (1.1) | - | (0.9) |
| Neurosurgery | 0.1 | - | 0.2 | 0.00 | (0.2) | - | (0.1) |
| OB/GYN | 1.1 | - | 1.6 | 0.23 | (1.4) | - | (0.9) |
| Ophthalmology | 0.6 | - | 0.6 | 0.23 | (0.3) | - | (0.3) |
| Orthopedic | 0.6 | - | 1.0 | 0.18 | (0.9) | - | (0.5) |
| Plastic Surgery | 0.2 | - | 0.3 | 0.00 | (0.3) | - | (0.2) |
| Urology | 0.4 | - | 0.5 | 0.00 | (0.5) | - | (0.4) |

1 Physician FTEs calculated as 5 days per week = 1.0 FTE or 18 days per month = 1.0 FTE

2 See Appendix for detail of Supply Studies.

### Findings and Analysis

- Primary care current needs analysis, based on adjusted Total Service Area population, indicates a range of between a **(0.2)** to **(3.7) deficit** of primary care provider FTEs
  - Primary care physician range of a (1.5) to (3.5) deficit is partially offset by 3.2 non-physician provider (advanced practice) FTEs
  - Reported that no formal multi-year provider development plan exists
- Specialty Care needs analysis suggests shortages in the *majority* of listed specialties with the highest need in the following areas: OB/GYN, General Surgery, and Orthopedics
  - Best practice rural hospital peers actively recruit providers to meet service area population demand and achieve greater primary care alignment

### Recommendations

- Partner with existing medical staff to identify medical and surgical specialty-care needs and service development opportunities
- Establish a multi-year provider development/recruitment plan
  - Use this analysis to support future evaluation and testing of medical staff complement, as well as primary care and specialty clinic development

Boa Vida v. PCHCA
BV009288 07/22/2020

# Provider Complement

DRAFT

STROUDWATER

- **Findings and Analysis**
  - Primary Care Providers (PCPs) in the service area consist primarily of the following:

| Provider Name | Credentials | Specialty | Name of Practice | FTE |
|---|---|---|---|---|
| Phillip Greg Robbins | MD | Family Practice | Carrollton Primary Care | 1.00 |
| Chesie Skinner | NP | Family Practice | Carrollton Primary Care | 0.60 |
| Dale T. Robbins | MD | Family Practice | Aliceville Family Practice | 1.00 |
| James L. Parker | MD | Family Practice | Dr. James L. Parker | 0.80 |
| Kate Gentry | NP | Family Practice | Dr. James L. Parker | 0.80 |
| Brittany Anderson | MD | Family Practice | Whatley Health Services- Carrollton | 1.00 |
| Andera Gardener | NP | Family Practice | Whatley Health Services- Carrollton | 0.90 |
| Julia Boothe | MD | Family Practice | Pickens County Primary Care, PC | 0.90 |
| Robert N Honea | MD | Family Practice | Pickens County Primary Care, PC | 0.90 |
| Dakota Acton Jones | MD | Family Practice | Pickens County Primary Care, PC | 0.90 |
| Darlene Putman | NP | Family Practice | Pickens County Primary Care, PC | 0.90 |

| Findings and Analysis | Recommendations |
|---|---|
| • PCMC employs only two of 11 primary care providers within the service area, and has opportunities to better position the hospital for future population-based payment methodologies that are rapidly emerging<br>  • All other primary care providers are either independent or employed by Whatley Health Services, an FQHC<br>    • Best practice peer rural hospitals establish robust primary care networks to position for emerging population-based payment models as primary care providers will be the future revenue centers | • Continue the strategic growth of the clinic network in an effort to broaden access and capture market share, as well as position for future population-based payment models |

Boa Vida v. PCHCA
BV009289 07/22/2020



# Provider Complement

DRAFT

- Specialty Care Providers in the service area consist mainly of the following :

**Medical Specialities**

| Provider Name | Credentials | Specialty | Name of Practice | FTE |
|---|---|---|---|---|
| Edward Carraway | MD | Cardiology | PCMC Specialty Clinics | 0.09 |
| John Mantle | MD | Cardiology | PCMC Specialty Clinics | 0.09 |
| Drake Lavender | MD | Gastroenterology | PCMC Specialty Clinics | 0.37 |
| Sudan Bostick | MD | Hem/Oncology | PCMC Specialty Clinics | 0.09 |
| Dirk Berry | MD | Nephrology | PCMC Specialty Clinics | 0.05 |
| Arturo Otero | MD | Neurology | PCMC Specialty Clinics | 0.02 |

**Surgical Specialties**

| Provider Name | Credentials | Specialty | Name of Practice | FTE |
|---|---|---|---|---|
| Catherine Skinner | MD | OB/GYN | PCMC Specialty Clinics | 0.18 |
| John McDonald | MD | OB/GYN | PCMC Specialty Clinics | 0.05 |
| Tim Johnston | MD | Ophthalmology | Tucaloosa Opthalmology | 0.23 |
| Brian Claytor | MD | Orthopedic | PCMC Specialty Clinics | 0.18 |

| Findings and Analysis | Recommendations |
|---|---|
| • PCMC offers medical and surgical specialty services in the following areas: cardiology, gastroenterology, hematology/oncology, nephrology, neurology, OB/GYN, ophthalmology, and orthopedics<br>  • Reported that all specialists lease space from PCMC and bill for professional fees<br>    • The physician complement benchmark analysis indicates that demand exists within the adjusted service area population for further addition of part-time medical and surgical specialty-service growth | • Evaluate specialty care recruitment and partnership opportunities as supported by the supply study, in order to meet the needs of PCMC's service area population |

Boa Vida v. PCHCA
BV009290 07/22/2020



# Provider Complement

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| Practice Management<br>• PCMC owns and operates Carrollton Primary Care, a Provider-based Rural Health Clinic (PB-RHC), staffed M – F, 8a-5p, as follows: Dr. Robbins, 5 days/week; Chelsie Skinner, NP, 3 days (M, W, F) /week<br>  • Reported that neither provider is overly busy as they both see approximately 12 patients per day<br>  • Reported that provider efficiency is monitored on a monthly and daily basis; however, no productivity targets have been established<br>    • Best performing peer rural hospitals that operate practices establish productivity targets (often based on the MGMA industry standard) and frequently monitor individual provider efficiency | • Utilize MGMA, or other industry benchmark data, to establish targets and monitor individual provider productivity |
| • PCMH has experienced provider turnover in the past with the departure of two providers in 2014 and retirement of another in 2016<br>  • Reported that Dr. Robbins, who joined in 2015, has announced that he is leaving in December 2018<br>  • PCMC reported that it is in discussions with a replacement physician candidate<br>  • Reported that PCMC leadership has had discussions with the University of Alabama's College of Community Health Sciences (UA), based in Tuscaloosa, regarding possibility of developing a Rural Residency Program, which could serve as a recruitment pipeline<br>    • Best performing peer rural hospitals ensure that the community has adequate access to primary care through active development and recruit efforts | • Accelerate short-term recruitment efforts to ensure a smooth transition related to Dr. Robbins departure<br>• Partner with UA to develop a Rural Residency Program, which will serve as the foundation of a future primary care recruitment pipeline |

Boa Vida v. PCHCA
BV009291 07/22/2020

# Provider Complement

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| • Reported that compensation model does not currently include incentive provisions for productivity, quality, patient satisfaction, or panel size<br>  • Best practice hospitals with employed providers utilize Relative Value Units (RVUs) or Work RVUs for determining productivity bonuses, as well as value-based incentives and panel size<br>    • Generally a minimum threshold is required with pre-determined $ per RVU (or Work RVU) once the threshold has been met<br>    • RVU based incentives provide a direct correlation between provider effort and incentive dollars<br>    • RVU based systems require monthly updates to providers to measure performance relative to goals<br>    • Base compensation for contracts typically set at 50th percentile of MGMA benchmarks | • Modify compensation models to ensure proper alignment and accountability across *all* employed providers<br>  • Consider setting production incentive at attainable levels, such as 25th to 35th percentile, especially for new providers who are establishing practice followings<br>  • Evaluate incorporation of incentive compensation components such as quality/value-based targets, patient satisfaction, and panel size to compensation plan |
| • Reported that PCMH has a vacant MOB located in Gordo that could be upfitted and utilized as a future PB-RHC with goal of offsetting outmigration of patients to Tuscaloosa-based competitors<br>  • Best performing peer rural hospitals conduct return-on-investment analyses to examine market demand and financial viability regarding service expansion plans | • Consider developing a business plan that examines the feasibility of establishing of a Gordo-based practice<br>  • Provider recruitment efforts could be conducted in conjunction with other area providers (see Provider Alignment section) |

Boa Vida v. PCHCA
BV009292 07/22/2020



# Inpatient Services

DRAFT





| Area | 2018 ADC |
|---|---|
| Acute | 5.3 |
| Swing Bed | 0.8 |
| IPF | 4.0 |
| Observation | 0.8 |

- Overall inpatient days (Med/Surg, Swing Bed, IPF and Observation) decreased 10% from FY 2015 (4,095 days) to FY 2017 (3,703 days) largely as a result of decreased IPF admissions and provider turnover, yet has since increased 8% due to growth of Med/Surg admissions
  - Medical/Surgical inpatient days increased by 42% from FY 2015 (1.373 days) to FYTD 2018 (1,945 days), largely due to shift away from fragmented hospitalist program that was discontinued in 2016
  - IPF inpatient days decreased by 27% from FY 2015 (2.002 days) to FYTD 2018 (1,460 days), largely due to increased competition from Tuscaloosa-based mental health facilities
  - Observation days remained relatively constant over the report period
- PCMC's swing bed ADC of 0.8 is significantly below the rural peer benchmark target of 4 ADC
  - Swing bed services are an important opportunity for rural hospitals as they allow the hospital to provide additional IP rehab services, generate increased reimbursement, and help to dilute fixed costs in the nursing unit

Boa Vida v. PCHCA
BV009293   07/22/2020



# Inpatient Services

DRAFT



- Inpatient Acute Financial Opportunity

| Acute Incremental Volume Contribution Margin | | |
|---|---|---|
| | **Low Growth** | **High Growth** |
| Baseline Average Daily Census (ADC) - FYTD 2018 | 5.3 | 5.3 |
| | | |
| Targeted Acute ADC | 5.9 | 6.4 |
| Incremental Acute ADC | 0.5 | 1.1 |
| Incremental Acute Days | 195 | 389 |
| Estimated Revenue per Acute Day | $ 2,500 | $ 2,500 |
| Estimated Incremental Daily Expense | $ (500) | $ (500) |
| Estimated Daily Acute Profit | $ 2,000 | $ 2,000 |
| Estimated Incremental Acute Contribution Margin | $ 389,000 | $ 778,000 |

- Analysis indicates profit opportunity resulting from the following incremental inpatient acute volume growth scenarios over actual PCMC FYTD 2018 census:
  - Low Growth census model – 0.5 ADC increase
  - High Growth census model – 1.1 ADC increase
- Analysis assumes $2,500 / day average reimbursement and $500 / day average expense
- Significant contribution margin opportunity exists from inpatient volume growth ranging from approximately $390K at low growth levels to $780K at high growth levels

Boa Vida v. PCHCA
BV009294   07/22/2020



# Inpatient Services

DRAFT

- Inpatient Swing Bed Financial Opportunity

| Swing Bed Incremental Volume Contribution Margin | | |
|---|---|---|
| | **Low Growth** | **High Growth** |
| Baseline Average Daily Census (ADC) - FYTD 2018 | 0.8 | 0.8 |
| Targeted Acute ADC | 1.2 | 3.2 |
| Incremental Acute ADC | 0.4 | 2.3 |
| Incremental Acute Days | 148 | 856 |
| Estimated Revenue per Acute Day | $ 375 | $ 375 |
| Estimated Incremental Daily Expense | $ (100) | $ (100) |
| Estimated Daily Acute Profit | $ 275 | $ 275 |
| Estimated Incremental Acute Contribution Margin | $ 40,563 | $ 235,263 |

- Analysis indicates profit opportunity resulting from the following incremental inpatient acute volume growth scenarios over actual PCMC FYTD 2018 census:
  - Low Growth census model – 0.4 ADC increase
  - High Growth census model – 2.3 ADC increase
- Analysis assumes $375 / day average reimbursement and $100 / day average expense
- Significant contribution margin opportunity exists from inpatient volume growth ranging from approximately $41K at low growth levels to $235K at high growth levels

Boa Vida v. PCHCA
BV009295 07/22/2020

# Inpatient Services

DRAFT

STROUDWATER

| Findings and Analysis | Recommendations |
|---|---|
| • Inpatient staffing consists of the following: 2 RNs (7a-7p / 7p-7a), 2 PCAs (7a-7p), 1 PCAs (7p-7a), 1 unit secretary (7a-3p) covering 24/7<br>  • Reported that staff flexes with census and that most nurses are cross-trained to float to ED and IPF unit<br>    • Volume-based benchmarks indicate that med/surg unit is staff efficiently, yet has some capacity to accommodate incremental volume growth (see department staffing analysis section of this report)<br>• Inpatient medical coverage is through a combination of ED and primary care providers (PCP) as follows: PCPs – M – Th; ED – F, Sa, Su for all assigned and unassigned patients<br>• PCMC's 36 bed (14 staffed) inpatient unit, which provides care to patients ranging from acute med/surg, swing bed, to observation status, is currently operating below capacity<br>  • Current combined (Med/Surg/Peds – 5.3; Observation – 0.8; Swing Bed – 0.8) inpatient ADC is 6.9 | • Target an acute average daily census of **6** through the following activities:<br>  • Utilize daily ED log review, follow-up on a regular basis with patient referral sources<br>  • Conduct service marketing meetings with referral providers/centers<br>  • Increase of acute census to **6** yields a potential **$390K** contribution margin improvement |

Boa Vida v. PCHCA
BV009296 07/22/2020

# Inpatient Services

DRAFT

STROUDWATER

| Findings and Analysis | Recommendations |
| --- | --- |
| • PCMC reported that it has an assigned case manager that periodically promotes the swing bed program to area providers / hospitals<br>• Reported that there is not a process in place to identify prospective swing bed patients<br>• Best-performing peer CAHs develop and actively promote robust swing bed programs, which drive inpatient rehabilitation services and generate increased reimbursement | • Elevate the swing bed program as a strategic priority by targeting ADC of **3**<br>• Empower case manager and nursing manager to establish a focused swing bed marketing plan, targeting area providers and case managers of neighboring hospitals<br>• Investigate the use of available patient tracking systems to identify prospective swing bed candidates<br>• Message to nurses and providers the importance of growing IP services to meet current staffing levels<br>• Increase of swing bed census to **3** yields a potential **$235K** contribution margin improvement |

Boa Vida v. PCHCA
BV009297 07/22/2020



# Inpatient Services: Psychiatric Facility (IPF)

DRAFT

STROUDWATER

- **PCMC's IPF Contribution Margin Assessment (Source: 9/30/17 Cost Report)**

**FY 2017 Inpatient Psych Facility Profitability Analysis**

| | | | |
|---|---|---|---|
| **Revenue:** | Days | Rate | Revenue |
| Medicare Revenue | 1,180 | $ 833.17 | $ 983,143 |
| Medicaid and Other (Est. 80% Medicare) | 239 | $ 666.54 | $ 159,302 |
| Total | 1,419 | | 1,142,445 |
| **Operating Expenses:** | | | |
| *Direct Expenses (2017 ICR - WS A):* | | | |
| Salary expense | $ 626,659 | | $ 626,659 |
| Other | $ 395,354 | | $ 395,354 |
| Total Direct Expense | $ 1,022,013 | | $ 1,022,013 |
| | Total Allocation | IPF Variable % | |
| *Ancillary Expenses (ICR D-4 SNF PPS)* | $ 101,425 | 50% | $ 50,713 |
| *Allocated Expenses (ICR Stepdown - WS B)* | | | |
| Capital Costs | $ 57,408 | 90% | $ 51,667 |
| Admin and General | $ 149,698 | 50% | $ 74,849 |
| Employee Benefits | $ 167,138 | 90% | $ 150,424 |
| Operation of Plant | $ 2,798 | 50% | $ 1,399 |
| Maintenance & Repairs | $ 59,821 | 50% | $ 29,911 |
| Dietary | $ 84,224 | 50% | $ 42,112 |
| Medical Records & Library | $ 21,726 | 50% | $ 10,863 |
| Nursing Admin | $ 63,450 | 50% | $ 31,725 |
| Housekeeping | $ 28,481 | 50% | $ 14,241 |
| Laundry and Linen | $ 24,490 | 50% | $ 12,245 |
| Total IPF Allocated Expense | $ 659,234 | | $ 419,435 |
| Total IPF Expenses | $ 1,782,672 | | $ 1,492,161 |
| **IPF Direct Gain (Loss)** | $ (640,227) | | $ (349,715) |
| **IPF Costs Per Day** | $ 1,256 | | $ 1,052 |

## Findings and Analysis

- PCMC operates a 10-bed IPF with an ADC of 3.9
  - PCMC's IPF is operating at a $640K loss on a fully allocated cost basis, based on the 2017 cost report
  - The IPF is projected to operate at a $350K contribution margin loss when adjusting for fixed versus variable costs
- IPFs will be an increasingly important community resource as the growing senior population will drive future demand
  - Best practice rural hospitals must balance service line profitability with community benefit

## Recommendations

- Strongly consider immediate strategies to increase volume, decrease expenses or close the IPF unit given the limited demand for service and high cost of operations

Boa Vida v. PCHCA
BV009298 07/22/2020

# Emergency Department

## Findings and Analysis

- Overall emergency department (ED) volume declined by 17% from FY 2015 (11,218) to FY 2018 (9,305) largely due to the recent emergence of urgent care centers in Columbus and Tuscaloosa
  - Reported that PCMC experiences a high amount of low-acuity, non-emergent patients seeking care in the ED due to the lack of urgent care available in the community, and family practice providers are not taking on new patients
- ED admissions (acute admissions and observation status) as a percentage of ED visits has increased from 5.6% in FY 2015 to 7.1% in FY 2018, while ED transfer rates have declined from 4.4% to 4.0% during the same time period
  - Over the last several months, PCMC has begun to review all ED admissions and transfers for appropriateness, as seen by the 8% increase in admissions and 16% decrease in transfers between FY 2017 and FY 2018
  - Best performing peer rural hospitals target ED admission rates (Acute and Observation) of between 8% and 10% of total visits

## Recommendations

- PCMC must develop urgent care services to meet the demand and better manage non-emergent patient needs
  - Consider opening a fast track / urgent care space, adjacent to the ED
- Target appropriate ED admission rates (Acute and Observation) to industry best practice of greater than 10% of total visits through the following:
  - Educating providers on admission criteria to ensure that eligible inpatients are appropriately admitted to correct status
  - Continue to review and monitor ED admissions and transfers for medical appropriateness

Boa Vida v. PCHCA
BV009299 07/22/2020

# Emergency Department

DRAFT

Stroudwater

| Findings and Analysis | Recommendations |
|---|---|
| • Medical coverage of the ED is provided on a 24/7 basis as follows:<br>  • Dr. Brooke, 3 12-hour shifts; Dr. Sullivan 2 24-hours shifts; and Dr. Pike (new ED Medical Director) 6 12-hour shifts, with remaining shifts staffed with locum tenens<br>    • Reported that ED providers will also cover the IP unit on nights and weekends<br>• Nurse staffing consists of the following: 2 RNs (7a-7p), 1 RN (3p-11p) and 1 RN (7p-7a)<br>  • Volume-based benchmarks (see Staff Benchmark Analysis section) indicate that the ED has capacity for incremental volume | • Evaluate current staffing levels for opportunities to achieve greater efficiency, i.e., shared staffing with med/surg |
| • Given PCMC's significant percentage of non-emergent patients in the ED and the increases in bad debt, PCMC has an opportunity to develop solutions to better manage non-emergent care utilization to include an ED redirect program<br>  • Medically screen all presenting patients and focus on education of non-emergent patients regarding payment options for continuation of treatment within the ED, or redirect them to a more appropriate OP clinic care setting, i.e., RHC or potential urgent care setting | • Develop strategies to better manage demand for non-emergent care to include the following:<br>  • Explore development of an ED redirect program in partnership with providers<br>  • Educate public on the appropriate use of the ED to reduce the number of non-emergent visits<br>  • Enroll patients with a primary care provider at PCMC's RHC |
| • Reported that PCMC's ED has historically had very poor patient perception, contributing to volume declines<br>  • PCMC leadership has made it a strategic priority to improve provider attitude and overall perception of the ED by hiring a new ED Medical Director | • PCMC leadership must partner with new Medical Director and ED providers and staff to improve perception and care experience |

Boa Vida v. PCHCA
BV009300 07/22/2020

# Surgical Services

DRAFT

- PCMC's surgery center incudes 2 ORs, 1 endoscopy procedure room, and 5 pre/post operative care bays
- PCMC's overall surgical services program (General Surgery, Endoscopy and Other) procedure volume grew 8% from FY 2015 to FY 2016 largely due to Dr. Gentry, a busy general surgeon
  - Overall volumes have since declined 27% largely as a result of Dr. Gentry slowing down his practice and ultimately retiring in March '18
  - Dr. Dsa, a gastroenterologist contracted to cover two times per month, also left in January '18

## Findings and Analysis

- PCMH has significant capacity to grow as Tuesday, Wednesday and Thursdays are open
  - General Surgery: PCMH currently does not have a general surgeon
    - Reported that Dr. Hipp, a PCMH ED physician, is a trained vascular and general surgeon who is interested in performing surgery on Fridays
  - Endoscopy: Dr. Lavender performs endoscopy procedures on Mondays and Fridays
  - Ophthalmology: Dr. Johnson sees patients in the clinic, yet does not conduct surgery at PCMH
  - OB/ GYN: Dr. McDonald has expressed an interest in performing hysterectomies and GYN procedures
  - Orthopedics: Dr. Claytor, who offers a clinic on Tuesdays, has expressed an interest in performing knee scope procedures
    - Reported that PCMC will need to invest in equipment to support GYN and orthopedic and ophthalmology procedures
      - Best performing peer hospitals develop robust ambulatory surgery programs in an effort to meet community need and generate incremental revenue

## Recommendations

- Elevate surgical services program as a strategic priority
  - Accelerate recruitment efforts a full-time general surgeon
  - Collaborate with Dr. Lavender on shifting his block time to accommodate Dr. Hipp's interest in performing surgery on Fridays
  - Partner with Drs. Claytor and McDonald on performing surgery at PCMH
    - Conduct return on investment analysis equipment purchase for orthopedic, GYN and eye surgery
  - Approach Dr. Johnson about possibility of performing surgery

Boa Vida v. PCHCA
BV009301 07/22/2020

# Surgical Services

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| • Reported that Dr. Frederick Graham, a Tuscaloosa-based physiatrist, is interested in establishing a pain management clinic at PCMC<br>    • Best performing peer rural hospitals conduct return on investment (ROI) analyses and demand forecasts to guide decisions on service introduction and expansion decisions<br>• Surgery department staffing consists of the following generally scheduled M and F (6:30a – 3p): 1 RN circulator, 1 LPN scrub nurse (manager also scrubs as needed), 1 RN pre/post care<br>• Employed anesthesia coverage consists of 1 CRNA who is available on M and F<br>    • Volume-based benchmarks (see Staff Benchmark Analysis section) indicate that the surgical services department is efficiently staffed with limited capacity for incremental volume (see Department Staffing Analysis section of this report) | • Partner with Dr. Graham to explore the establishment of a pain management clinic<br>    • Conduct ROI analysis and demand forecasts to evaluate feasibility and pursue if favorable |

Boa Vida v. PCHCA
BV009302 07/22/2020

# Imaging Services

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| • PCMC provides multiple digital imaging service modalities including diagnostic X-ray, CT (16-slice), ultrasound, MRI, nuclear, and mammography<br>  • Overall imaging volume (IP/OP) has increased approximately 4% between FY 2015 and FY 2018 largely driven by increase in inpatient census in FY 2018<br>    • Reported that just recently PCMC's sonographer left and PCMC has had to discontinue ultrasound services until a sonographer is recruited<br>  • PCMC reports that both the MRI and CT need upgrades; MRI should be upgraded to a 12-channel scanner and CT will reach "end of life" by December 2019<br>    • Best performing peer rural hospitals conduct ROI analyses to determine feasibility of upgrading and replacing diagnostic equipment | • Conduct ROI analyses to determine feasibility of upgrading the MRI to a 12-channel scanner and replacing the CT machine prior to December 2019<br>  • Goal should be to upgrade CT to 32-slice |

Boa Vida v. PCHCA
BV009303 07/22/2020

# Imaging Services

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| • Reported that the imaging department does not track referral data for services<br>  • Best practice peer rural hospitals track and trend referral data by provider and use the information to strategically conduct outreach efforts and monitor changes in volume<br>• Radiology is staffed on a 24/7 basis by 9 FTE radiology technologists, who are all cross-trained on x-ray/CT<br>  • Volume-based benchmarks indicate that the radiology department is efficiently staffed<br>• Interpretation services are provided by The Radiology Clinic in Tuscaloosa, who provides nighthawk coverage and PACS | • Implement a process in which referrals are tracked by provider to allow for strategic decision making and to investigate referral volume trends |

Boa Vida v. PCHCA
BV009304 07/22/2020

# Rehabilitation Therapy Services

| Findings and Analysis | Recommendations |
|---|---|
| • PCMC offers Physical Therapy (PT), Speech Therapy (ST) and Occupational Therapy (OT) services in inpatient, outpatient, swing bed and settings through a contract arrangement with Encore Rehabilitation, which began in 2017 following the termination of contract with Summit<br>  • Note that utilization trends analysis was not possible as statistics were unavailable<br>  • Staffed coverage is provided five days per week<br>  • Reported that Encore rents space from PCMC and bills for all outpatient services, while the hospital bills for inpatient services<br>    • Reported that this arrangement was established due to billing challenges that PCMC had in past<br>      • Best performing rural hospitals periodically evaluate contract billing arrangements to ensure that they yield the optimal financial benefit | • Re-evaluate the contract billing arrangements with Encore to ensure that PCMC is generating the optimal financial reimbursement<br>  • Resolve internal process issues if it's determined to be more advantageous for PCMC to manage billing |
| • Reported that services are widely promoted to the community and through outreach to area providers<br>  • Manager indicated a strong desire to partner with nursing services and the case manager to grow the swing bed program, which has stagnated<br>    • Best performing peer rural hospitals widely promote rehabilitation service offerings to build broad awareness of capabilities, and establish robust swing bed services in partnership with nursing | • Continue to promote rehabilitation services to area providers with the goal of driving growth and services expansion<br>• Partner with nursing/case manager to aggressively promote and grow the swing bed program |

Boa Vida v. PCHCA
BV009305 07/22/2020



# Laboratory

DRAFT

- PCMC's lab offers the following array of services: hematology, immunoassay, serology, urinalysis, blood bank, chemistry, microbiology and phlebotomy
- Overall lab volume (IP & OP) dropped 4% from FY 2015 to FY 2017 largely as a result of provider turnover and declining ED utilization
  - Overall volume has since increased 6% as a result of increased referrals from a new Pickens County Primary Care provider in Reform (Dr. Jones), as well as the addition of the Arbor Woods LTC routine lab contract
  - Inpatient Lab increased 38% from FY 2015 to FY 2018, largely mirroring inpatient services utilization
  - Outpatient Lab decreased 5% from FY 2015 to FY 2017 then increased 2% for reasons stated above

## Findings and Analysis

- Reported that lab services are occasionally promoted to area providers, and that PCMC's courier service supports many independent providers and long-term care facilities
  - Reported that Whatley Health Services providers do not utilize PCMC for routine lab services and choose to send tests to Quest Diagnostics
  - Reported that PCMC has not established competitive outpatient pricing strategy
    - Best practice peer rural hospitals develop market competitive outpatient pricing and actively promote lab services to area providers, nursing homes, healthcare facilities, schools and employers

## Recommendations

- Target additional outpatient growth through the following:
  - Evaluate fee schedule to ensure that it outpatient test prices are market competitive
  - Actively promote lab services to area providers on a frequent basis
  - Explore other market opportunities to further grow services to include occupational medicine for area employers

Boa Vida v. PCHCA
BV009306 07/22/2020

# Laboratory

DRAFT

STROUDWATER

| Findings and Analysis | Recommendations |
|---|---|
| • Lab is staffed on a 24/7 basis as follows: 3 MT/MLTs and 2 Phlebotomists (6a-4:30p), 1 MT and 1 Phlebotomist (3p-11p) and 1 MT (11p-7a)<br>  • Volume-based benchmarks indicate that the lab department is efficiently staffed with limited capacity for incremental volume growth<br>• Reported that PCMC does not currently offer a formal Occupational Services program and that demand may exist within the market<br>  • Reported that lab services could be paired with primary care, rehabilitation services, and cardiopulmonary services (portable PFTs and fit testing) as component offerings<br>    • Best performing peer rural hospitals examine market demand and conduct return on investment (ROI) analyses when considering the introduction of new service offerings | • Investigate the feasibility of offering an occupational medicine program by conducting market and ROI analyses<br>  • Partner with primary care, rehabilitation and cardiopulmonary departments to establish program service components<br>  • Evaluate lab's ability to scale given current staffing complement |

Boa Vida v. PCHCA
BV009307 07/22/2020



# Cardiopulmonary

DRAFT

STROUDWATER

Cardiopulmonary Statistics (low volume)
600
500
400
300
200
100
0
505
388
303
272
239
176
168
136
104
80
63
45
44
34
22
34
15
17
17
25
31
FY 2015
FY 2016
FY 2017
FY 2018 Annualized
Electroencephalograms (EEG)
Cardiac Rehabilitation
Pulmonary Function Tests
Holter Monitor Tests
Other
Sleep Studies

Cardiopulmonary Statistics (high volume)
6,000
5,000
4,000
3,000
2,000
1,000
0
5,153
3,307
2,869
1,921
1,914
1,719
1,729
1,833
1,591
1,265
1,206
833
FY 2015
FY 2016
FY 2017
FY 2018 Annualized
RT Treatments Outpatient
Electrocardiogram (EKG) Outpatient
RT Treatments Inpatient

## Findings and Analysis

- PCMC offers respiratory therapy, sleep studies, EKGs, Pulmonary Function Tests, Holter monitoring, EEGs, cardiac stress test, and Cardiac Rehabilitation, which started in late 2017
  - Overall cardiopulmonary volume decreased 19% from FY 2015 to FY 2017 largely as a result of provider turnover, and has since slightly increased to levels that approximate FY 2015 due to addition of a Pickens County Primary Care provider located in Reform and higher outpatient services utilization
- Reported that outreach and promotion of services to the community and providers has not been conducted regularly and that a new marketing liaison has been hired
  - Reported that visiting cardiologists Dr. Carraway and Dr. Mantle do not utilize PCMC for holter monitoring and cardiac stress tests
    - Best performing peer rural hospitals conduct regular outreach to area providers to ensure strong customer service and to build awareness of service offerings

## Recommendations

- Partner with marketing liaison to re-educate providers on available services through frequent outreach with the dual goals of providing strong customer service and capturing business
  - Focus initial efforts on reducing outmigration driven by cardiologists

Project Overview Financial Summary Service Area Opportunities Recommendations 45

Boa Vida v. PCHCA
BV009308 07/22/2020

# Cardiopulmonary

DRAFT

Stroudwater

| Findings and Analysis | Recommendations |
|---|---|
| • Cardiopulmonary 24/7 staffing consists of 1 RT (7a-7p, 7p-7a) and 1 RT staffing the sleep lab M, Tu, W and Th<br>  • Reported that all respiratory therapists are cross-trained and multi-licensed to cover modalities<br>  • Volume-based benchmarks indicate that the cardiopulmonary department has capacity to support incremental volume increases<br>• Reported that cardiac rehabilitation services (currently offered two days per week) have declined due to patient transportation challenges and inability to pay co-pays<br>  • Reported that Dr. Carraway refers patients for cardiac rehabilitation<br>  • Reported that PCMC is partnering with University of Alabama to offer ankle-brachial index (ABI) testing, which can be used to identify potential cardiac rehabilitation patients<br>    • Reported that the ABI machine was ordered and that testing was anticipated to begin by end of year 2018<br>      • Best performing rural hospitals that offer cardiac rehabilitation services frequently promote the service and utilize ABI testing to identify prospective patients | • Focus on growing the cardiac rehabilitation program which can also drive utilization of other ancillary services (e.g., U/S, EKGs, Stress Tests)<br>  • Actively promote service to local area providers<br>  • Emphasize new capability to perform ABIs<br>  • Investigate potential solutions related to patient transportation and difficulty paying co-pays |

Boa Vida v. PCHCA
BV009309 07/22/2020



# Quality Improvement

DRAFT

- **Findings and Recommendations**
  - U.S. Department of Health and Human Services Hospital Compare website data compares hospitals on HCAHPS patient-satisfaction scores and assigns an overall star rating
    - Star rating provides a snapshot of the patient experience of care by combining all 11 HCAHPS measures into a single, comprehensive metric, but PCMC does not have a star rating due to low survey responses

| U.S. HHS Hospital Compare Measures | National Avg. | AL Average | Pickens County Medical Center | DCH Regional Medical Center | UAB Hospital | Baptist Memorial Hospital-Golden Triangle |
|---|---|---|---|---|---|---|
| **Patient Survey Summary Star Rating:** | | | **NA** | **3** | **4** | **3** |
| **Patient Satisfaction (HCAHPS) Average:** | **72%** | **73%** | **80%** | **68%** | **75%** | **73%** |
| Nurses "Always" communicated well: | 80% | 81% | 92% | 79% | 82% | 83% |
| Doctors "Always" communicated well: | 82% | 84% | 95% | 80% | 84% | 86% |
| "Always" received help when wanted: | 69% | 71% | 92% | 61% | 66% | 67% |
| Staff "Always" explained med's before administering: | 66% | 68% | 67% | 61% | 67% | 66% |
| Room and bathroom "Always" clean: | 75% | 74% | 85% | 65% | 71% | 71% |
| Area around room "Always" quiet at night: | 62% | 71% | 80% | 65% | 68% | 77% |
| YES, given at home recovery information: | 87% | 87% | 91% | 85% | 88% | 86% |
| "Strongly Agree" they understood care after discharge: | 53% | 50% | 62% | 49% | 58% | 53% |
| Gave hospital rating of 9 or 10 (0-10 scale): | 73% | 73% | 72% | 69% | 83% | 72% |
| YES, definitely recommend the hospital: | 72% | 71% | 65% | 67% | 85% | 70% |

Source: www.hospitalcompare.hhs.gov
Date: 10/1/2016-9/30/2017

Highest Score
Above State Avg.
Below State Avg.
Lowest Score

  - PCMC is currently at 80% on publicly reported HCAHPS scores, which is above the AL state average and the national average
    - PCMC is highest among regional competitors on 8 out of the 10 reported HCAHPS scores, while measures “gave hospital rating of 9 or 10” and “yes, definitely recommend the hospital” were below state average and must be targeted for improvement

Boa Vida v. PCHCA
BV009310 07/22/2020



# Quality Improvement

- **Findings and Recommendations (continued)**
  - U.S. Department of Health and Human Services Hospital Compare website data comparing PCMC and competitor hospitals on publicly-reported core measure scores

| Condition | Measure ID | Measure Name | National Avg. | AL Average | Pickens County Medical Center | DCH Regional Medical Center | UAB Hospital | Baptist Memorial Hospital-Golden Triangle |
|---|---|---|---|---|---|---|---|---|
| **Heart Attack or Chest Pain** | OP 3b | Median Time to Transfer to Another Facility for Acute Coronary Intervention | 57 | 61 | NA | NA | NA | NA |
| | OP 5 | Median time to ECG | 7 | 7 | 14 | 9 | NA | 4 |
| | OP 2 | Fibrinolytic Therapy Received within 30 Minutes of ED Arrival | 59% | 62% | NA | NA | NA | NA |
| | OP 4 | Aspirin on Arrival | 95% | 94% | 91% | 84% | NA | 100% |
| **Emergency Department** | OP 21 | Avg. time patients who came to the ED w/ broken bones had to wait for pain meds | 48 | 59 | 94 | 26 | 60 | 59 |
| | OP 22 | Percentage of patients who left the emergency department before being seen | 2% | 2% | 1% | 3% | 5% | 1% |
| | OP 23 | Head CT results | 73% | 64% | NA | 50% | NA | 95% |
| | EDV | Emergency Department Volume | | | Low (0-19,999) | Very High (60,000+) | Very High (60,000+) | Very High (60,000+) |
| | ED 1b | Avg. time patients spent in the ED, before admitted to the hospital as inpatient | 208 | 215 | 240 | 347 | 428 | 218 |
| | ED 2b | Avg. time patients spent in the ED after admit decision and arrival in IP room | 55 | 61 | 87 | 134 | 134 | 44 |
| | OP 18b | Avg. time patients spent in ED before being sent home | 111 | 112 | 108 | 186 | 218 | 136 |
| | OP 20 | Avg. time patients spend in ED before they were seen by a healthcare provider | 16 | 25 | 14 | 54 | 39 | 17 |

Highest Score
Above State Avg.
Below State Avg.
Lowest Score

Source: https://www.medicare.gov/hospitalcompare

Boa Vida v. PCHCA
BV009311 07/22/2020



# Quality Improvement

DRAFT

- **Findings and Recommendations (continued)**
  - U.S. Department of Health and Human Services Hospital Compare website data comparing PCMC and competitor hospitals on publicly-reported core measure scores

| Condition | Measure ID | Measure Name | National Avg. | AL Average | Pickens County Medical Center | DCH Regional Medical Center | UAB Hospital | Baptist Memorial Hospital-Golden Triangle |
|---|---|---|---|---|---|---|---|---|
| Preventive Care | IMM 2 | Patients assessed and given flu vaccination | 93% | 94% | 92% | 96% | 97% | 100% |
| | IMM 3 | Healthcare workers given influenza vaccination | 88% | 80% | 100% | 95% | 57% | 99% |
| Blood Clot Prevention and Treatment | VTE 6 | Hospital acquired potentially preventable venous thromboembolism | 2% | 3% | NA | 3% | 3% | NA |
| Pregnancy and Delivery Care | PC 01 | Percent of newborns whose deliveries were scheduled early (1-3 weeks early), when a scheduled delivery was not medically necessary | 2% | 2% | NA | 1% | 2% | 2% |
| Cancer Care | OP 33 | External Beam Radiotherapy for Bone Metastases | 82% | 82% | NA | 92% | 96% | 82% |
| Cataract Surgery Outcome | OP 31 | Improvement in Patient's Visual Function within 90 Days Following Cataract Surgery | 96% | 100% | NA | NA | NA | NA |
| Colonoscopy Care | OP 29 | Endoscopy/polyp surveillance: appropriate follow-up interval for normal colonoscopy in average risk patients | 85% | 89% | 100% | 83% | 91% | NA |
| | OP 30 | Endoscopy/polyp surveillance: colonoscopy interval for patients with a history of adenomatous polyps - avoidance of inappropriate use | 90% | 83% | 50% | 100% | 95% | NA |
| Sepsis Care | SEP 1 | Received appropriate care for severe sepsis and septic shock | 49% | 51% | NA | 28% | 44% | 73% |

Highest Score
Above State Avg.
Below State Avg.
Lowest Score

Source: https://www.medicare.gov/hospitalcompare

  - PCMC currently reports on four process of care measure categories (as seen above) including chest pain, emergency department, preventative care and colonoscopy care, performing above the state average in 5 out of 12 reported measures
    - Best-practice peer rural hospitals track MBQIP data and use the information to make systematic and operational changes to improve overall quality and patient outcomes

Boa Vida v. PCHCA
BV009312 07/22/2020



# Quality Improvement

DRAFT



| Findings and Analysis | Recommendations |
|---|---|
| • As part of the Delta Region Community Health Systems Development (DRCHSD) Program, PCMC participated in a comprehensive Quality Improvement Program Assessment conducted by Stroudwater Associates in October 2018.  As a result, the following Quality section of this Strategic Financial and Operational (SFOA) report provides an initial, high level review of the PCMC Quality Program. | • PCMC leadership must reference the comprehensive Quality Improvement Assessment report for a more detailed treatment of the hospital's clinical program, reporting infrastructure and improvement processes |

Boa Vida v. PCHCA
BV009313   07/22/2020

# Information Technology

DRAFT

Stroudwater

| Findings and Analysis | Recommendations |
|---|---|
| • Stroudwater believes successful hospitals of the future will leverage IT resources to deliver demonstrable quality, patient safety, and customer service in a secured network environment<br>  • Reported that PCMC has not developed a formal IT strategic plan and is currently set to go-live with Cerner Community Works, November 2018, replacing Meditech<br>    • Best performing peer rural hospitals develop multi-year IT strategic plans that define how resources should be invested to develop integrated IT solutions that drive work flow efficiency and ensure seamless transfer of information across the care continuum<br>  • Reported that IT director currently reports to facilities manager and not the CEO<br>    • Best practice peer rural hospitals understand the strategic importance in IT and position IT directors report to the CEO<br>  • PCMC just hired a help desk staff member and clinical informatics to the IT department, in addition to the director, but reported that additional support is needed as PCMC embarks on a new EHR implementation | • Develop a multi-year strategic IT vision and plan that identifies how to leverages IT resources to create a high-quality culture of patient safety through system training and integration into clinical operations<br>• Consider having IT director report to CEO as an investment to be developed rather than an expense to be managed<br>• Consider recruitment of additional support for IT department |

Boa Vida v. PCHCA
BV009314 07/22/2020



# 340B Drug Pricing Program

DRAFT

| Findings and Analysis | Recommendations |
|---|---|

- The 340B program has proven highly beneficial to rural hospital peers with outpatient clinics
  - The 340B Drug Pricing Program allows rural hospitals to benefit from reduced drug costs and profit from contracted retail pharmacy program revenues
  - For rural hospitals, the 340B program is available to provider-based entity (PBE) clinics and PB-RHCs

| PCMC Clinic Visits | Est. PCMC Medicare and 3rd Party Payer % | PCMC 340B Eligible Visits | Avg. RX per Visit | Total 340B RXs | Avg. per Rx 340B Increase | 340B Incremental Benefit |
|---|---|---|---|---|---|---|
| 4.2K | 85% | 3.6K | 1.5 | 5.4K | $35.00 | $187K |

- Carrollton Primary Care is a designated PB-RHC, enabling PCMC to participate in the 340B retail drug pricing program
  - Reported that PCMC was participating in the 340B retail drug pricing program, but was disenrolled in 2018
    - Potential 340B program benefit analysis shown above is based on Stroudwater experience with the 340B program in rural hospitals (340B revenue forecasting is complex, so use the estimate below as a guideline)
      - PCMC has potential to generate between $350K and $450K in supplemental income from the 340B program for every 10K eligible Medicare and 3rd Party visit

**Recommendations**

- Target $200K in net revenue (based on $350K - $450K / every 10K visits) through participation in the 340B retail drug pricing program
  - Re-engage all area retail pharmacies to establish partnerships
  - Evaluate financial impact in conjunction with clinic expansion and provider recruitment decisions

Boa Vida v. PCHCA
BV009315 07/22/2020



# Cost Report Improvements

DRAFT

- **Findings and Recommendations**
  - A high-level review of the FY17 cost report was conducted to identify common errors in preparation, or opportunities to enhance revenue or decrease expenses

| Findings and Analysis | Recommendations |
|---|---|
| ED Professional Component<br>• PCMC's professional costs for physician staffing of the ED are classified 100% as "professional component"<br>  • If PCMC were to obtain CAH designation, PCMC would be reimbursed for Medicare's share of the stand-by costs when costs are appropriately classified as "provider component" | • PCMC should review physician contracts and polices/procedures to determine the percentage of time the physicians are not actively engaged in patient care, so that remaining time can be paid under potential CAH status on a cost basis |
| RHC Provider FTE Calculation<br>• Currently reporting 1.0 FTE MD in RHC, which reportedly is incorrect, indicating that non-patient time was not accounted for and carved out. Adjustment to FTE calculation would garnish a $54K increase in reimbursement.<br>  • Peer rural hospitals typically report .75 to .8 FTE for a physician and .65 to .8 FTE for a NP/PA on the cost report | • Recalculate provider FTE count by carving out vacation time, non-patient time and CME; consider doing a time study to accurately calculate patient vs. non-patient time per provider |

Boa Vida v. PCHCA
BV009316 07/22/2020

# Staffing Benchmark Analysis

DRAFT

STROUDWATER

**Pickens County Medical Center**
**Sample of Selected Departments**

| Department | Performance Indicator | FY 2018 Volume | Hourly Standard[1] | FTEs @ Standard | Actual FTEs[2] | Variance |
|---|---|---|---|---|---|---|
| Nursing - Med Surg | Per Patient Day | 2,536 | 12.00 | 14.63 | 16.71 | 2.08 |
| Inpatient Subtotal | | | | 14.63 | 16.71 | 2.08 |
| Nursing - Surgery - Major | Per Case | 44 | 11.00 | 0.23 | 1.23 | 1.00 |
| Nursing - Surgery - Minor | Per Case | 87 | 5.50 | 0.23 | - | (0.23) |
| Nursing - Endoscopy/GI Lab | Per Case | 236 | 3.60 | 0.41 | - | (0.41) |
| Nursing - Other OP Proc | Per Case | 104 | 1.60 | 0.08 | - | (0.08) |
| Nursing - Recovery Room | Per Case | 131 | 3.30 | 0.21 | - | (0.21) |
| Surgery Subtotal | | | | 1.16 | 1.23 | 0.07 |
| Emergency Room | Per Visit | 9,305 | 2.75 | 12.30 | 13.98 | 1.68 |
| UR/Case Mgr/Soc Ser | Patient Days | 2,536 | 0.75 | 0.91 | 0.01 | (0.90) |
| Nursing Administration | Per Adj. Admissions | 3,690 | 1.75 | 3.10 | 1.84 | (1.26) |
| Subtotal Nursing | | | | 32.11 | 33.77 | 1.66 |
| Radiology | Per Procedure | 15,068 | 1.43 | 10.37 | 8.54 | (1.83) |
| Lab/Blood Bank | Per Test | 75,880 | 0.25 | 9.12 | 9.42 | 0.30 |
| Cardio/Pulmonary | Per Procedure | 6,979 | 1.31 | 4.40 | 8.00 | 3.60 |
| Subtotal Ancillary | | | | 23.88 | 25.96 | 2.08 |
| Subtotal - Clinical | | | | 55.99 | 59.73 | 3.74 |
| Hospital Administration | Per Adj. Admissions | 3,690 | 1.65 | 2.93 | | (2.93) |
| Information Systems / Telecom | Per Adj. Admissions | 3,690 | 1.36 | 2.41 | 1.93 | (0.48) |
| Human Resources | Per Adj. Admissions | 3,690 | 1.10 | 1.95 | 2.31 | 0.36 |
| Marketing/Public Rel/Volunteers | Per Adj. Admissions | 3,690 | 1.03 | 1.83 | - | (1.83) |
| General Accounting | Per Adj. Admissions | 3,690 | 1.23 | 2.18 | 1.00 | (1.18) |
| Security | Gross Square Feet | 110,000 | 0.02 | 1.06 | 0.91 | (0.15) |
| Patient Accounting | Per Adj. Admissions | 3,690 | 3.00 | 5.32 | 13.00 | 7.68 |
| Admitting/Patient Registration | Per Adj. Admissions | 3,690 | 3.79 | 6.71 | - | (6.71) |
| Medical Records | Per Adj. Admissions | 3,690 | 3.00 | 5.32 | 1.55 | (3.77) |
| Cent Supply/Mtl Mgmt/Sterile | Per Adjusted Day | 10,479 | 0.20 | 1.01 | 2.00 | 0.99 |
| Housekeeping | Net Square Feet | 78,571 | 0.31 | 11.71 | 7.87 | (3.84) |
| Dietary | Meals Served | 11,623 | 0.25 | 1.40 | 8.07 | 6.67 |
| Plant Ops/Maintenance | Gross Square Feet | 110,000 | 0.08 | 4.23 | 4.81 | 0.58 |
| Laundry and Linen | Lbs of Laundry | 902 | 0.02 | 0.01 | 2.03 | 2.02 |
| Subtotal Support | | | | 48.07 | 45.48 | (2.59) |
| | | | | 104.06 | 105.21 | 1.15 |

[1] Hourly Standards based on Stroudwater sample of hospitals

[2] FY 2018 internal information provided by hospital administration

## Findings and Analysis

- Departmental Staffing Analysis comparing PCMC paid FTEs for selected departments with peer benchmarks
    - Efficiency standards based on Stroudwater's field experience with over 350 rural hospitals
    - Generally only 20% of top performing rural hospitals achieve the standards. Lower volume hospitals often cannot achieve the standards due to minimum staffing requirements.
    - *Note: Use caution when evaluating individual departmental performance relative to staffing productivity standards, as standards do not generally take into account stand-by capacity or specific nuances of each hospital's operations such as low volume thresholds*
- Overall staffing levels indicates that PCMC is operating an efficient levels across *most* departments/units based on volume guidelines

## Recommendations

- Use volume-based staffing benchmarks to evaluate departmental staffing levels for possible inefficiencies
    - Continue to monitor departments/units recognizing that staffing maybe already be at a minimum threshold

Boa Vida v. PCHCA
BV009317 07/22/2020

# Human Resources

DRAFT

| Findings and Analysis | Recommendations |
| --- | --- |
| Employee Wages<br>• Reported that across-the-board pay raises have not occurred in the last four years due to strained financial performance of the organization<br>• PCMC's Wage Scale Index has been built over time, mirrored after DCH Regional Medical Center wages/job classifications, but reported that PCMC has not participated in the Alabama Hospital Association (ALHA) Wage Survey since 2009<br>  • Best practice peer rural hospitals evaluate pay scales to ensure the wages set are competitive within the market and to attract high quality staff | • PCMC must re-engage with the ALHA wage survey and commit to the process of increasing wages to keep pace with the market wages, as financial resources permit |
| Employee Benefits<br>• Reported that PCMC employees have access to a 457B self-funded retirement plan, for which PCMC historically had matched the first 3% funded by the employee, but this has not occurred since 2010<br>  • Best practice peer rural hospitals offer retirement plans with a match incentive | • Consider re-instituting the employee retirement plan match incentive to support employee recruitment and retention, as financial resources permit |

Boa Vida v. PCHCA
BV009318 07/22/2020

# Revenue Cycle

DRAFT

STROUDWATER

- **Findings and Recommendations**
  - Performance Measures/Management

Pickens County Medical Center
Contractual Allowances, Bad Debt and Charity Care as a % of Gross Revenue
70%
60%
50%
40%
30%
20%
10%
0%
55.9%
56.8%
59.3%
54.0%
8.0%
5.3%
6.4%
10.4%
0.1%
0.7%
0.8%
0.4%
FY 15
FY 16
FY 17
FY 18
Contractual Allowances
Bad Debt
Charity Care

- **Contractual Allowances** as a percentage of gross revenue decreased from 56% in FY 2015 to 54% in FY 2018, remaining relatively stable over the measured period
- **Bad Debt and Charity Care** as a percentage of gross revenue increased from 8.1% in FY 2015 to 10.8% in FY 2018 due to PCMC replacing a poor performing early-out company who had neglected to provide PCMC with files for nearly two years, which partially resulted in an under-reporting of bad debt expense in FY 2016 and FY 2017
  - Bad debt and charity care combined levels are at best practice peer rural hospital target as a percentage of gross revenue of between 8%-10%

Project Financial Summary Service Area Opportunities Recommendations 56

Boa Vida v. PCHCA
BV009319 07/22/2020



# Revenue Cycle

DRAFT

- **Findings and Recommendations (continued)**
  - Performance Measures/Management (continued)

| Days in Net Accounts Receivable | | FY 15 | | FY 16 | | FY 17 | | FY 18 |
|---|---|---|---|---|---|---|---|---|
| Net Accounts Receivable* | $ | 1,956,663 | $ | 1,426,710 | $ | 1,397,025 | $ | 1,914,000 |
| Net Patient Revenue* | $ | 11,510,008 | $ | 11,692,026 | $ | 10,181,822 | $ | 11,668,000 |
| Hospital Rate | | **62.0** | | **44.5** | | **50.1** | | **59.9** |
| Benchmark | | | | | | | | |
| 75th percentile | | 66.7 | | 64.2 | | 64.2 | | 64.2 |
| Median | | 54.1 | | 49.2 | | 49.2 | | 49.2 |
| 25th percentile | | 45.1 | | 40.8 | | 40.8 | | 40.8 |

Benchmark for small, rural hospitals from 2010 Sourcebook (Thomson Reuters, based on 2009 data).

**Note: Net of contractual allowances and bad debt expense*

- **Days Net Revenue in Net A/R** has been between median and the 75th percentile benchmark of peer rural hospitals over the measured period due to limited oversight and measurement of revenue cycle performance
  - 60 Days Net Revenue in A/R is above best practice levels when compared to peer benchmark standard of 45 days for both gross and net
- At this time PCMC does not track any Key Performance Indicators (KPIs) to measure and manage revenue cycle performance
  - Best-performing peer rural hospitals establish, target, track, and manage many performance indicators, such as the following HFMA best-practice revenue-cycle metrics, in an effort to improve revenue cycle performance:
    - Cash collected and cash percentage of net revenue
    - Gross A/R and gross A/R days
    - Net A/R and net A/R days
    - In-house and discharged not-final-billed receivables
    - Third-party aging over 90 days
    - Cost to collect
    - Bad debt and charity as a percent of gross charges
    - Denials as a fraction of gross charges
    - Point of service collections as a fraction of goal

Boa Vida v. PCHCA
BV009320 07/22/2020

# Revenue Cycle

DRAFT

STROUDWATER

| Findings and Analysis | Recommendations |
|---|---|
| <u>Performance Measures/Management (continued)</u><br>• Reported that PCMC has a weekly revenue cycle/chargemaster meetings in which denied claims are discussed<br>• A revenue cycle KPI dashboard is not utilized to monitor and drive performance across all critical revenue cycle functions<br>    • Best practice peer rural hospitals conduct a minimum of bi-weekly revenue cycle meetings using KPIs to drive revenue cycle performance | • Develop set of KPIs to be measured regularly, setting targets for each, and develop strategies to specifically address improving KPIs to targeted levels in an effort to increase accountability and awareness to process improvement initiatives<br>    • See Appendix III for best practice KPI dashboard example<br>• Convene structured, routine weekly revenue cycle team meetings utilizing performance metrics and departmental goal-setting and the internal dashboard to drive meeting agenda |
| <u>Point of Service Collections</u><br>• Reported that PCMC does complete Point of Service (POS) collections for services within the hospital, but does not have established POS goals to hold staff accountable throughout the hospital<br>    • Best-practice peer rural hospitals set POS goals for the ED, main registration, and other outpatient departments in an effort to collect co-payments and co-insurance at the time of service | • Prioritize improvement of POS cash collection amounts, with particular focus in all outpatient departments, and hold staff accountable through the creation of POS collection goals |

Boa Vida v. PCHCA
BV009321 07/22/2020

# Revenue Cycle

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| Patient Registration<br>• PCMC utilizes best-practice processes with regard to the pre-registration of patients for scheduled services throughout the hospital and collection of payment for scheduled services<br>• PCMC has not implemented a formal ED-redirect program, where low-level, non-emergent patients are redirected to the clinic, but PCMC does required a down payment if patient does not have insurance<br>  • Best practice rural hospitals often create ED-redirect programs where patients that present in the ED are provided a full medical screening examination in accordance with EMTALA criteria; patients deemed non-urgent must make a down payment prior to receiving further services or a redirected to amore appropriate OP clinic care setting, while patients deemed urgent are immediately cared for regardless of method of payment | • PCMC should evaluate ED-redirect strategy as a method for reducing both bad debt expense and unnecessary visits in the ED, by redirecting care to RHC<br>  • Consider reaching out to peer hospitals for the development of a policy |
| Third Party Contracts<br>• Reported that PCMC has not conducted a review of third party contracts or checked actual payments to contracted amounts of third party payers<br>  • Best practice peer rural hospitals will inventory/catalogue insurance contracts and proactively renegotiate where appropriate | • Inventory/catalogue insurance contracts and proactively negotiate with payers to ensure third party contracts meet the needs of PCMC<br>  • Evaluate actual paid amounts to third-party contract amounts |

Boa Vida v. PCHCA
BV009322 07/22/2020



# Revenue Cycle

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| <u>Charge Description Master (CDM)</u><br>• Reported that DCH is responsible for PCMC's CDM and there has not been an update in several years<br>  • Best practice peer rural hospitals will regularly audit the CDM to ensure CDM is up-to-date and reflects market reality | • Consider conducting an assessment of PCMC's chargemaster via an outside third party |
| <u>Health Information Management (HIM)</u><br>• Reported that PCMC only employs one FTE coder, with limited back-up support<br>  • Best practice peer rural hospitals ensure that necessary personnel is available to continue maintaining efficient revenue cycle processes | • PCMC must develop back-up plan to support current coder, consider PRN recruitment and/or additional training for revenue cycle staff |

Boa Vida v. PCHCA
BV009323 07/22/2020

# Management Accounting

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| <u>Budget Preparation</u><br>• Reported that PCMC had involved department managers in operational financial management through departmental budget preparation in FY 2017, but managers have not been involved in budget preparation in FY 2018/2019<br>  • Best practice peer rural hospitals will have department managers take the lead in developing departmental budgets<br><u>Financial Statements</u><br>• Reported that at this time department managers do not receive monthly financial statements that compare actual results with their budget and that department managers do not complete variance analysis, nor is there a formalized process that holds department managers accountable for volume growth and expense management<br>  • Best practice peer rural hospitals provide monthly department financial statements to managers and require variance analysis, holding department managers accountable for both volume growth and expense reduction | • Foster a measurement and accountability culture through the following initiatives:<br>  • Leadership must engage with staff around financial education and creating a culture of ownership, then PCMC must apply the following:<br>    • Must re-engage department managers to take the lead in creation of their budget<br>    • Develop organizational priority to provide monthly budget-to-actual reports to all department managers and mentor them to improve financial understanding and commitment to accountability<br>      • Require all department managers to prepare variance reporting for pre-determined variances from budget and pursue efficiencies with regard to variance analysis to improve the process<br>    • Establish performance monitoring dashboards for all managers |

Boa Vida v. PCHCA
BV009324 07/22/2020

# Provider Alignment

DRAFT

| Findings and Analysis | Recommendations |
|---|---|

- PCMC has made some initial critical investments in developing its primary care network of providers as evidenced by the establishment of its Carrollton Primary Care PBRHC
  - Whatley Health Services, a multi-site Federally Qualified Health Center (FQHC) leases space at PCMC and operates Whatley Health Services – Carrollton
    - Reported that Whatley providers refer patients to the ED for admission and also utilizes PCMH for ancillary services
  - Dr. Parker and his NP, independent providers located in Carrollton, as well as Pickens County Primary Care, an independent practice located in Reform, both demonstrate their support of PCMH through admitting privileges and ancillary referral trends
  - PCMC did not report any significant outreach efforts regarding any of the area providers
  - Best performing peer rural hospitals develop alignment strategies with local primary care providers as the future success of rural hospitals will be directly related to the strength of these relationships
    - In a budget- or population-based payment system, per capita patient revenue will be attributed to primary care providers, giving them tremendous potential value (estimate of a primary care clinic with one physician and one NP/PA):

| Specialty | Provider | Ambulatory Encounters | Average Annual Visit per Patient | Patient Estimate | Directed per Capita Cost | Health Based Value |
|---|---|---|---|---|---|---|
| Family Practice | Physician | 4,200 | 3 | 1,400 | 9,990 | $ 13,986,000 |
| Family Practice | NP / PA | 3,000 | 3 | 1,000 | 9,990 | $ 9,990,000 |
| | | | | 2,400 | | $ 23,976,000 |

Recommendations

- Establish regular outreach meetings with Whatley Health Services with goal of forging an enhanced partnership
  - Evaluate opportunities to jointly recruit in conjunction with Whatley
- Consider approaching independent providers about enhanced partnership opportunities which could entail employment

Boa Vida v. PCHCA
BV009325 07/22/2020



# Provider Alignment

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| • Further alignment with primary care providers will require developing interdependencies through contractual, functional, and governance relationships with current PCMC providers as follows:<br>• Functional Alignment (shared medical records, joint development of evidence-based protocols)<br>• Contractual Alignment (employment, contracted management services, lab services, radiology, contracted ED physicians)<br>• Governance Alignment (possible shared board positions, senior management team involvement) | • Pursue increased alignment with primary care providers in the service area through *functional*, *contractual* and *governance alignment strategies* given the future importance of primary care network development to developing payment systems |

Boa Vida v. PCHCA
BV009326 07/22/2020

# Service Area Rationalization

DRAFT

STROUDWATER

| Findings and Analysis | Recommendations |
|---|---|
| System Alignment<br>• PCMC is currently an independent organization, ending a management agreement with Tuscaloosa-based DCH Health System in 2014<br>• Reported that PCMC is now beginning to seek strategic partnership opportunities again due to the financial position of the organization<br>  • Reported that PCMC has good relationships with the University of Alabama at Birmingham (UAB) and the University of Alabama (UA), as well as Rush Health Systems in MS, which could provide the opportunity that PCMC needs to advance in the market<br>    • Best practice independent peer rural hospitals will evaluate partnership and affiliation opportunities based on the needs of the organization to solidify their position within the market<br>      • Stroudwater has developed the Affiliation Commitment Curve (Appendix II) as a tool to guide hospitals in maximizing their value, in conjunction with strategic partners, to better position themselves for changes in the healthcare environment | • Evaluate the impact of a long-term partnership to maximize PCMC's value based on the Affiliation Commitment Curve with a focus on the following areas:<br>  • Improve physician and clinical integration throughout the service area and region<br>  • Expand integrated and coordinated care management capabilities while establishing best practice, evidence-based medical protocols<br>  • Capital investments<br>  • Expense reductions through administrative integration and group purchasing<br>  • Technological integration and support |

Boa Vida v. PCHCA
BV009327 07/22/2020



# Service Area Rationalization

- Contribution margin analysis indicates that PCMC would generate a significant financial benefit to the Rush Health System resulting from increase in service area volume and associated IP and OP revenues flowing to Rush Foundation Hospital
  - PCMC contribution to system (after PCMC operating expenses) estimated at approximately $3.0M

**Pickens County Medical Center Affiliate Contribution Margin Analysis**

| 2017 Financial performance | Pickens County Medical Center |
|---|---|
| **PCMC Statement of Operations (Source: FY 2018 Interim Financial Statements - 11 months annualized)** | |
| Total Operating Revenue | $ 14,215,000 |
| Total Operating Expense | 15,048,000 |
| **Operating Income (Loss)** | **(833,000)** |
| Depreciation Expense | 889,000 |
| Non Operating Income | - |
| Net Income Less Depreciation Expense | **$ 56,000** |
| **Transfer Benefits** | |
| Total 2017 Est. Discharges for PCMC Service Area (Source: Truven Health) | 2,119 |
| Current RFH Medicare Market Share (Source: 2017 CMS Data) | 0.10% |
| Estimated RFH from PCMC Service Area | 2 |
| Estimated RFH Net Revenue Per Discharge (Source: AHD.com; 2017 Data) | $ 7,529 |
| Estimated RFH Net Inpatient Revenue from PCMC Service Area | $ 15,954 |
| RFH OP Rev relative to IP Revenue (2017 Cost Report WS G-2) | 135% |
| Estimated Net OP Rev From PCMC Service Area | $ 21,576 |
| Total Net Transfer / Referral Dollars to RFH from PCMC service area | $ 37,530 |
| Estimated Contribution Margin % (Source: Estimated) | 80% |
| Estimated Contribution Margin on Net Revenue from PCMC Service Area | $ 30,024 |
| Contribution Margin Per 1% of Inpatient Market Share | $ 300,242 |
| Estimated Change in Market Share % with Competitive Entry into PCMC Service Area | **10%** |
| **CM from Loss of existing or potential gain of PCMC SA Market Share** | **$ 3,002,417** |
| **Total Benefit / (Cost) to RFH for PCMC service area** | **$ 3,058,417** |

Boa Vida v. PCHCA
BV009328 07/22/2020

# Population Health Management

DRAFT

STROUDWATER

| Findings and Analysis | Recommendations |
|---|---|
| **PCMH Development**<br><br>• PCMC has not actively pursued Patient Centered Medical Home (PCMH) recognition of Carrollton Primary Care Clinic through NCQA or other certification bodies<br>  • The PCMH framework promotes quality, greater utilization of existing EHR technology, and care coordination, and is an important step rural hospitals with aligned primary care networks can take to unlock their value<br>  • PCMH recognition allows hospitals to be reimbursed at potentially higher levels for standard primary care through participation in per member per month (PMPM) or other payment incentives that some third-party payers have organized for PCMHs, or to negotiate such payment | • Evaluate the Patient Centered Medical Home (PCMH) certification through NCQA or a PCMH-like structure as a key strategy for future population health positioning<br>  • Negotiate with all third-party payers to recognize PCMH status and to be reimbursed for per member per month case management fees after obtaining PCMH recognition |
| **Claims/Analytic Capabilities**<br><br>• Reported that PCMC receives consolidated employee health claims data, which are broad and have not been analyzed for improvement opportunities<br>  • Best practice peer rural hospitals conduct analysis on employee claims to better understand where opportunities may exist to improve the health of the workforce, as well as gain efficiencies in plan design | • Utilize available claims data from employee health plan to better understand opportunities for improved health of workforce and better efficiencies in plan design |

Boa Vida v. PCHCA
BV009329 07/22/2020

# Payment System Transformation



DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| • PCMC purchases health insurance through BC/BS and offers two high-deductible health plans with $2K and $4K deductible options<br>    • Reported that PCMC has built in penalties for unhealthy behaviors (smoking) and discounts if employees use PCMC for healthcare services<br>        • Increasingly, rural hospitals adopt self-insured plans and redesign these plans with appropriate incentives/disincentives for a healthier workforce; incentives include high deductible plans with employer sponsored HSA, higher premiums for poor health choices (e.g., smoking), and establishing targets for improved health (See Appendix IV for top 5 Benefits of Population Health Management Model) | • Partner with BC/BS to incorporate and support population health interventions, such as disease management programs to manage overall benefits costs, into the employee health plan and learn how to provide high-quality, low-cost health care to sell to external markets<br>• Consider exploration of self-insured option |
| • PCMC does not currently participate in an Accountable Care Organization (ACO) or other alternative payment system<br>    • Best performing peer rural hospitals evaluate and actively participate in alternate payment models, including ACOs, when it is demonstrated to be advantageous | • PCMC should proactively develop a strategy to participate in a population health payment mechanisms, and consider an ACO model or alternative payment system option that meets the needs of PCMC |

Boa Vida v. PCHCA
BV009330   07/22/2020



# Payment System Transformation

DRAFT

| Findings and Analysis | Recommendations |
|---|---|
| • Reported that PCMC providers are not currently conducting and billing for care management codes within the RHC<br>• Beginning in 2016 and updated January 1, 2018 CMS has established CPT codes for services that are intended to keep beneficiaries healthy and care coordinated, this includes chronic care management (CCM), transitional care management (TCM), general behavioral health integration (BHI) and psychiatric collaborative care model (CoCM)<br>• Best performing practices operated by rural hospitals consistently offer TCM, CCM, BHI and CoCM services to all eligible patients and establish appropriate systems for coding and billing | • Investigate opportunity to implement systems for billing and coding to capture additional care management services, and then widely promote the chronic care management program<br>• Refer to: Care Management in RHCs for information on program requirement and billing/payment for care management services within the RHCs<br>• Explore strategies to improve patient compliance through the use of health coaches and health navigator roles |

Boa Vida v. PCHCA
BV009331 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Financial Statements** | • PCMC must ensure its long-term financial viability by continuing the following activities:<br>  • Focus on short-term cash infusion through accelerating amounts owed to PCMC from various parties (HHA acquirer, Medicaid DSH, etc.)<br>  • Implement low-cost revenue growth opportunities to accelerate current cash flow<br>  • Pursue careful expense management, increased revenue for services provided, expansion into specialty services needed in the community, and volume growth<br>  • Pursuit of a long-term partner through either an affiliation or acquisition of PCMC<br>• Use the strategies discussed in this report to target a positive operating margin and improved organizational liquidity<br>  • These goals will be achieved through volume and revenue growth driven by acute volume increases, increases in related ancillary services, cost report improvements, re-establishment of the 340B program, and overall business growth through increased primary care alignment |
| **Market Service Area** | • Target growth efforts to increase captured inpatient market share in PCMC's home ZIP code to 40%<br>  • Consider market segment potential demand when evaluating locations to focus primary care outreach strategy efforts<br>  • Focus service development and marketing efforts on all growing age cohorts with particular attention to the 65+ age cohort<br>  • Improve the efficiency of services available with a focus on ambulatory care and primary care |

Boa Vida v. PCHCA
BV009332 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Future of Rural Healthcare** | • Use this report as the foundational framework for development of an 18-month strategic plan focused on the following initiatives:<br>• Increasing alignment and leverage of PCMC's primary care network<br>• Promoting high quality and patient safety scores to community<br>• Increasing hospital efficiency and financial viability to position for population-based payment methodologies<br>• Proactively transforming payment models beginning with self-insured health plan<br>• Developing care management strategies in anticipation of payment system shifts |

Boa Vida v. PCHCA
BV009333 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Provider Complement** | • Partner with existing medical staff to identify medical and surgical specialty-care needs and service development opportunities<br>• Establish a multi-year provider development/recruitment plan<br>  • Use this analysis to support future evaluation and testing of medical staff complement, as well as primary care and specialty clinic development<br>• Continue the strategic growth of the clinic network in an effort to broaden access and capture market share, as well as position for future population-based payment models<br>• Evaluate specialty care recruitment and partnership opportunities as supported by the supply study, in order to meet the needs of PCMC's service area population<br>• Utilize MGMA, or other industry benchmark data, to establish targets and monitor individual provider productivity<br>• Accelerate short-term recruitment efforts to ensure a smooth transition related to Dr. Robbins departure<br>• Partner with UA to develop a Rural Residency Program, which will serve as the foundation of a future primary care recruitment pipeline<br>• Modify compensation models to ensure proper alignment and accountability across *all* employed providers<br>  • Consider setting production incentive at attainable levels, such as 25th to 35th percentile, especially for new providers who are establishing practice followings<br>  • Evaluate incorporation of incentive compensation components such as quality/value-based targets, patient satisfaction, and panel size to compensation plan<br>• Consider developing a business plan that examines the feasibility of establishing of a Gordo-based practice<br>• Provider recruitment efforts could be conducted in conjunction with other area providers (see Provider Alignment section) |

Boa Vida v. PCHCA
BV009334 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Inpatient Services** | • Target an acute average daily census of **6** through the following activities:<br>  • Utilize daily ED log review, follow-up on a regular basis with patient referral sources<br>  • Conduct service marketing meetings with referral providers/centers<br>  • Increase of acute census to **6** yields a potential **$390K** contribution margin improvement<br>• Elevate the swing bed program as a strategic priority by targeting ADC of **3**<br>  • Empower case manager and nursing manager to establish a focused swing bed marketing plan, targeting area providers and case managers of neighboring hospitals<br>  • Investigate the use of available patient tracking systems to identify prospective swing bed candidates<br>  • Message to nurses and providers the importance of growing IP services to meet current staffing levels<br>  • Increase of swing bed census to **3** yields a potential **$235K** contribution margin improvement |
| **Inpatient Services: IPF** | • Strongly consider immediate strategies to increase volume, decrease expenses or close the IPF unit given the limited demand for service and high cost of operations |

Boa Vida v. PCHCA
BV009335 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
| --- | --- |
| **Emergency Department** | • PCMC must develop urgent care services to meet the demand and better manage non-emergent patient needs<br>  • Consider opening a fast track / urgent care space, adjacent to the ED<br>• Target appropriate ED admission rates (Acute and Observation) to industry best practice of greater than 10% of total visits through the following:<br>  • Educating providers on admission criteria to ensure that eligible inpatients are appropriately admitted to correct status<br>  • Continue to review and monitor ED admissions and transfers for medical appropriateness<br>• Evaluate current staffing levels for opportunities to achieve greater efficiency, i.e., shared staffing with med/surg<br>• Develop strategies to better manage demand for non-emergent care to include the following:<br>  • Explore development of an ED redirect program in partnership with providers<br>  • Educate public on the appropriate use of the ED to reduce the number of non-emergent visits<br>  • Enroll patients with a primary care provider at PCMC's RHC<br>• PCMC leadership must partner with new Medical Director and ED providers and staff to improve perception and care experience |
| **Surgery** | • Elevate surgical services program as a strategic priority<br>  • Accelerate recruitment efforts a full-time general surgeon<br>  • Collaborate with Dr. Lavender on shifting his block time to accommodate Dr. Hipp's interest in performing surgery on Fridays<br>  • Partner with Drs. Claytor and McDonald on performing surgery at PCMH<br>    • Conduct return on investment analysis equipment purchase for orthopedic, GYN and eye surgery<br>  • Approach Dr. Johnson about possibility of performing surgery<br>• Partner with Dr. Graham to explore the establishment of a pain management clinic<br>• Conduct ROI analysis and demand forecasts to evaluate feasibility and pursue if favorable |

Boa Vida v. PCHCA
BV009336 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Imaging Services** | • Conduct ROI analyses to determine feasibility of upgrading the MRI to a 12-channel scanner and replacing the CT machine prior to December 2019<br>    • Goal should be to upgrade CT to 32-slice<br>• Implement a process in which referrals are tracked by provider to allow for strategic decision making and to investigate referral volume trends |
| **Rehabilitation Services** | • Re-evaluate the contract billing arrangements with Encore to ensure that PCMC is generating the optimal financial reimbursement<br>    • Resolve internal process issues if determined to be more advantageous for PCMC to manage billing<br>• Continue to promote rehabilitation services to area providers with the goal of driving growth and services expansion<br>• Partner with nursing/case manager to aggressively promote and grow the swing bed program |
| **Laboratory** | • Target additional outpatient growth through the following:<br>    • Evaluate fee schedule to ensure that it outpatient test prices are market competitive<br>    • Actively promote lab services to area providers on a frequent basis<br>    • Explore other market opportunities to further grow services to include occupational medicine for area employers<br>• Investigate the feasibility of offering an occupational medicine program by conducting market and ROI analyses<br>    • Partner with primary care, rehabilitation and cardiopulmonary departments to establish program service components<br>    • Evaluate lab's ability to scale given current staffing complement |

Boa Vida v. PCHCA
BV009337 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
| --- | --- |
| **Cardiopulmonary** | • Partner with marketing liaison to re-educate providers on available services through frequent outreach with the dual goals of providing strong customer service and capturing business<br>  • Focus initial efforts on reducing outmigration driven by cardiologists<br>• Focus on growing the cardiac rehabilitation program which can also drive utilization of other ancillary services (e.g., U/S, EKGs, Stress Tests)<br>  • Actively promote service to local area providers<br>  • Emphasize new capability to perform ABIs<br>  • Investigate potential solutions related to patient transportation and difficulty paying co-pays |
| **Quality Improvement** | • PCMC leadership must reference the comprehensive Quality Improvement Assessment report for a more detailed treatment of the hospital's clinical program, reporting infrastructure and improvement processes |
| **Information Technology** | • Develop a multi-year strategic IT vision and plan that identifies how to leverages IT resources to create a high-quality culture of patient safety through system training and integration into clinical operations<br>• Consider having IT director report to CEO as an investment to be developed rather than an expense to be managed<br>• Consider recruitment of additional support for IT department |

Boa Vida v. PCHCA
BV009338 07/22/2020

# Recommendations Summary

DRAFT

STROUDWATER

| Area | Recommendations |
|---|---|
| **340B Drug Pricing Program** | • Target $200K in net revenue (based on $350K - $450K / every 10K visits) through participation in the 340B retail drug pricing program<br>  • Re-engage all area retail pharmacies to establish partnerships<br>  • Evaluate financial impact in conjunction with clinic expansion and provider recruitment decisions |
| **Cost Report Improvements** | • PCMC should review physician contracts and polices/procedures to determine the percentage of time the physicians are not actively engaged in patient care, so that remaining time can be paid under potential CAH status on a cost basis<br>• Recalculate provider FTE count by carving out vacation time, non-patient time and CME; consider doing a time study to accurately calculate patient vs. non-patient time per provider |

Boa Vida v. PCHCA
BV009339 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Staffing Benchmark Analysis** | • Use volume-based staffing benchmarks to evaluate departmental staffing levels for possible inefficiencies<br>  • Continue to monitor departments/units recognizing that staffing maybe already be at a minimum threshold |
| **Human Resources** | • PCMC must re-engage with the ALHA wage survey and commit to the process of increasing wages to keep pace with the market wages, as financial resources permit<br>• Consider re-instituting the employee retirement plan match incentive to support employee recruitment and retention, as financial resources permit |

Boa Vida v. PCHCA
BV009340 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Revenue Cycle** | • Develop set of KPIs to be measured regularly, setting targets for each, and develop strategies to specifically address improving KPIs to targeted levels in an effort to increase accountability and awareness to process improvement initiatives<br>  • See Appendix III for best practice KPI dashboard example<br>• Convene structured, routine weekly revenue cycle team meetings utilizing performance metrics and departmental goal-setting and the internal dashboard to drive meeting agenda<br>• Prioritize improvement of POS cash collection amounts, with particular focus in all outpatient departments, and hold staff accountable through the creation of POS collection goals<br>• PCMC should evaluate ED-redirect strategy as a method for reducing both bad debt expense and unnecessary visits in the ED, by redirecting care to RHC<br>  • Consider reaching out to peer hospitals for the development of a policy<br>• Inventory/catalogue insurance contracts and proactively negotiate with payers to ensure third party contracts meet the needs of PCMC<br>  • Evaluate actual paid amounts to third-party contract amounts<br>• Consider conducting an assessment of PCMC's chargemaster via an outside third party<br>• PCMC must develop back-up plan to support current coder, consider PRN recruitment and/or additional training for revenue cycle staff |

Boa Vida v. PCHCA
BV009341 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Management Accounting** | • Foster a measurement and accountability culture through the following initiatives:<br>• Leadership must engage with staff around financial education and creating a culture of ownership, then PCMC must apply the following:<br>• Must re-engage department managers to take the lead in creation of their budget<br>• Develop organizational priority to provide monthly budget-to-actual reports to all department managers and mentor them to improve financial understanding and commitment to accountability<br>• Require all department managers to prepare variance reporting for pre-determined variances from budget and pursue efficiencies with regard to variance analysis to improve the process<br>• Establish performance monitoring dashboards for all managers |
| **Provider Alignment** | • Establish regular outreach meetings with Whatley Health Services with goal of forging an enhanced partnership<br>• Evaluate opportunities to jointly recruit in conjunction with Whatley<br>• Consider approaching independent providers about enhanced partnership opportunities which could entail employment<br>• Pursue increased alignment with primary care providers in the service area through functional, contractual and governance alignment strategies given the future importance of primary care network development to developing payment systems |

Boa Vida v. PCHCA
BV009342 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Service Area Rationalization** | • Evaluate the impact of a long-term partnership to maximize PCMC's value based on the Affiliation Commitment Curve with a focus on the following areas:<br>• Improve physician and clinical integration throughout the service area and region<br>• Expand integrated and coordinated care management capabilities while establishing best practice, evidence-based medical protocols<br>• Capital investments<br>• Expense reductions through administrative integration and group purchasing<br>• Technological integration and support |

Boa Vida v. PCHCA
BV009343 07/22/2020

# Recommendations Summary

DRAFT

| Area | Recommendations |
|---|---|
| **Payment System Transformation** | • Partner with BC/BS to incorporate and support population health interventions, such as disease management programs to manage overall benefits costs, into the employee health plan and learn how to provide high-quality, low-cost health care to sell to external markets<br>• Consider exploration of self-insured option<br>• PCMC should proactively develop a strategy to participate in a population health payment mechanisms, and consider an ACO model or alternative payment system option that meets the needs of PCMC<br>• Investigate opportunity to implement systems for billing and coding to capture additional care management services, and then widely promote the chronic care management program<br>    • Refer to: Care Management in RHCs for information on program requirement and billing/payment for care management services within the RHCs<br>    • Explore strategies to improve patient compliance through the use of health coaches and health navigator roles |
| **Population Health Management** | • Evaluate the Patient Centered Medical Home (PCMH) certification through NCQA or a PCMH-like structure as a key strategy for future population health positioning<br>    • Negotiate with all third-party payers to recognize PCMH status and to be reimbursed for per member per month case management fees after obtaining PCMH recognition<br>• Utilize available claims data from employee health plan to better understand opportunities for improved health of workforce and better efficiencies in plan design |

Boa Vida v. PCHCA
BV009344 07/22/2020

# Appendix I: Provider Supply Study Benchmarks

DRAFT

| Provider Supply (FTEs) for Service Area of | | | 14,957 |
|---|---|---|---|
| | | Supply Indicators | |
| **Primary Care** | Kaiser | Group Health | Health Partners |
| Family Practice | 2.0 | 7.0 | 3.3 |
| Internal Medicine | 4.2 | 1.7 | 4.1 |
| Pediatrics | 1.8 | 1.2 | 1.5 |
| **Subtotal** | 8.0 | 10.0 | 8.9 |
| | | | |
| Non-Phys Providers | 2.0 | 3.4 | 1.0 |
| **Primary Care Total** | 10.0 | 13.4 | 9.9 |
| **Medical Specialties** | | | |
| Allergy | 0.2 | 0.2 | 0.1 |
| Cardiology | 0.5 | 0.5 | 0.5 |
| Dermatology | 0.4 | 0.3 | 0.3 |
| Endocrinology | 0.2 | 0.0 | 0.1 |
| Gastroenterology | 0.3 | 0.4 | 0.3 |
| Hem/Oncology | 0.3 | 0.3 | 0.3 |
| Infectious Disease | 0.1 | 0.1 | 0.1 |
| Nephrology | 0.2 | 0.2 | 0.3 |
| Neurology | 0.3 | 0.3 | 0.4 |
| Pulmonary | 0.1 | 0.3 | 0.3 |
| Rheumatology | 0.1 | 0.2 | 0.2 |
| **Surgical Specialties** | | | |
| ENT | 0.4 | 0.5 | 0.1 |
| General | 0.9 | 1.0 | 1.1 |
| Neurosurgery | 0.1 | 0.2 | |
| OB/GYN | 1.6 | 1.1 | 1.3 |
| Ophthalmology | 0.6 | 0.6 | 0.6 |
| Orthopedic | 0.6 | 1.0 | |
| Plastic Surgery | 0.2 | | 0.3 |
| Urology | 0.4 | 0.5 | |

- Physician Need Calculations
  - Physician-to-population ratio data represents physician to 100,000 population rates from three large prepaid group practices that serve over eight million consumers
    - Source: Weiner JP, Prepaid Group Practice Staffing and U.S. Physician Supply: Lessons for Workforce Policy, Health Affairs, 4 February 2004.
    - Calculated need values for Family Practice developed by averaging Weiner data (above) and a state-specific ratio of family/general practice physicians to population
      - Source: Flowers et al. State Profiles: Reforming the Health Care System. AARP Public Policy Institute. 12th Edition. 2003
    - Area physician FTEs calculated as 18 days per month = 1.0 FTE
- Physician Shortage/Surplus Caveats
  - Determination of physician shortage/surplus is much more complex than comparisons to national ratios
  - Factors such as local access to care (e.g., delay for non-urgent appointments), community perceptions, current physician perceptions, projected service area change, etc., should be considered

# Appendix II: Affiliation Commitment Curve

DRAFT

STROUDWATER

- Affiliation benefits are arranged along a diverse continuum and mutual commitment from both partners is required to yield maximum benefit from an affiliation

Clinical Integration
Physician Integration
Affiliate
Technology Integration
Management Support
Service Coordination
Capital Investment
Purchased Services
Image
Gap
Commitment
Gap
Franchise
Support Services
Focused Service Linkage
Distributed Overhead
Regional Investment
Financial & Clinical Transparency
Broad Physician Deployment
Partner
Integrated System Capacity

Boa Vida v. PCHCA
BV009346 07/22/2020

83

# Appendix III: Revenue Cycle Key Performance Indicators (KPIs)

| KPI | Responsible | Benchmark | How Do We Rank? June | July | August | Sept. | October | November | December | Purpose of Data |
|---|---|---|---|---|---|---|---|---|---|---|
| A/R > 90 Days | Trudy / Patti / BO | 20% | 37% | 42% | 37% | 41% | 33% | 34% | 36% | Monitor account follow-up processes and practices for extreme efficiencies |
| Gross Cash Collections to Total Revenue | Patti Sullivan | 64% | 42% | 52% | 49% | 49% | 50% | 46% | 49% | Total revenue being collected |
| Bill Hold Days | Patti Sullivan | 3 days | 4 days | 4 days | 4 days | 4 days | 4 | 4 | 4 | Time frame that bills are held in order to collect accurate data imput, medical record coding and charges |
| Percentage of Unbilled Receivable | Patti Sullivan | <10% | 13% | 10% | 12% | 13% | 12% | 12% | 12% | Strictly monitor in-house, recurring and missing diagnosis accounts. |
| Average Daily Revenue in held Medical Records | Rheadawn Street | 5 days | 3.5 days | 3.14 days | 3 days | 2 days | 2 days | 2 days | 3 | Total days in revenue that are held for coding delays. |
| Registration Error Rate | Stephanie / Patti | 2% | 5% | 3% | 4% | 3% | 3% | 3% | 5% | Registration error rate as a percentage of total registrations. |
| Percentage of Bad Debt to Gross Revenue | Ann Brown | 2.5% | 5% | 1% | 1.66% | 1.8 | 0 | 1.00% | 1% | Monitor uncollectible accounts to ensure they have been appropriately handled. |
| Charity Percentage to Gross Revenue | Ann Brown | 2.5% | 3% | 3% | 0.03% | 2 | 3% | 1.00% | 1% | Monitor charity write-off and ensure financial counseling is accomplished. |
| Days in A/R | Crystal Bruner | 60 | 68.75 | 68 | 64 | 59.23 | 52 | 58.13 | | Average days to collect the receivable. |
| Percentage Clean Claims from Bill Editor | Patti Sullivan | 95% | 99% | 99% | 99% | 99% | 99% | 99% | 99% | Number of errors on accounts due to data input, charging and coding |
| Return on Worker's Compensation, Third Party Liability and Auto Insurance Accounts | Patti Sullivan | 85% | 85% | 85% | 85% | 85% | 85% | 85% | | Effectiveness of difficult third party liability claims collection. |
| Up-front Deductible and Co-payment Collections | Stephanie Smithson | 50% | Unable to track | Unable to track | unable to track | unable to track | unable to track | unable to track | No way to track yet | Improvements to cashflow, acknowledging the financial obligation with the patient at the time of service. |
| Average Daily Revenue in Credit Balances | Patti Sullivan | <1 day | 4.54 | 4.82 | 5.24 | 4.49 days | 4.65 | 4.96 | 5.55% | Credit Balances negatively effect the total A/R. |
| Claim Denial Rate | Patti Sullivan | 4% | Unable to track | Unable to track | unable to track | unable to track | 1% | unable to track | 2% | Total denied claims as a percentage of total claims |
| Percentage of Scheduled Services that are Pre-Registered | Stephanie Smithson | 95% | 92% ancillary 78% OR 65% Angio | Overall avg 88% | 88% overall | 93% overall | 90% | 94% | 94% | Improving patient information data gathering including demographics, medical necessity and insurance eligibility. |
| Percentage of Self-pay Patients that Receive Financial Counseling | Stephanie / Ann | 95% | Unable to track | Unable to track | unable to track | unable to track | unable to track | unable to track | No way to track yet | Providing patients with payment options and/or charity consideration. |
| Hospital-wide Education Regarding Charity Policy and Payment Options for Patients | Ann Brown | 100% | | | | Brochure in process | | | | Ensuring that Hospital Payment and Charity Care Policies are well understood by all hospital staff. |

# Appendix IV: Population Health Management Model

DRAFT

The table below outlines benefits of a population health management model:

| Top 5 Benefits of a Population Health Management Model |
|---|
| **1. Average Year 1 insured group savings of 12.6%** (source: RAND corporation) |
| **2. Employee case management programs** (source: MD Anderson)<br>• 80% improvement lost work days over 6 years<br>• 64% decline modified-duty days<br>• 50% reduction in workers' comp insurance premiums |
| **3. High-risk patient management** (source: Harvard Business Review)<br>• 57% converted to low-risk over 6 months<br>• $1,421/participant claims reduction over 1 year<br>• $6 savings per $1 invested over 1 year |
| **4. Wellness programs** (source: Johnson & Johnson)<br>• 67% reduction smoking<br>• 50% reduction hypertension<br>• 50% increase in physical activity<br>• $2.70 savings per $1 invested (5 years) |
| **5. Voluntary employee turnover reduction**<br>• 9% vs. 15% (source: Towers Perrin study)<br>• 9% vs. 19% (source: Biltmore study) |

Boa Vida v. PCHCA
BV009348 07/22/2020

**Pickens County Medical Center**
**Financial Trending Report**
**2015-2024**

| | FYE^ 9/30/15 | FYE^ 9/30/16 | FYE^ 9/30/17 | FYE^ 9/30/18 | FYE* 9/30/19 | FYE* 9/30/20 | FYE* 9/30/21 | FYE* 9/30/22 | FYE* 9/30/23 | FYE* 9/30/24 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Revenue (000s)** | | | | | | | | | | |
| **Gross Patient Revenue** | $ 31,971 | $ 31,519 | $ 30,349 | $ 33,095 | $ 35,743 | $ 38,781 | $ 42,271 | $ 46,287 | $ 50,915 | $ 58,553 |
| Contractual Allowances | (17,866) | (17,915) | (17,991) | (17,864) | (20,373) | (22,105) | (24,094) | (26,383) | (29,022) | (33,375) |
| Bad Debt | (2,566) | (1,679) | (1,946) | (3,430) | (1,787) | (1,939) | (2,114) | (2,314) | (2,546) | (2,928) |
| Charity Care | (29) | (233) | (230) | (133) | (156) | (188) | (177) | (164) | (171) | (175) |
| **Net Patient Revenue** | 11,510 | 11,692 | 10,182 | 11,668 | 13,426 | 14,549 | 15,886 | 17,425 | 19,177 | 22,075 |
| Other Operating Revenue | 723 | 476 | 388 | 768 | 589 | 592 | 584 | 592 | 589 | 589 |
| Sales Tax Revenue | 1,301 | 1,183 | 1,208 | 1,234 | 1,232 | 1,206 | 1,220 | 1,206 | 1,216 | 1,212 |
| Medicaid DSH | 740 | 426 | 614 | 589 | 592 | 590 | 596 | 590 | 592 | 592 |
| **Total Revenue** | 14,274 | 13,777 | 12,392 | 14,259 | 15,838 | 16,937 | 18,287 | 19,813 | 21,574 | 24,469 |
| **Operating Expenses (000s)** | | | | | | | | | | |
| Salaries & Wages | 6,322 | 6,688 | 7,154 | 6,692 | 6,713 | 7,274 | 7,943 | 8,713 | 9,588 | 11,038 |
| Benefits | 862 | 1,034 | 1,194 | 1,152 | 1,141 | 1,237 | 1,350 | 1,481 | 1,630 | 1,876 |
| Supplies & Other | 5,679 | 6,015 | 5,592 | 5,998 | 5,646 | 5,638 | 5,547 | 5,536 | 5,424 | 5,370 |
| Revenue Cycle Fee | 0 | 0 | 0 | 0 | 806 | 873 | 953 | 1,046 | 1,151 | 1,325 |
| Management Fee | 0 | 0 | 0 | 0 | 300 | 300 | 300 | 300 | 300 | 300 |
| Interest | 462 | 451 | 436 | 405 | 439 | 433 | 428 | 426 | 431 | 429 |
| Depreciation | 1,297 | 1,202 | 1,036 | 886 | 709 | 567 | 454 | 363 | 290 | 232 |
| **Total Operating Expense** | 14,622 | 15,390 | 15,412 | 15,133 | 15,753 | 16,322 | 16,975 | 17,865 | 18,815 | 20,571 |
| **Net Operating Margin (Loss)** | (348) | (1,613) | (3,020) | (874) | 85 | 615 | 1,311 | 1,949 | 2,759 | 3,898 |
| **Non-Operating Inc/(Exp)** | 48 | 41 | 146 | 0 | 50 | 50 | 50 | 50 | 50 | 50 |
| **EMR Incentive Revenue** | 95 | 596 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net Income (Loss)** | $ (205) | $ (976) | $ (2,874) | $ (874) | $ 135 | $ 665 | $ 1,361 | $ 1,999 | $ 2,809 | $ 3,948 |
| **Net Income (Loss) (w/o sales taxes)** | (1,506) | (2,159) | (4,082) | (2,108) | (1,096) | (541) | 141 | 793 | 1,593 | 2,736 |
| **Cash and Investments, End of Period** | $ 1,375 | $ 635 | $ 175 | $ 183 | $ 192 | $ 541 | $ 1,551 | $ 3,114 | $ 5,390 | $ 8,558 |
| **AP & Accrued Liabilities** | $ 1,936 | $ 1,866 | $ 3,659 | $ 4,026 | $ 3,825 | $ 3,623 | $ 3,422 | $ 3,221 | $ 3,020 | $ 2,818 |
| **Days Cash on Hamd** | 39 | 17 | 5 | 5 | 5 | 13 | 35 | 67 | 109 | 157 |
| **Average Payment Period** | 55 | 50 | 96 | 107 | 96 | 86 | 78 | 69 | 61 | 52 |
| **Days in Net Accounts Receivable** | 62 | 45 | 50 | 51 | 50 | 49 | 48 | 47 | 46 | 45 |
| **Net A/R** | 1,957 | 1,427 | 1,397 | 1,914 | 1,839 | 1,953 | 2,089 | 2,244 | 2,417 | 2,722 |
| **Operating Margin** | **-2.4%** | **-11.7%** | **-24.4%** | **-6.1%** | **0.5%** | **3.6%** | **7.2%** | **9.8%** | **12.8%** | **15.9%** |

**Footnotes:**
**^-Actual Financial Statement Data**
***-Projected Financial Statement Data**

**Assumptions:**
**1) 8% Incr in GPSR Year 1, Additional .5% Incr/Annum After Due to Higher Census, Detox Program, Surgical Cases, O/P and RHC volume increases**
**2) Contractual Allowances are 57% of Gross Revenue**
**3) Bad Debts are 5% of Gross Revenues**
**4) Salaries Are Set at 50% of Net Patient Revenues**
**5) Benefits are set at 17% of Gross Salaries**
**6) Mgmt Fee $300K, Rev Cycle 6% of Net Patent Revenue**
**7) Accounts Payable Reduction of 5% Per Annum**
**8) 10% Bonus Based on Net Income w/o Sales Tax**